No. 24-7049

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TRACEY EDWARDS
*Plaintiff-Appellant,*

*v.*

BENITA WITHERSPOON, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of North Carolina
Case No. 75:21-ct-03270-D (Hon. James C. Dever III, U.S. District Judge)

## APPELLANT'S OPENING BRIEF

D Dangaran
RIGHTS BEHIND BARS
1800 M St. NW
Fnt. 1 #33821
Washington, DC 20033
202-455-4399
d@rightsbehindbars.org

Shana Hope Khader
Jaclyn S. Tayabji
Hassan A. Zavareei
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Ave. NW, Ste. 1010
Washington, DC 20006
202-973-0900
skhader@tzlegal.com

Sarah Grady
David Howard Sinkman
Amelia Caramadre
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
312-852-2184
sinkman@kaplangrady.com

Joseph K. Longley
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW, 7th Floor
Washington, DC 20005
202-675-2338
jlongley1@aclu.org

*Additional counsel on following page*     March 7, 2025

Daniel K. Siegel
Amika Medha Singh
ACLU OF NORTH CAROLINA LEGAL
FOUNDATION
PO Box 28004
Raleigh, NC 27611
919-592-4630
dsiegel@acluofnc.org

*Counsel for Plaintiff-Appellant Tracey Edwards*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-7049       Caption: Tracey Edwards v. Benita Witherspoon et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Tracey Edwards
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO


2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   N/A, Appellant is an individual.


3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

   N/A, Appellant is an individual.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

There are no other entities that have direct financial interests in the outcome of this litigation.

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

N/A, Appellant is an individual.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

N/A, case does not arise out of a bankruptcy proceeding.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

N/A, this case is not a criminal case.

Signature: /s/Shana H. Khader Date: 11/19/2024

Counsel for: Appellant



Print to PDF for Filing

## CORPORATE DISCLOSURE STATEMENT

Pursuant to <u>Federal Rule of Appellate Procedure 26.1(a)</u>, Appellant Tracey

Edwards certifies that she is a natural person.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..............................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE ..................................................................3

    I.     Nature of the Case ...................................................................3

    II.    Factual Background ..................................................................5

          A.    North Carolina Enforces a Blanket Policy to Deny MOUD Despite Defendants' Awareness of the Risks of Denying MOUD ..........................................................................6

          B.    Defendants Abruptly Terminated Edwards's MOUD, Forcing Painful Withdrawal, and Never Provided MOUD Again ..........9

          C.    Defendants Shackled Edwards While in Labor and Postpartum, Causing Severe Pain and Contravening Statewide Policy........10

               1.    North Carolina Department of Public Safety prohibits shackling people during labor and postpartum but NCCIW's Warden disregards DPS's policies ...............11

               2.    NCCIW's Warden disregards DPS's express direction to conform NCCIW's violative policies ............................13

               3.    Officer Defendants disregard DPS policy and cause harm to Edwards, and shackle her late in pregnancy, during labor, and postpartum ....................................................14

    III.   Procedural History..................................................................17

SUMMARY OF THE ARGUMENT .......................................................19

ARGUMENT ..........................................................................................20

    I.     Standard of Review .................................................................20

    II.    The District Court Erred in Granting Defendants Summary Judgment on Edwards's ADA and RA Claims for the Denial of MOUD...........21

          A.    Legal Standards.................................................................22

          B.    Edwards was a Qualified Person with a Disability..................23

                1.    Edwards's OUD is a disability .......................................24

               2.    Edwards qualified for medical services at NCCIW .......25

C.  Defendants Denied Edwards MOUD on the Basis of her Disability ...................................................................... 28

    1.  Defendants' categorical ban on MOUD for all non-pregnant patients was intentional discrimination on the basis of disability ........................................................ 28

    2.  Defendants unlawfully denied Edwards's reasonable accommodation by refusing to provide MOUD ............. 30

III.  Defendants Acted with Deliberate Indifference and Placed Edwards at Risk of Serious Harm or Injury ........................................................... 35

    A.  The District Court Erred in Granting Summary Judgment on Edwards's Eighth Amendment Claim for Denial of MOUD ... 37

        1.  Edwards's OUD is an objectively serious medical condition ........................................................................ 37

        2.  A reasonable jury could conclude that Amos acted with deliberate indifference when he enforced a policy to categorically deny patients with OUD access to MOUD unless they were pregnant ............................................... 38

        3.  A reasonable jury could conclude that Alexander acted with deliberate indifference when he ratified a policy to categorically deny patients with OUD access to MOUD unless they were pregnant ............................................... 42

        4.  The district court based its contrary conclusion on faulty legal support ................................................................... 43

    B.  The District Court Erred in Granting Summary Judgment on Edwards's Eighth Amendment Claim for Unlawful Shackling Around Childbirth ................................................................... 44

        1.  Defendants' shackling of Edwards late in her pregnancy (including during her transportation to the hospital), during childbirth, and immediately after delivery posed a substantial risk of serious harm ...................................... 45

        2.  Defendants acted with deliberate indifference to the serious harm and risk of harm they inflicted upon Edwards ........................................................................... 47

IV.  The District Court Erred in Finding Defendants Entitled to Qualified Immunity on Edwards's Shackling Claims ......................................... 50

    A.  Qualified Immunity Standard .................................................... 50

B.     Defendants are not Entitled to Qualified Immunity Under *Thorpe's* Single-Prong Analysis ...............................................53

C.     Edwards's Right to be Free from Shackling Was Clearly Established ...............................................................................55

CONCLUSION.........................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ............................................57

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A Helping Hand, LLC v. Baltimore Cnty.*,
   515 F.3d 356 (4th Cir. 2008) ................................................22, 34

*Aleman v. City of Charlotte*,
   80 F.4th 264 (4th Cir. 2023) ................................................20

*Alexander v. Choate*,
   469 U.S. 287 (1985)................................................23

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011)................................................50, 55

*Baird ex rel. Baird v. Rose*,
   192 F.3d 462 (4th Cir. 1999) ................................................22

*Basta v. Novant Health Inc.*,
   56 F.4th 307 (4th Cir. 2022) ................................................23

*Brawley v. Washington*,
   712 F. Supp. 2d 1208 (W.D. Wash. 2010) ................................................56

*Brawner v. Scott Cnty.*,
   14 F.4th 585 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022) ................38

*Cartagena v. Lovell*,
   103 F.4th 171 (4th Cir. 2024) ................................................26, 27, 30

*Chamberlain v. Va. Dep't of Corr.*,
   No. 7:20-cv-45, 2021 WL 4100354 (W.D. Va. Sept. 9, 2021) ................33

*Colwell v. Bannister*,
   763 F.3d 1060 (9th Cir. 2014) ................................................37

*De'Lonta v. Angelone*,
   330 F.3d 630 (4th Cir. 2003) ................................................41

*Estelle v. Gamble*,
   429 U.S. 97 (1976)................................................35

*Farmer v. Brennan*,
    511 U.S. 825 (1994)................................................................35, 36

*Fauconier v. Clarke*,
    966 F.3d 265 (4th Cir. 2020) ..............................................22, 34

*Finley v. Huss*,
    102 F.4th 789 (6th Cir. 2024) ..............................................23, 30

*Gordon v. Schilling*,
    937 F.3d 348 (4th Cir. 2019) ..........................................36, 40, 43

*Halpern v. Wake Forest Univ. Health Sci.*,
    669 F.3d 454 (4th Cir. 2012) .......................................................25

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024)....................................................................3, 4

*Est. of Beland ex rel. Hayes v. Charleston Cnty. Sheriff's Off.*,
    No. 1:20-30060SAL0SVH, 2021 WL 4754576 (D.S.C. Oct. 12,
    2021) ..............................................................................................44

*Hicks v. Ferreyra*,
    965 F.3d 302 (4th Cir. 2020) ......................................................24

*Hildreth v. Butler*,
    960 F.3d 420 (7th Cir. 2020) ......................................................33

*Hope v. Pelzer*,
    536 U.S. 730 (2002).............................................19, 52, 54, 55

*Horton v. Methodist Univ., Inc.*,
    788 F. App'x 209 (4th Cir. 2019) .......................................26, 27, 33

*Jackson v. Lightsey*,
    775 F.3d 170 (4th Cir. 2014) ......................................................36

*Jacobs v. N.C. Admin. Off. of the Courts*,
    780 F.3d 562 (4th Cir. 2015) ......................................................25

*Johnson v. Dixon*,
    No. 23-CV-23021, 2023 WL 6481252 (S.D. Fla. Oct. 5, 2023) ......................42

*Kapche v. City of San Antonio*,
    304 F.3d 493 (5th Cir. 2002) ...................................................29

*Koon v. North Carolina*,
    50 F.4th 398 (4th Cir. 2022) ..................................................33

*Brown ex rel. Lawhorn v. Elliott*,
    876 F.3d 637 (4th Cir. 2017) ..................................................51

*M.C. v. Jefferson Cnty.*,
    No. 6:22-CV-190, 2022 WL 1541462 (N.D.N.Y. May 16, 2022) ...................29

*Makdessi v. Fields*,
    789 F.3d 126 (4th Cir. 2015) ..................................................36

*Mendiola-Martinez v. Arpaio*,
    836 F.3d 1239 (9th Cir. 2016) ..............................................5, 56

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ..................................................31

*Nelson v. Corr. Med. Servs.*,
    583 F.3d 522 (8th Cir. 2009) ...............................................5, 56

*Owens v. Baltimore City State Atty's Off.*,
    767 F.3d 379 (4th Cir. 2014) ..............................................52, 55

*P.G. v. Jefferson Cnty.*,
    No. 5:21-CV-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021) ...................29

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998) ..........................................................25

*Pandazides v. Va. Bd. of Educ.*,
    13 F.3d 823 (4th Cir. 1994) ..................................................23

*Pesce v. Coppinger*,
    355 F. Supp. 3d 35 (D. Mass. 2018) .......................................29, 42

*Pfaller v. Amonette*,
    55 F.4th 436 (4th Cir. 2022) ..............................................51, 57

*Phoenix v. Amonette,*
      95 F.4th 852 (4th Cir. 2024) ...............................................................40

*Quinn v. Zerkle,*
      111 F.4th 281 (4th Cir. 2024) .............................................................20

*Quintana v. Santa Fe Cnty. Bd. of Comm'rs,*
      973 F.3d 1022 (10th Cir. 2020) ..........................................................43

*Richardson v. Clarke,*
      52 F.4th 614 (4th Cir. 2022) ..........................................................32, 33

*Roe v. Elyea,*
      631 F.3d 843 (7th Cir. 2011) ..............................................................37

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.,*
      938 F.3d 1259 (11th Cir. 2019) ...........................................................31

*Scinto v. Stansberry,*
      841 F.3d 219 (4th Cir. 2016) ..................................................35, 38, 55

*Smith v. Aroostook Cnty.,*
      376 F. Supp. 3d 146 (D. Me. 2019) .................................3, 4, 28, 29

*Smith v. Aroostook Cnty.,*
      922 F.3d 41 (1st Cir. 2019) .................................................................29

*Stanton v. Elliott,*
      25 F.4th 227 (4th Cir. 2022) ..........................................................51, 57

*Sylvester v. City of Newark,*
      120 F. App'x 419 (3d Cir. 2005) .......................................................44

*Taylor v. Riojas,*
      592 U.S. 7 (2020) ................................................................................52

*Taylor v. Wexford Health Sources, Inc.,*
      737 F. Supp. 3d 357 (S.D.W. Va. 2024) .........................29, 38, 41, 44

*Theriault v. Flynn,*
      162 F.3d 46 (1st Cir. 1998) .................................................................29

*Thompson v. Commonwealth of Va.*,
  878 F.3d 89 (4th Cir. 2017) ................................................36

*Thorpe v. Clarke*,
  37 F.4th 926 (4th Cir. 2022) ..............................45, 51, 52

*Torcasio v. Murray*,
  57 F.3d 1340 (4th Cir. 1995) ............................................32

*United States v. Georgia*,
  546 U.S. 151 (2006)............................................................34

*United States v. Smith*,
  75 F.4th 459 (4th Cir. 2023) .......................................31, 38

*Villegas v. Metro Gov't of Nashville*,
  709 F.3d 563 (6th Cir. 2013) ........................................4, 56

*Women Prisoners of D.C. Dep't of Corr.*,
  877 F. Supp. 634 (D.D.C. 1994) ......................................56

*Younger v. Crowder*,
  79 F.4th 373 (4th Cir. 2023) .......................................36, 51

**Statutes**

42 U.S.C. § 12102 ...................................................................24

42 U.S.C. § 12132 ...................................................................22

42 U.S.C. § 12134 ...................................................................29

**Regulations**

28 C.F.R. § 35.108 ..................................................................24

28 C.F.R. § 35.130 ..................................................................31

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff Tracey Edwards timely filed her appeal of the district court's September 30, 2024 final order on October 29, 2024. This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in dismissing Plaintiff's claim that Defendants discriminated against her on the basis of her disability, Opioid Use Disorder, when they denied her access to medication for Opioid Use Disorder.

II.    Whether the district court erred in holding that Defendants did not act with deliberate indifference when they suddenly discontinued Plaintiff's medication for Opioid Use Disorder, causing painful withdrawal symptoms and increasing risk of relapse, overdose and death.

III.    Whether the district court erred in holding that Defendants did not act with deliberate indifference when they shackled Plaintiff at the end of her pregnancy, while she was giving birth, and while recovering from birth and bonding with her newborn baby.

IV.    Whether the district court erred in holding that Defendants are entitled to qualified immunity on Plaintiff's claims for unlawful shackling at the end of her

pregnancy, while she was giving birth, and while recovering from birth and bonding with her newborn baby.

## INTRODUCTION

Shortly after Plaintiff-Appellant Tracey Edwards gave birth while incarcerated, Defendants at the North Carolina Correctional Institution for Women ("NCCIW") made a drastic change to her medical care—they forced her to discontinue her lifesaving Medication for Opioid Use Disorder ("MOUD"). This decision was made pursuant to a blanket policy prohibiting MOUD for non-pregnant people and without regard to Edwards's individual medical needs, causing her to suffer weeks of painful withdrawal symptoms and putting her at increased risk of relapse, overdose, and death.

Moreover, Defendants exposed Edwards to serious medical risk when they shackled Edwards late in her pregnancy, during labor, and immediately postpartum, in violation of the binding statewide policy of the North Carolina Department of Public Safety ("DPS")—a policy that DPS had directed NCCIW to comply with multiple times.

In granting Defendants' motion for summary judgment, the district court misconstrued Edwards's arguments, failed to draw reasonable inferences in Edwards's favor, and applied inapposite law. Edwards now appeals the district court's erroneous order to seek redress for the grave violations she suffered.

2

## STATEMENT OF THE CASE

### I.     Nature of the Case

This appeal concerns the denial of Plaintiff-Appellant Tracey Edwards's meaningful access to prison medical services—including on the basis of her disability, Opioid Use Disorder ("OUD")—and NCCIW officers' painful and dangerous shackling of Edwards at the end of her pregnancy, while she was in labor, and immediately after childbirth.

The opioid epidemic is one of the worst public health crises in this nation's history. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024). OUD is a chronic medical condition that manifests when the use of opioids such as oxycodone rewires the brain for addiction, causing "compulsive use of opioids and an increasing need for additional doses over time that becomes damaging to a person's life." *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 149 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019).

A class of FDA-approved drugs known as MOUD[1] is the standard of care to treat OUD.[2] JA174. Buprenorphine is one type of MOUD that allows individuals to pursue major life activities without debilitating drug cravings and reduces the risk

---

[1]  MOUD is also known as Medication Assisted Treatment ("MAT"). JA350. "MOUD" is used throughout this brief for clarity.
[2]  *Substance Use Disorder Treatment Options*, SAMHSA (April 11, 2024), https://www.samhsa.gov/substance-use/treatment/options.

of potential misuse of drugs.[3] Oxycodone is not within the class of FDA-approved MOUD and, to the contrary, can *cause* addiction. *See Harrington*, 603 U.S. at 209; JA178.

Without MOUD, individuals with OUD are more susceptible to relapse, overdose, and death. JA177. This is particularly true of incarcerated people, who disproportionately die of OUD following release when their treatment is discontinued while they are incarcerated. JA177. When OUD is successfully managed by medication, abrupt termination of MOUD causes "wrenching side effects" of "painful" withdrawal. *Smith*, 376 F. Supp. 3d at 161–62 & n.21.

Shackling a person who is late in pregnancy, giving birth, or immediately postpartum is "psychologically devastating, dehumanizing, and painful." JA173. It also increases the risk of dangerous falls (one in four women fall during pregnancy, which can cause the placenta to detach from the uterus) and impedes emergency medical intervention. JA173. The practice is opposed by the United Nations Committee Against Torture and multiple medical organizations, and is expressly prohibited in most states. Dkt. 286 at 9-10; *see* JA173. Every Circuit to have addressed shackling in these circumstances has upheld possible constitutional violations. *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013);

---

[3] *Buprenorphine*, SAMHSA (Mar. 28, 2024), https://www.samhsa.gov/substance-use/treatment/options/buprenorphine.

*Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1252, 1254, 1257 (9th Cir. 2016).

## II.    Factual Background

In her early twenties, Edwards began taking prescribed opioids, including oxycodone, to treat pain resulting from medical conditions including a broken foot, platelet disorder, and dental problems. JA3034-3035. The prolonged use of prescribed opioids changed her brain chemistry, causing opioid cravings and altering her perception of pain. JA3035. After doctors stopped prescribing her opioids, Edwards turned to buying opioids illegally to self-medicate and stifle the intense cravings of her rewired brain. JA3035. She was eventually convicted of a nonviolent drug offense and incarcerated in NCCIW. JA166.

Before her incarceration, Edwards was diagnosed with OUD and was prescribed MOUD (specifically, buprenorphine) to treat it; she took MOUD for at least one year before she was incarcerated. JA166; JA3181. She understood that buprenorphine would suppress the effects of opioids so that she wouldn't get "high," and reported being stable on this dose of MOUD prior to her incarceration. JA3035; JA3164.

Edwards entered NCCIW custody on May 15, 2019, and learned she was pregnant with her second child the following day. JA166; JA458–459. NCCIW allowed her access to MOUD only because she was pregnant. JA459; JA3325.

During transportation to the hospital, labor, and postpartum, NCCIW officers shackled Edwards using varying combinations of handcuffs, leg cuffs, and a belly chain around her waist. JA167–169. She gave birth to her daughter on December 20, 2019 and was returned to NCCIW two days later. JA167-168. When she returned to NCCIW, Defendants discontinued her MOUD. JA459.

### A. North Carolina Enforces a Blanket Policy to Deny MOUD Despite Defendants' Awareness of the Risks of Denying MOUD

After giving birth, Edwards was abruptly forced off her lifesaving MOUD pursuant to a blanket policy and absent any individualized review of her medical needs. JA169-170. MOUD was the only treatment that had been effective to treat her OUD. JA169-170. NCCIW's policy prohibits incarcerated people from accessing MOUD, except while they are pregnant. JA636. NCCIW's policy is to force people immediately ██████████████████████ JA3214.

At all times relevant to this case, Defendant Dr. Elton Amos, NCCIW's Medical Director, was responsible for clinical oversight of medical care at NCCIW, including approvals of "utilization review" requests for MOUD. JA350–352; JA370–371. Amos primarily drafted the policies for medical care at NCCIW and issued NCCIW's "MAT Provider Handbook," setting forth NCCIW's policy to prescribe MOUD to pregnant people and immediately terminate MOUD after delivery. JA353; JA635–636.

6

Defendant Dr. James Alexander, NCCIW's Healthcare Facility Health Treatment Administrator, —the "CEO of [NCCIW's] healthcare facility"—was responsible for reviewing NCCIW's policies before implementation to ensure compliance with statewide policies. JA737; JA568. Alexander was aware of and responsible for reviewing the policy that categorically denied patients access to MOUD unless they were pregnant. JA1195-1196.

Defendant Dr. Gary Junker, DPS's Behavioral Health Director, was involved with overseeing and developing or revising statewide policies related to mental health interventions for incarcerated people in DPS facilities and providing oversight for facility Medical Directors like Amos. JA732; JA1032; JA2219; JA2340.

Amos knew OUD is a serious and potentially deadly condition. JA148 (¶ 218; undisputed); *see* JA3066. He was personally aware that withdrawal from buprenorphine can cause pain and nausea, and testified that buprenorphine would help relieve the painful symptoms associated with withdrawal including headache, twitching, itching, restlessness, insomnia, and pain. JA2688; JA3078. Nonetheless, Amos refused to continue Edwards's MOUD because he believed "[w]e are not in the business of addicting people, nor continuing addiction." JA2749.

Amos further testified that NCCIW's MOUD exception for pregnant people was merely necessary "for fetal safety because there is a high risk of fetal loss during pregnancy for women who withdraw," JA2683, not because of the mother's need

eg

for medical services. He agreed with [REDACTED] statement that Edwards was "prescribed [buprenorphine] for a limited time to decrease the likelihood of [Edwards] aborting [her] fetus, not to treat [her] substance use disorder." JA3325; JA2686. Alexander, like Amos, was also explicitly aware that terminating MOUD could cause unnecessary suffering and increase the risk of relapse, overdose, and death. JA592.

In an article he published in September 2020, Amos recognized that "[p]regnant women with OUD face tremendous stigma," "are at risk for death from overdose during pregnancy *and postpartum*," and "are at extremely high risk of overdose death when they return to the community." JA691 (emphasis added). He also recognized that "[e]nsuring that women who have initiated MOUD during pregnancy can continue treatment postpartum and are referred to community providers is an important step in continuity of care for OUD." JA696.

At the time NCCIW forced Edwards off MOUD, the standard of care for treating OUD was to provide MOUD. JA174; JA176–177. Amos and Alexander knew that a so-called "x-waiver" allowed medical providers to prescribe buprenorphine (the type of MOUD Edwards was on), and that at least Amos was x-waivered and was thus legally authorized to prescribe buprenorphine at the time. JA460; JA386–387; JA402; JA446. NCCIW's pharmacy contract included MOUD, no state or federal entity prohibited NCCIW providers from prescribing it, and

NCCIW was already dispensing MOUD to pregnant people, including Edwards herself. JA460; JA445–446; JA571; JA3276. The NCCIW policy was the only thing that stood in the way of prescribing MOUD to Edwards. *See* JA446; JA1203.

### B. Defendants Abruptly Terminated Edwards's MOUD, Forcing Painful Withdrawal, and Never Provided MOUD Again

After Edwards gave birth on December 20, 2019, doctors at the hospital prescribed her MOUD; she returned to NCCIW two days later, with an active MOUD prescription. JA3316; JA169; JA373. Upon returning to NCCIW, an NCCIW physician again diagnosed her with OUD. JA3176. NCCIW ignored Edwards's prescription and abruptly terminated her MOUD, forcing her into severe withdrawal. JA3176; JA3275-3276; JA459; JA169.

Even when terminating MOUD is appropriate, the standard of care is to taper down MOUD over several weeks while monitoring withdrawal symptoms using the Clinical Opiate Withdrawal Scale ("COWS"). JA178. NCCIW, however, terminated Edwards's MOUD with *no* taper. JA459; JA3275-3276; JA169. Instead of continuing or tapering down her MOUD to avoid severe withdrawal and risk of relapse, NCCIW prescribed her a nine-day course of the opioid oxycodone, which is *not* an FDA-approved MOUD and instead heightens the risk of misuse and overdose. JA3176; JA178. NCCIW also failed to monitor her withdrawal using the COWS test—contrary to the standard of care. JA404-405; JA178.

While taking oxycodone as directed, and without MOUD, Edwards found herself craving opioids more and more. JA1710. The oxycodone did not alleviate Edwards's symptoms; she suffered intense nausea, insomnia, diarrhea, vomiting, anxiety and physical pain for weeks because she lacked MOUD. JA169; JA3324; JA178; JA3035. The pain Edwards endured while withdrawing "was more painful than giving birth." JA169. At times, she could not eat or shower because of the intensity of her symptoms. JA169. Without MOUD, Edwards's severe cravings for opioids returned and, throughout the remainder of her incarceration, she worried she would relapse. JA170. Indeed, NCCIW's termination of Edwards's MOUD placed Edwards at a higher risk of relapse, overdose, and death—including a five-fold higher risk of fatal overdose after release. JA176–177.

### C. Defendants Shackled Edwards While in Labor and Postpartum, Causing Severe Pain and Contravening Statewide Policy

Edwards endured a traumatic childbirth experience in which NCCIW officers—Defendants Gill, Brown, Dixon, Williams, Brodie, Lynch, and Ragano (collectively, "Officer Defendants")—routinely shackled her and treated her "worse than you'd treat a dog." JA168.

Any shackling of pregnant, laboring, and postpartum people is "psychologically devastating, dehumanizing, and painful," and poses serious medical risks. JA173; JA174. The practice is opposed by the United Nations

10

Committee Against Torture, in addition to multiple major medical organizations. JA173.

Wrist and ankle restraints inhibit a pregnant person's mobility. JA175-176. Due to the shift in the pregnant person's center of gravity, one in four women fall during pregnancy, which can cause the placenta to detach from the uterus—a risk that is heightened when restraints are used. JA175. Hand and leg cuffs exacerbate the natural pain of childbirth and postpartum recuperation. JA175–176. Shackling can also interfere with emergency medical interventions and "inhibits empathy from doctors and nurses towards patients." JA175. And chaining a new mother to a bed while she meets and holds her newborn baby interferes with ability to care for her baby during initial bonding and can cause significant emotional trauma. *See* JA175; JA168.

> ### 1. North Carolina Department of Public Safety prohibits shackling people during labor and postpartum but NCCIW's Warden disregards DPS's policies

Recognizing these dangers, in September 2018—more than a year before Edwards gave birth—DPS enacted a policy restricting the use of restraints, including handcuffs, during transportation to the hospital to give birth, labor, and postpartum. JA510–511. As a prison under DPS oversight—and the *only* state prison that houses pregnant people—NCCIW was required to adhere to this policy. JA317; JA331; JA267–268; JA291; JA293.

Defendant Benita Witherspoon was the NCCIW Warden from November 2018 to June 2020. JA720. Witherspoon was personally responsible for ensuring NCCIW's policies complied with DPS's directives, including by reviewing policies upon starting as Warden, conducting annual policy reviews, and ensuring all prison staff were adequately trained. JA721; JA317; JA329; JA334; JA494; JA270; JA278; JA302.

Witherspoon was aware of the 2018 DPS policy restricting the use of restraints during transportation to the hospital, labor and postpartum. JA322. But she took no action to implement them. Instead, in February 2019—a full five months after DPS issued its policy *restricting* the use of restraints around childbirth—Witherspoon implemented at least two policies *requiring* use of restraints, directly conflicting with DPS policy as follows:

| Applicable Period | DPS Policy | NCCIW Policy |
|---|---|---|
| Transportation to hospital for treating labor and delivery | All restraints prohibited (JA510 at F.1104(i)(2)(D)) | Handcuffs required (JA513-514 at D.1802(b)(3), D.1804 (k)(1)) |
| During labor (at onset of contractions or, in cases of induction, after IV line placed and medication started) | All restraints prohibited (JA510 at F.1104(i)(2)(A), (E)) | One handcuff and one leg iron required unless except during "active labor" (JA513 at D.1802(b)(3); JA524 at H.0303(f)(8)) |

12

| During initial bonding with newborn, including nursing and skin-to-skin contact | All restraints prohibited<br><br>(JA511 at F.1104(i)(2)(G)) | One leg iron required while holding infant<br><br>(JA518 at D.1804(*l*)(10)(E); *see* JA524 at H.0303(f)(8)) |
|---|---|---|
| Postpartum recuperation | All restraints prohibited<br><br>(JA510 at F.1104(i)(2)(C)) | One handcuff and one leg iron required<br><br>(JA518 at D.1804(*l*)(10)(B); JA523 at H.0303 (f)(6)) |
| Transportation back to prison after labor | Waist restraints prohibited<br><br>(JA511 at F.1104(i)(5)) | Full restraints, including waist restraint, required<br><br>(JA514 at D.1804(k)(5)) |

### 2. NCCIW's Warden disregards DPS's express direction to conform NCCIW's violative policies

Two months after NCCIW implemented these violative policies, a DPS Regional Director contacted Witherspoon, directing that she conform NCCIW's noncompliant policies. *See* JA321–323. But NCCIW's policies remained noncompliant. JA548-549; JA722.

In November 2019, DPS chastised NCCIW officials for violating DPS policy when NCCIW officers shackled a pregnant person at the hospital. *See* JA554-555; JA539. Witherspoon's direct report spoke with the hospital and Governor's office

about this violation of DPS policy. JA553. That same day, DPS issued a "directive" to Witherspoon that "any [person] in their third trimester should not be restrained." JA539; JA551–555. Witherspoon did not update NCCIW's instructions to officers stationed at the hospital until January 2020, two months later. JA722; JA326–327; JA3353-3360. Edwards's December 20, 2019 childbirth took place within that two-month window. JA167.

Witherspoon *never* updated NCCIW's policies reflected in the table above that conflicted with DPS policy limiting the shackling of pregnant and postpartum people. JA341; JA548. Instead, her successor did so in 2021 after DPS *again* directed NCCIW to complete the updates that "apparently didn't get done" under Witherspoon. JA547-548. When Witherspoon's successor decided to update NCCIW's violative policies, the updates were completed within one day. JA547–548.

> ### 3. Officer Defendants disregard DPS policy and cause harm to Edwards, and shackle her late in pregnancy, during labor, and postpartum

It is ████████████████████████████████████

████ all applicable policies, including DPS policies, and including those regarding approved use of restraints. JA3364; JA331; JA1245. Despite Witherspoon's promulgation of contrary policies at NCCIW, the Officer Defendants testified to having received online and in-person training on DPS's policies restricting the use

14

of restraints around childbirth. JA747–749 (Brodie); JA726–727 (Ragano); JA752–754 (Williams); JA758-759 (Lynch). And when DPS directed Witherspoon in November 2019 that restraints could not be used during the third trimester, NCCIW notified officers. JA724.

Notwithstanding these policies and training, and despite the fact that that it is undisputed that Edwards was not a security or flight risk, JA117 (¶ 15, undisputed); *see* JA3057, Officer Defendants used dangerous and painful restraints on Edwards as they transported her to the hospital for induction, during childbirth, and postpartum.

Defendant Shelda Brodie handcuffed Edwards, then 39 weeks pregnant, while transporting her to the hospital to be induced, causing Edwards significant pain and discomfort. JA167; JA471. Upon arrival, Brodie shackled one of Edwards's arms and one of her legs to the hospital bed. JA167; JA623.

Defendants Tianna Lynch and Lorafaith Ragano left Edwards in that position for hours, even after she was given the IV drip of induction medication and while she was laboring. JA167; JA623-625. Because of the shackles, when Edwards began experiencing "powerful contractions," she could only "l[ie] there" in pain while laboring—before she received an epidural. JA167. She testified that not only was it "extremely painful" to be unable to move while actively laboring, but that she "was in a lot of pain feeling the shackles on [her] body, especially where [her] ankles were

15

swollen." JA167. Edwards labored overnight and into the following morning, with her baby born at approximately 11:04 a.m. JA623–625. Officers did not remove her wrist or leg restraints until the doctors told her to start pushing. JA167. Less than an hour after Edwards gave birth, Ragano shackled Edwards's ankles together and handcuffed one of her wrists to the bed. JA168; JA729. Being shackled during contractions and postpartum caused Edwards extreme pain, embarrassment, and trauma. JA167–169.

Over the next two days of postpartum recovery, Ragano and other officers including Defendants Kavona Gill, Nikita Dixon, Tamara Brown, and Tammy Williams continued to shackle at least one of Edwards's legs to the bed, and often shackled her right arm while the IV remained in Edwards's left arm. JA168; JA729–730; JA471; JA606–621. The officers kept Edwards shackled to the bed even while she was holding and breastfeeding her newborn daughter, making it harder for her to soothe or bond with her daughter during the brief time they had together. JA168; JA632. Edwards testified that it was "horrible" that, when her baby cried, she "couldn't get up to pick her up," and that when medical staff were drawing blood, Edwards could not go to her daughter, but instead "just had to listen to her cry." JA168.

On December 22, 2019, Williams transported Edwards back to NCCIW, JA471, cuffing her hands and ankles together, placing a belly chain around her waist,

16

and connecting her chains with a black box in front of her such that she could not move her hands at all. JA168. The waist restraint pressed on the site of her epidural injection, exacerbating her already severe pain. JA168. Upon arriving at NCCIW, Williams provided no assistance to the fully restrained Edwards, forcing her to jump out of the vehicle with her ankles shackled together, and causing her additional, immense pain from the hard landing. JA169. She was only two days postpartum.

### III. Procedural History

Edwards filed the operative Second Amended Complaint in April 2022, seeking declaratory and injunctive relief and compensatory and punitive damages. She asserted disability discrimination claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") and claims under the Eighth Amendment. JA43–110. After discovery, the parties filed cross-motions for summary judgment. JA111–114; JA702–703.

The district court denied Edwards's motion and granted summary judgment to Defendants on all claims. JA3070-3095 ("Order"). On Edwards's disability discrimination claims, the district court held that Defendants' conduct did not violate the ADA or RA because Edwards no longer qualified for NCCIW's MOUD program after giving birth, and the provision of oxycodone during withdrawal purportedly constituted a "reasonable accommodation." JA3093. In reaching this conclusion, the district court misconstrued Edwards's disability claims, emphasizing that

17

"pregnancy is not a disability" without analyzing her claim for discrimination on the basis of OUD. JA3094.

On Edwards's Eighth Amendment claims for denial of MOUD, the district court found that Edwards did not present "evidence that any defendant subjectively knew that she faced a substantial risk of serious harm and disregarded that risk by discontinuing MOUD after she gave birth." JA3084.

Finally, as to Edwards's Eighth Amendment claims arising from her shackling at the end of her pregnancy, during labor, and postpartum, the district court granted Defendants qualified immunity, holding that "the alleged Eighth Amendment right was not clearly established in December 2019." JA3090-3091.[4]

Edwards timely filed her notice of appeal. JA3097.

---

[4] The district court also denied Edwards's *Daubert* motion and pretrial motion to strike evidence in Defendants' appendix, JA3079-3080, dismissed Edwards's requests for declaratory and injunctive relief as moot because she was no longer in custody, JA3081, and denied Edwards's claims regarding a delay in accessing psychotropic medication, JA3084-3085; JA3094. Edwards does not appeal these decisions.

# SUMMARY OF THE ARGUMENT

The district court's ruling improperly reframed Edwards's claims and misread the evidence presented. The Order is wrong as a matter of law and fact and should be reversed.

Pursuant to a blanket policy rather than an individualized medical assessment, Defendants prevented Edwards from receiving necessary medical care: MOUD. Edwards presented overwhelming evidence that Defendants' abrupt termination of her MOUD after she gave birth violated the ADA and RA.

Defendants' blanket denial of medically necessary care also violated the Eighth Amendment. Edwards presented evidence that MOUD was medically necessary, and that Amos, Alexander, and Junker knew that NCCIW's blanket ban of MOUD for non-pregnant people would put those with OUD, such as Edwards, at serious risk of harm. And Edwards did in fact suffer injury during withdrawal. She therefore presented a triable issue of fact as to whether failure to provide MOUD and the sudden cessation of MOUD violated the Eighth Amendment.

Finally, the district court erred in finding Edwards pointed to no clearly established right on her claims for shackling just before, during, and after childbirth. First, the right *was* clearly established: the Supreme Court has held that the painful shackling of a prisoner who presented no security threat violates the Eighth Amendment. *Hope v. Pelzer*, 536 U.S. 730, 745 (2002). Edwards also demonstrated

a consensus amongst courts, medical professionals, prison administrators, and lawmakers that, in 2019, shackling around childbirth was known to be risky, cruel, and degrading. Second, Edwards presented sufficient evidence of an intentional constitutional violation such that the "deliberate indifference" prong under the Eighth Amendment and "clearly established" prong under qualified immunity run together—and a jury could easily find deliberate indifference here.

## ARGUMENT

### I.     Standard of Review

This Court reviews "district court decisions on motions for summary judgment and qualified immunity de novo." *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024).

Upon review of a summary judgment order, this Court "may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant." *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023). "Rather, [this Court] must view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party to determine whether there is a genuine dispute as to any material fact." *Quinn*, 111 F.4th at 290. "A material fact is one that 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.    The District Court Erred in Granting Defendants Summary Judgment on Edwards's ADA and RA Claims for the Denial of MOUD

Pursuant to a blanket policy, and absent any individualized review of her medical needs, Edwards was abruptly forced off her lifesaving MOUD, the only effective treatment for her OUD. It would be unimaginable for a prison to do this to someone with another disability, like forcing a diabetic off insulin. But because NCCIW discriminates against individuals with OUD in receiving effective medical care, Edwards was forced to endure excruciating withdrawal symptoms and increased risk of relapse, overdose, and death. The application of this blanket prohibition, which was rooted in stigma and lack of understanding of OUD, violates disability rights laws. The district court glossed over the proper analysis, concluding that there was no discrimination because "there is no record evidence indicating Edwards was taken off the MOUD program for any reason other than the end of her pregnancy." JA3093. That is beside the point. The district court should have considered whether NCCIW's blanket ban on MOUD for all non-pregnant patients, regardless of medical need, discriminated against people with OUD by singling out one type of lifesaving medical care and denying access to it. Given the support in the record and case law for Edwards's ADA and RA claims, the absence of proper

analysis of her claims in the Order, and the inferences that should have been drawn in Edwards's favor but were not, summary judgment must be reversed.

##### A.    Legal Standards

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Except as noted below, this Court construes the ADA and RA to impose the same requirements. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

To survive summary judgment on her ADA and RA claims, Edwards had to provide evidence that would permit a reasonable jury to conclude, taking all inferences in her favor, that: "(1) [s]he has a disability or has been regarded as having a disability; (2) [s]he is otherwise qualified to receive the benefits provided by a public entity; and (3) [s]he was denied those benefits or was otherwise discriminated against on the basis of [her] disability." *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020). Under the third element, there are "three distinct grounds for relief" under Title II of the ADA: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008). Edwards

argues that two grounds apply here: (1) intentional discrimination (disparate treatment) and (2) denial of a reasonable accommodation.

Intent has a special meaning in the disability law context. The Supreme Court has stated that disability discrimination "is primarily the result of apathetic attitudes rather than affirmative animus." *Alexander v. Choate*, 469 U.S. 287, 296 (1985). Thus, "[i]n passing the [RA], Congress sought to target a type of 'thoughtless and indifferent' discrimination, which arises not out of 'invidious animus' but rather out 'of benign neglect.'" *Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022) (quoting *Alexander*, 469 U.S. at 295) (cleaned up). Accordingly, the "intentional discrimination" required "to make out a violation of § 504" of the RA does not require a showing of "discriminatory animus." *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994); *see Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024) ("Because failing to grant a reasonable accommodation is itself direct evidence of discrimination, plaintiffs who meet this burden need not provide additional evidence of discriminatory intent.").

## B. Edwards was a Qualified Person with a Disability

The district court did not address whether Edwards's OUD was a "disability" for purposes of the ADA and RA. JA3091-3095; *but see* JA3072 (reciting Edwards's statements that she was diagnosed with OUD, which is a chronic medical condition). Instead, the district court misconstrued the nature of Edwards's disability claim

altogether, as it focused on whether pregnancy (or non-pregnancy) is considered a disability. JA3093.

To be clear: Edwards never raised the non-pregnancy discrimination claim that the district court discussed. The question is not whether Defendants discriminated against Edwards based on her pregnancy (or lack thereof); the question is whether Defendants discriminated against Edwards on the basis of *her OUD* by barring her from accessing MOUD, unlike treatment for every other chronic medical condition. JA75 ¶¶ 163–69. Edwards's pregnancy status is relevant to that question only insofar as the evidence establishes (1) that she was offered MOUD while she was pregnant for the benefit of her unborn fetus, and (2) that Defendants had the ability to provide MOUD to patients in its custody. In short, pregnancy is a narrow exception to the blanket ban on MOUD, not the basis of Edwards's claim. Below are all the arguments Edwards raised below that the district court erroneously ignored.

## 1.    Edwards's OUD is a disability

The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) having a record of such an impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Edwards easily satisfies this standard. 28 C.F.R. § 35.108(b)(2) (listing drug addiction as a disability). And Defendants did not present any argument to the contrary, forfeiting the issue. *See Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir.

2020). In any event, it is undisputed that Edwards was consistently diagnosed with OUD and that Defendants consistently regarded her as such. JA140 (¶¶ 154-159, undisputed); JA142 (¶¶ 173-175, undisputed); *see* JA3057. The failure of the district court to address Edwards's OUD as a disability was reversible error. *See Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) ("The district court also erred by concluding that Jacobs was not disabled within the meaning of the ADA.").

## 2. Edwards qualified for medical services at NCCIW

"A 'qualified' individual is one 'who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements' for participation in a program or activity." *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 462 (4th Cir. 2012) (*quoting Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); 42 U.S.C. § 12131(2)).

The "program" at issue here is medical services that NCCIW provides to all incarcerated people there. NCCIW is obligated to provide access to medical care to all people in its custody. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998). Edwards was therefore qualified to receive adequate medical services while incarcerated at NCCIW and Defendants do not claim otherwise.

The district court erred in holding that Edwards was not qualified for medical services. Continuing its misunderstanding that pregnancy was the disability at issue,

the court noted that "there is no genuine dispute that Edwards failed to qualify for NCCIW's MOUD program after giving birth." JA3093.

But that analysis missed the point and merely highlights the discrimination. The fact that Edwards was excluded from NCCIW's MOUD program after giving birth (based on the terms set by NCCIW), is irrelevant to whether she was qualified (within the meaning of the ADA and RA) to receive adequate medical services while incarcerated at NCCIW, including after childbirth. In conflating these questions, the district court failed to address Edwards's actual claim: that she was qualified (within the meaning of the ADA and RA) to receive adequate medical services, and that NCCIW's failure to provide MOUD was unlawful disability discrimination. *See* Dkt. 187 at 56.

In reaching its conclusion that Defendants escape liability simply by providing care only to one subset of the incarcerated population (pregnant people) while denying such care to everyone else regardless of their individual medical needs, the district court relied on two cases from this Court: *Cartagena v. Lovell*, 103 F.4th 171 (4th Cir. 2024), and *Horton v. Methodist Univ., Inc.*, 788 F. App'x 209 (4th Cir. 2019). Neither opinion supports the district court's conclusion. In *Cartagena*, this Court approved an individualized decision that a particular prisoner who was determined to be "assaultive, disruptive, and/or unmanageable" did not qualify for the benefit of housing in general population because he was found to be

26

a security threat. 103 F.4th at 184–85. The individualized decision made in *Cartagena* is precisely what is missing in this case. Here, the denial of MOUD was pursuant to a blanket policy. There is no dispute that Defendants engaged in no individualized consideration as to Edwards's medical need for MOUD after childbirth. JA3078 ("The parties agree that NCCIW took no action during the time of the events alleged in the second amended complaint to determine whether it could provide MOUD."). By failing to make the individualized determination that prison officials made in *Cartagena*, NCCIW violated the law.

Likewise, in *Horton*, an unpublished decision, this Court affirmed summary judgment on the plaintiff's ADA claim because, having failed numerous university classes even with reasonable accommodations, this Court held that the plaintiff no longer qualified for an academic program. 788 F. App'x at 210. This Court concluded that no reasonable jury could find that the plaintiff's failure in the program was due to a failure to accommodate. *Id.* This holding is inapposite to the facts here. Edwards was qualified to receive adequate medical care throughout her incarceration at NCCIW. NCCIW's blanket ban on MOUD for non-pregnant people denied Edwards meaningful access to this medical care, and NCCIW took no steps to accommodate Edwards's OUD.

### C.    Defendants Denied Edwards MOUD on the Basis of her Disability

Moving to the third prong of the ADA analysis, Edwards has advanced two theories to show Defendants discriminated against her on the basis of her OUD when they refused to give her access to MOUD. *See* Dkt. 187 at 56–58. First, the blanket prohibition on MOUD at NCCIW amounts to disparate treatment against people with OUD because it does not allow for any individualized assessment. Second, accessing MOUD is a reasonable accommodation, and Defendants did not show why it should not be granted.

### 1.    Defendants' categorical ban on MOUD for all non-pregnant patients was intentional discrimination on the basis of disability

Edwards has shown that she experienced disparate treatment because of her disability, in violation of the ADA and RA. Defendants provide adequate medical care for people in their custody, except for those people who seek treatment for their OUD. Those people, unless they are pregnant, are denied adequate medical care. As the district court in *Smith v. Aroostook County* held, when addressing a similar blanket ban on MOUD in a jail, "the Defendants' out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability." 376 F. Supp. 3d at 159–60. Accordingly, the district court ruled that Ms. Smith "is likely to

succeed" on her ADA claim and granted her preliminary injunction to enjoin the

jail's MOUD ban. *Id*. The First Circuit—the only circuit court to reach this issue—

agreed. *Smith*, 922 F.3d at 42.[5] Defendants discriminate on the basis of disability

when they simply define the disability itself as a disqualifying criterion. *See*

*Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998); *see also Kapche v. City of San*

*Antonio*, 304 F.3d 493, 500 (5th Cir. 2002) (noting that the ADA mandates

individualized assessments and bars categorical exclusions).

Similarly, the United States Department of Justice, which is responsible for

interpreting and implementing the ADA, *see* 42 U.S.C. § 12134, has expressly

determined that categorically denying MOUD to incarcerated patients who enter

custody with an active MOUD prescription is a violation of the ADA. U.S.

Department of Justice, *The Americans with Disabilities Act and the Opioid Crisis:*

*Combatting Discrimination Against People in Treatment or Recovery*,

https://perma.cc/YN6B-Z48K (last visited Feb. 28, 2025) ("A jail does not allow

---

[5] Many district courts agree, too. *See, e.g.*, *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47 (D. Mass. 2018) (holding MOUD ban likely violated the ADA because there were no "individualized security considerations underlying the decision to deny access to medically necessary treatment"); *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 376 (S.D.W. Va. 2024) (denying summary judgment because a jury could find that categorically denying MOUD even "to patients for whom it was medically appropriate" demonstrated "bias or discrimination toward patients with OUD"); *P.G. v. Jefferson Cnty.*, No. 5:21-CV-388, 2021 WL 4059409, at *4–5 (N.D.N.Y. Sept. 7, 2021) (granting preliminary injunction under the ADA enjoining ban on MOUD for non-pregnant people); *M.C. v. Jefferson Cnty.*, No. 6:22-CV-190, 2022 WL 1541462 at *4 (N.D.N.Y. May 16, 2022) (same).

incoming inmates to continue taking MOUD prescribed before their detention. The jail's blanket policy prohibiting the use of MOUD would violate the ADA.")

In sum, Edwards has presented ample evidence of intentional discrimination as it is undisputed that (1) the prison enforced a blanket ban on MOUD for all non-pregnant individuals even though there was no blanket restriction on effective treatment for other disabilities; and (2) there was no individualized determination that discontinuing her MOUD was medically appropriate.

### 2. Defendants unlawfully denied Edwards's reasonable accommodation by refusing to provide MOUD

An entity's failure to provide reasonable accommodations is actionable discrimination under the ADA. *See Finley*, 102 F.4th at 820. "Because failing to grant a reasonable accommodation is itself direct evidence of discrimination, plaintiffs who meet this burden need not provide additional evidence of discriminatory intent." *Id.* Reasonable accommodations (also called reasonable modifications) include individualized changes to policies or practices in order to allow disabled participants an equal opportunity. This Court recently reinforced the premise that the treatment of a disability can be a reasonable accommodation. *See Cartagena*, 103 F.4th at 185.

Here, Edwards requested a reasonable accommodation for her specific medical needs related to her disability: that she be allowed to continue her MOUD after her pregnancy and throughout her incarceration, so long as it was medically indicated.

JA3324. Once Edwards raised her need for a reasonable accommodation, the burden shifted to Defendants to either provide the requested accommodation, or provide an alternative and equally effective accommodation.[6]

While public entities are not always required to provide an individual's preferred accommodation, the ADA requires that the provided accommodation is equally effective as the requested accommodation. 28 C.F.R. § 35.130(b)(1)(iii); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016). Defendants are not free to provide something that has no connection to the disability or need— and indeed exacerbates it—in lieu of the requested, effective accommodation. *See Lamone*, 813 F.3d at 506.

Defendants did just that when they provided oxycodone to Edwards for a period of nine days instead of providing MOUD, as Edwards requested. Edwards has struggled for years with a severe opioid addiction that began with an oxycodone

---

[6] A defendant could have raised one of two affirmative defenses: demonstrating that "making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), or would impose "undue financial and administrative burdens" on the prison, *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1265 (11th Cir. 2019). Defendants raised neither affirmative defense, and they are forfeited. *See United States v. Smith*, 75 F.4th 459, 465 (4th Cir. 2023). Nonetheless, the record is also replete with evidence strongly suggesting that providing Edwards with MOUD would have imposed little, if any, burden to Defendants and would not have fundamentally altered their medical services. NCCIW medical staff had ensured Edwards received MOUD every day for more than six months before she gave birth, JA167, and the prison's MOUD clinic was operational and fully capable of providing Edwards with MOUD following her delivery, JA570-571.

prescription. JA3034-3035. There is no evidence in the record that oxycodone can reasonably be used to treat OUD; nor did Defendants raise this argument. Indeed, the record reflects the opposite: oxycodone is a highly addictive opiate which *does not treat OUD*. JA178. Providing oxycodone to Edwards, who predictably suffered from severe withdrawal symptoms after Defendants terminated her MOUD, made no medical or common sense and dramatically elevated her risk of relapse, overdose, and death. JA178; JA3036. In fact, weeks after being given oxycodone instead of MOUD, NCCIW physician Dr. Alison Goulding diagnosed Edwards again with ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. JA3214. Thus, the district court erred when it found that "[i]nstead of her requested MOUD, Edwards received an oxycodone taper, which is a reasonable accommodation." JA3093.

Neither of the cases relied on by the district court in so finding—*Richardson v. Clarke*, 52 F.4th 614 (4th Cir. 2022) and *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir. 1995)—support the proposition that oxycodone was a reasonable accommodation for Edwards's OUD. Unlike here, the prisons in both cases made numerous accommodations that actually addressed the specific disabilities, rather than exacerbating the problem. *Richardson*, 52 F.4th at 619–21 (providing ASL interpreters for deaf incarcerated people with language challenges); *Torcasio*, 57

32

F.3d at 1356 (providing an incarcerated person with mobility limitations with a larger bed equipped with railings).

The additional decisions cited by the district court in the section discussing reasonable accommodations are inapposite here. *See* JA3093. In the only case discussing OUD, the *pro se* plaintiff's treating physician had determined that MOUD was not medically necessary for him—in stark contrast to the facts here. *Chamberlain v. Va. Dep't of Corr.*, No. 7:20-cv-45, 2021 WL 4100354, at *4, *12 (W.D. Va. Sept. 9, 2021). The facts and reasoning of the others are not instructive here. *Koon v. North Carolina*, 50 F.4th 398, 404–10 (4th Cir. 2022) (assessing claim that mobility disability entitled individual to a reasonable accommodation of a hall pass for the first floor library where prison had already made extensive accommodations); *Hildreth v. Butler*, 960 F.3d 420, 430–31 (7th Cir. 2020) (holding accommodation allowing incarcerated plaintiff with Parkinson's disease more time with a typewriter to draft court documents was reasonable); *Richardson*, 52 F.4th at 621 (approving accommodations that allowed blind plaintiff to "read, research and compose detailed legal filings"); *Horton*, 788 F. App'x at 210 (holding accommodation allowing disabled student extra time to complete exams was reasonable).

Accordingly, the district court erred in its grant of summary judgment, especially considering that all reasonable inferences must be drawn in Edwards's favor.

\*     \*     \*

In short, Edwards experienced the "stigma that often attaches to" people in recovery after she gave birth and returned to NCCIW, and Defendants refused to provide her with MOUD. *A Helping Hand*, 515 F.3d at 367. The district court's failure to analyze her legal claim—that she was discriminated against and not reasonably accommodated for equal access to prison healthcare because of her OUD—is reversible error. Given the support in the record and in case law for Edwards's ADA and RA claims, the lack of supportive material cited in the district court's order, and the inferences that should have been drawn in her favor but were not, the summary judgment ruling must be reversed.[7]

---

[7] The Supreme Court has held that plaintiffs can plead an ADA claim and a companion constitutional claim for the same deprivation of medical services. *See United States v. Georgia*, 546 U.S. 151, 157–59 (2006). Although this Court has not issued a decision in the Eighth Amendment context, it has agreed that the same conduct can establish an ADA violation and a companion constitutional violation. *See Fauconier*, 966 F.3d at 280. This Court should not hesitate to reach both of Edwards's claims because "Title II validly abrogates state sovereign immunity" where, as here, Plaintiff alleges "conduct that *actually* violates the [Eighth] Amendment," as shown below. *Id.* (quoting *Georgia*, 546 U.S. at 159).

## III.    Defendants Acted with Deliberate Indifference and Placed Edwards at Risk of Serious Harm or Injury

The Eighth Amendment's prohibition of cruel and unusual punishment protects individuals from inhumane treatment and conditions while imprisoned, including the deprivation of medically necessary care. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Incarcerated people alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the two-pronged test set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), which includes both objective and subjective elements.

*Farmer*'s objective test is satisfied if the challenged condition poses "a substantial risk" of a "serious or significant physical or emotional injury resulting from the challenged conditions." *Scinto*, 841 F.3d at 225 (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). A medical deliberate indifference claim requires the plaintiff to have an objectively "serious" medical condition, *i.e.*, one that is "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Under *Farmer*'s "subjective" prong, a plaintiff must show that prison officials acted with deliberate indifference. *Id.* A prison official is deliberately indifferent if he "knows of and disregards" a serious medical need or a substantial risk to a

prisoner's health or safety. *Farmer*, 511 U.S. at 837; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (noting that a prison official must have "had actual subjective knowledge of both the [incarcerated person's] serious medical condition and the excessive risk posed by the official's action or inaction").

Plaintiffs need not show that a prison official actually believed that the harm would occur—"it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Indeed, this Court has recognized that a plaintiff "need not show that she in fact suffered serious harm to prevail on [an Eighth Amendment deliberate indifference claim] because the Eighth Amendment protects against future harm." *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 107 (4th Cir. 2017) (cleaned up); *see also Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023). The subjective component is a question of fact that may be satisfied through ordinary methods of proof, including "inference from circumstantial evidence." *Thompson*, 878 F.3d at 108 (quoting *Farmer*, 511 U.S. at 842).

Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). A prison medical director may be held liable if they implement a policy that denies care they realize is necessary, even if they did not treat a particular patient. *See Gordon v. Schilling*,

937 F.3d 348, 362 (4th Cir. 2019). Denying necessary medical care for non-medical reasons makes out a case for deliberate indifference. *See, e.g.*, *Roe v. Elyea*, 631 F.3d 843, 861–63 (7th Cir. 2011) (holding that doctor who implemented blanket policy basing treatment on sentence length rather than individual medical needs was deliberately indifferent); *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) ("The blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference.").

## A.   The District Court Erred in Granting Summary Judgment on Edwards's Eighth Amendment Claim for Denial of MOUD

Edwards brought an Eighth Amendment claim against Alexander, Amos, and Junker for denying her access to MOUD.[8] JA72. Edwards provided a wealth of evidence that would easily permit a jury to find that she satisfied both prongs of her deliberate indifference claim against them—particularly if viewed in her favor, as required here. The district court's unexplained conclusion to the contrary failed to properly credit Edwards's evidence and should be reversed.

### 1.   Edwards's OUD is an objectively serious medical condition

The district court did not make any ruling on serious medical need, but it acknowledged the relevant facts showing the substantial risk associated with withdrawal and OUD. *See* JA3072-3077. Defendants never disputed that OUD is an

---

[8] Edwards also asserted this claim against Defendants Ishee, Perry, and Witherspoon below, but does not advance this claim against them on appeal.

objectively serious medical need—perhaps because their own providers recognized it as a condition "mandating treatment." *Scinto*, <u>841 F.3d at 225</u>.[9] Edwards suffered serious harm during her withdrawal and was put at serious risk of substantial harm given her heightened risk of relapse, overdose, and death from the discontinuation of her MOUD. This Court should not hesitate to align with other courts that have recognized the objective seriousness of OUD and withdrawal. *See Brawner v. Scott Cnty.*, <u>14 F.4th 585, 598</u> (6th Cir<u>. 2021)</u>, *cert. denied*, <u>143 S. Ct. 84</u> (2022) (denying summary judgment for nurse who denied a detained individual MOUD); *Taylor v. Wexford Health Sources, Inc.*, <u>737 F. Supp. 3d at 373</u>–74 (denying summary judgment for jail and medical contractor that denied plaintiff MOUD).

> **2.    A reasonable jury could conclude that Amos acted with deliberate indifference when he enforced a policy to categorically deny patients with OUD access to MOUD unless they were pregnant**

The district court erred when it granted summary judgment to Defendants on Edwards's deliberate indifference claim by summarily concluding that Edwards "ha[d] not presented evidence that any defendant subjectively knew she faced a substantial risk of serious harm and disregarded that risk by discontinuing MOUD after she gave birth." <u>JA3084</u>. The record is replete with evidence to the contrary, including in the district court's very own factual findings.

---

[9] Defendants have thus forfeited any argument that OUD is not an objectively serious medical condition. *See Smith*, <u>75 F.4th at 465</u>.

First, the district court's conclusion contradicts its finding that the record establishes without dispute that Amos was "personally aware that withdrawal from buprenorphine can cause pain and nausea[,]" that OUD is a "potentially deadly condition[,]" and that despite this knowledge, "NCCIW took no action . . . to determine whether it could provide MOUD" to Edwards. JA3078. Amos testified that OUD is a serious illness that can be fatal. JA148 (¶ 218, undisputed); *see* JA3066. Amos was also personally aware that "[w]omen with OUD are particularly vulnerable to overdose immediately post-incarceration and also in the postpartum period[]" and that "[e]nsuring that women who have initiated MOUD during pregnancy can continue treatment postpartum and are referred to community providers is an important step in continuity of care for OUD." JA696. Amos testified that MOUD would help relieve the painful symptoms associated with withdrawal including "headache to twitching to itching to restlessness, can't sleep, pain, initiation of pain throughout their body because of the withdrawal process." JA2688. Amos co-authored an article explaining that women with OUD are at risk of death or overdose during pregnancy and postpartum and that women who abstain from drug use during incarceration are at "extremely high risk of overdose death when they return to the community," JA691; more broadly, he has admitted that the standard treatment for OUD in the community involves prescribing medication. JA2659-2660; JA696.

The record also shows that Amos knew of the risk of harm to Edwards, specifically. *See* JA3181. Even though Edwards was allowed to take MOUD throughout her pregnancy and it was effective in treating her OUD, NCCIW's policy barred Edwards from accessing MOUD after giving birth. It is undisputed that after returning to NCCIW after childbirth, Edwards experienced physical symptoms from the forced withdrawal of MOUD, including several weeks of pain, diarrhea, and vomiting. JA3324; JA178; JA169. Edwards said the pain of withdrawal from MOUD was even worse than childbirth. JA169.

Amos disregarded all of this information when he enforced NCCIW's MOUD-denial policy. Amos personally issued NCCIW's "MAT Provider Handbook," which set out the mandatory NCCIW protocols for prescribing MOUD only for the benefit of unborn fetuses. Immediately after birth, according to this mandatory blanket policy, postpartum patients' MOUD prescriptions were terminated. JA636.

This Court held that a blanket ban against particular medical care that does not allow for individualized assessment of needs violates the Eighth Amendment. *See Gordon*, 937 F.3d at 360. Furthermore, this Court has repeatedly recognized that a defendant's concession of knowledge that a particular course of action will impose a substantial risk of serious harm is sufficient to defeat summary judgment. *See Phoenix v. Amonette*, 95 F.4th 852, 860 (4th Cir. 2024); *see also Gordon*, 937 F. 3d.

at 362 (holding that a prison director "may not escape liability by claiming that he did not know the identities of the [incarcerated people] who would suffer under his policies"). Amos's intentional decision to implement a blanket ban on MOUD satisfies the subjective requirement and requires reversal of the district court's order as to Amos.

Edwards's case is analogous to this Court's decision in *De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003). There, this Court held that the evidence presented established deliberate indifference to the plaintiff's serious medical needs for her gender dysphoria where prison officials (1) knew of her diagnosis, (2) knew her treatment was discontinued for no legitimate medical reason, (3) knew the termination of the treatment resulted in harm, and (4) provided no treatment to prevent the harm. *See id.* at 634.

Here, Amos (1) knew Edwards had OUD, (2) knew Edwards was receiving MOUD while pregnant, (3) knew Edwards faced a serious risk of harm if MOUD was discontinued, (4) discontinued MOUD for no legitimate medical reason because of an arbitrary discriminatory policy, and (5) forced her to experience the harm of MOUD withdrawal, putting her at increased future risk of harm from relapse and overdose. The blanket policy banning MOUD violates the Eighth Amendment.

District courts within this circuit and throughout the country have reached similar conclusions. *Wexford*, 737 F. Supp. at 373–74 (denying defendant's

summary judgment motion because a jury could find that defendants had a policy of denying MOUD to non-pregnant people even when medically necessary); *Johnson v. Dixon*, No. 23-CV-23021, 2023 WL 6481252, at *4 (S.D. Fla. Oct. 5, 2023) (holding FDOC's alleged blanket prohibition on MOUD, which does not consider individual needs, may constitute "deliberate indifference" to medical needs); *Pesce v. Coppinger*, 355 F. Supp. 3d at 47 (finding plaintiff likely to succeed on Eighth Amendment claim where defendants categorically denied MOUD). The district court's grant of summary judgment must be reversed.

> ### 3. A reasonable jury could conclude that Alexander acted with deliberate indifference when he ratified a policy to categorically deny patients with OUD access to MOUD unless they were pregnant

Alexander, as "CEO of the healthcare facility" at NCCIW, was aware of and responsible for reviewing the policy that categorically denied patients access to MOUD unless they were pregnant. JA1194; JA1195-1196. He was explicitly aware that terminating MOUD could cause unnecessary suffering and increase the risk of relapse, overdose, and death. JA3027. Alexander confirmed that there was nothing preventing x-waivered providers (like Amos) at NCCIW from prescribing anyone, including non-pregnant people, buprenorphine. JA446. The only deterrent was the blanket ban Alexander ratified. *See* JA1195-1196. Alexander was therefore aware that OUD constituted a serious medical need and that denying treatment would put

patients at risk of serious harm, such as pain and suffering, relapse, overdose, and death. JA3027.

Alexander was subjectively aware of the objectively serious harm the policy would and did cause, yet ratified it anyway, disregarding the safety of the women under his authority at NCCIW—violating the Eighth Amendment. *See Gordon*, 937 F. 3d. at 360–62. The district court's grant of summary judgment against him should therefore also be reversed.

### 4. The district court based its contrary conclusion on faulty legal support

The district court cited two circuit cases and two district court cases in support of its conclusory statement that Edwards presented no evidence of subjective deliberate indifference. JA3084. The cases are inapposite. The only published appellate decision cited was a Tenth Circuit case, which actually supports reversal. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022 (10th Cir. 2020). There, an incarcerated individual died from the severe effects of opioid withdrawal. *Id.* at 1030. The Tenth Circuit held that the subjective deliberate indifference requirement was met because a defendant officer was aware that the individual was vomiting blood, so a jury could conclude that the officer was aware of a serious medical risk. *Id.* Similarly, here, there is no question that Amos and Alexander had subjective knowledge of the policy preventing treatment and the harms that policy would cause, and Amos knew of Edwards's needs, specifically.

Next, the district court cited an unpublished Third Circuit case that also supports Edwards because it held that withdrawal symptoms exhibited a serious medical need. *Sylvester v. City of Newark*, 120 F. App'x 419, 423 (3d Cir. 2005). Defendants provided emergency medical care in response to those symptoms. *Id.* at 424. Here, Edwards's withdrawal was not monitored using COWS and she never received the treatment that would help: MOUD.

The district court opinions similarly support Edwards's claims. *See Wexford*, 737 F. Supp. 3d at 372–74 (upholding Eighth Amendment claim against a policy issuing a blanket MOUD ban); *Est. of Beland ex rel. Hayes v. Charleston Cnty. Sheriff's Off.*, No. 1:20-30060SAL0SVH, 2021 WL 4754576, at *17 (D.S.C. Oct. 12, 2021) (denying summary judgment because a jury could find that defendants knew of and disregarded an excessive risk to plaintiff's health when they delayed treatment despite severe withdrawal symptoms). The district court's legal analysis is conclusory and erroneous; these cases support Edwards's claim when viewing the record in the light most favorable to her.

### B.  The District Court Erred in Granting Summary Judgment on Edwards's Eighth Amendment Claim for Unlawful Shackling Around Childbirth

The district court did not address the merits of Edwards's Eighth Amendment shackling claim against former NCCIW Warden Witherspoon or the Officer Defendants who restrained Edwards, instead dismissing her claims based on

qualified immunity.[10] As laid out below, though, Edwards presented ample evidence that Defendants acted with deliberate indifference to Edwards's serious medical needs. At bottom, this question should have been presented to a jury.

**1.  Defendants' shackling of Edwards late in her pregnancy (including during her transportation to the hospital), during childbirth, and immediately after delivery posed a substantial risk of serious harm**

Edwards put forth substantial evidence on which a jury could conclude that Defendants subjected her to a substantial risk of serious harm when they restrained her while being transported for childbirth, while she labored at the hospital, while recovering and bonding with her newborn, and while being transported back to NCCIW. Defendants do not dispute that, at all those times, Edwards did not pose a security or flight risk. JA117 (¶ 15, undisputed); *see* JA3057.

First, DPS itself prohibited most of the restraints Defendants applied to Edwards during this time. JA510-511. Viewing this evidence in Edwards's favor, this prohibition evidences DPS's judgment that shackling people while about to give birth, during childbirth, and immediately afterward could cause serious harm.

Edwards's expert, Maternal-Fetal Medicine specialist Dr. Stuebe, substantiated the recognized harms: "[Shackling] is psychologically devastating,

---

[10] As discussed below, *see infra* Section IV(B), Defendants' mental state is crucial to determining whether qualified immunity attaches. *See Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022). Thus, the district court's failure to analyze the merits of Edwards's Eighth Amendment claim led to error on the issue of qualified immunity.

dehumanizing, and painful, and it increases the risks to mother and baby." JA173. The practice is opposed by the United Nations Committee Against Torture and multiple major medical organizations. JA173. Stuebe explained the medical risks associated with use of restraints late in pregnancy and childbirth, including potential falls (which can cause the placenta to detach from the uterus, causing a medical emergency), inhibiting the doctor-patient relationship, and interfering with emergency medical intervention. JA175.

A jury could also rely on Edwards's own testimony about the pain and degradation that she experienced to conclude that she was exposed to serious risk: she testified that, while shackled to the hospital bed by one leg and one wrist, she began experiencing "powerful contractions" and had no choice but to "l[ie] there" in pain while laboring—before she received an epidural. JA167. The shackles themselves also caused her extreme pain, rubbing her swollen ankles raw. JA167. She testified that the restraints were not removed until the doctors "told [her] to start pushing." JA167. After her baby was born, she "couldn't walk around to soothe her." JA168. She described the treatment as "worse than you'd treat a dog," causing her mental and emotional trauma that has not abated. JA168; JA170.

From all this evidence, a jury could readily conclude that Defendants subjected Edwards to a substantial risk of serious harm.

### 2. Defendants acted with deliberate indifference to the serious harm and risk of harm they inflicted upon Edwards

A jury could also determine that Witherspoon and Officer Defendants acted with deliberate indifference to the substantial risk of serious harm posed by shackling Edwards at the end of her pregnancy, while in labor, and just after giving birth.

Witherspoon, for her part, was responsible for ensuring that NCCIW officers complied with DPS policies. JA317. Witherspoon was aware that DPS policy prohibited shackling individuals around childbirth. JA510–511; *see* JA318–319 (Witherspoon recounting conversation with DPS regional director regarding shackling policies); JA321–322 (same). But she promulgated contradictory policies at NCCIW, requiring additional restraints. JA513-524; JA339-340. And, under Witherspoon's watch, the Officer Defendants continued shackling pregnant, laboring, and postpartum people—including Edwards—in violation of DPS policy.

When NCCIW's unlawful shackling around childbirth came to DPS's attention in April 2019, the DPS Regional Officer contacted Witherspoon, instructing her to reform NCCIW's contradictory policies. JA321–322. Witherspoon did not. JA321-322. In November 2019, when a pregnant person was shackled at the hospital in violation of DPS policy, DPS *again* contacted Witherspoon and instructed her to conform NCCIW policies. JA554–555; JA539; JA542. The DPS Regional Director instructed Witherspoon: "Any offender in their third trimester

47

should not be restrained . . . . Please ensure that you notify your staff of this temporary directive." JA539. Just a month later, Officer Brodie handcuffed Edwards on the way to the hospital to be induced. JA167; *see* JA623, JA1706-1708.

From these facts, a jury could conclude that Witherspoon was apprised of the serious risk to pregnant people—including Edwards—of being restrained late in pregnancy, during labor and childbirth, and postpartum. A jury could conclude that Witherspoon knew that NCCIW officers were *still* shackling Edwards at all of these times and took minimal action, at best.[11] A jury could conclude that Witherspoon acted with deliberate indifference when she did not implement the state policies designed to mitigate the known harms to pregnant people, despite having been expressly directed to do so.

As to the risk of harm that each of the Officer Defendants was aware of when they shackled Edwards—cuffing her swollen ankles to the hospital bed while she endured labor contractions, tethering her to the bed so she could not stand to soothe her crying newborn just hours after delivery—the record presents a quintessential question of fact for a jury to consider.

---

[11] A reasonable jury could also conclude that Witherspoon knowingly lied to DPS when, about three months after Edwards gave birth, the DPS Regional Director asked if NCCIW was complying with the prohibition against restraints during the third trimester. Witherspoon replied: "Yes ma'am." JA543.

First, Defendants Ragano, Brodie, Williams, and Lynch all testified that they had been trained on the DPS policies *prohibiting the very conduct* in which they engaged. JA747–749; JA726–727; JA752–754; JA758-759. From this, a jury could infer that they had been trained on the risks to pregnant people posed by their violative conduct, disregarding it when they shackled Edwards.

Moreover, a jury could find that—even without specific training—the risk of harm was evident to the Officer Defendants on the facts presented here. For example, a jury should be able to consider what risk of harm Lynch was aware of when she left Edwards with one arm and one leg shackled to the hospital bed for hours, even after she was induced. JA167. A jury should be able to consider the harm and risk of harm that Lynch was apprised of when Edwards could not move during her painful labor contractions, and when the restraints had cut into Edwards's swollen ankles. JA167.

As another example, it is a question for the jury what risk of harm Defendant Ragano was apprised of and disregarded when, less than an hour after Edwards gave birth to her daughter, Ragano handcuffed Edwards's wrist to the bed and chained her ankles together. JA168.

It is a question for the jury what risk of harm Defendants Gill, Dixon, Brown, and Williams were aware of as they chained one or both of Edwards's legs to the hospital bed, and sometimes one arm, in the recovery room. JA168. A jury could

49

find that these officers saw Edwards could not stand to go to her crying baby and struggled to hold her as a result of the restraints. JA168. A jury should assess the risk of harm of which they were aware as Edwards endured this pain and humiliation before them.

Finally, a jury must assess the risk of harm Williams was aware of when, while transporting Edwards back to NCCIW two days after Edwards gave birth, Williams secured a belly chain around Edwards's sensitive midsection, pressing on the site of her epidural injection and exacerbating her already severe pain. JA168. Williams further forced Edwards to jump from the vehicle with her hands and ankles shackled, causing Edwards intense pain when she landed. JA169.

Simply put, a jury could easily conclude from the facts in the record that, when each of the Officer Defendants shackled Edwards, they were consciously disregarding a risk of physical and emotional suffering and degradation. As the record would permit a jury to find that Witherspoon and Officer Defendants violated Edwards's Eighth Amendment rights, the district court should not have dismissed Edwards's shackling claims on summary judgment.

## IV. The District Court Erred in Finding Defendants Entitled to Qualified Immunity on Edwards's Shackling Claims

### A. Qualified Immunity Standard

Qualified immunity operates to "shield[] federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Generally, a court

assesses a qualified immunity defense in a two-pronged approach: first, the court asks whether "the official violated a statutory or constitutional right"; then the court asks whether "the right was clearly established at the time of the challenged conduct." *Id.* (quotation omitted). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). Thus, to prevail on qualified immunity, Defendants must establish that the right at issue was *not* clearly established at the time of their conduct. In assessing qualified immunity at the summary judgment stage, a court must draw all inferences in favor of the nonmovant—even when a court addresses only the "clearly established" prong. *Brown ex rel. Lawhorn v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017).

This Court has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases"—those involving intentional violations of the Eighth Amendment. *Younger*, 79 F.4th at 385 n.17. In these cases, where a plaintiff demonstrates an intentional violation of the Eighth Amendment, "they have also made a showing sufficient to overcome any claim to qualified immunity." *Thorpe*, 37 F.4th at 934 (citations and quotation marks omitted). Thus, "[s]o long as the officers' mental state remains genuinely in issue," a court should not dismiss based on qualified immunity. *Id.*

51

This single-prong analysis applies "most neatly" to "a prison doctor, who doesn't need case law to tell him his patient deserves fair treatment" or "a prison guard, who doesn't need case law to tell him he can't abuse an inmate." *Pfaller v. Amonette*, 55 F.4th 436, 446 (4th Cir. 2022). This Court has also done away with the "clearly established" prong where the defendants engaged in long-term use of solitary confinement that caused physical and mental harms observable even to untrained professionals. *Thorpe*, 37 F.4th at 935–37. Where an officer "deliberately ignores the harms confinement conditions cause . . . [,] [h]e does not need precedent to tell him [that he is violating the law]; he can use his own state of mind as a reference point to assess conformity to the law." *Id.* at 939 (quotation marks and citations omitted).

Even in cases where the court must separately evaluate the "clearly established" prong, "a right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens v. Baltimore City State Atty's Off.*, 767 F.3d 379, 399 (4th Cir. 2014). The Supreme Court has "expressly rejected a requirement that previous cases be 'fundamentally similar'" for a right to be clearly established. *Hope*, 536 U.S. at 741. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* And prison officials who commit intentional acts of "obvious

cruelty" are not entitled to qualified immunity. *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (quoting *Hope*, 536 U.S. at 745).

At bottom, "[q]ualified immunity fundamentally concerns itself with fair notice." *Thorpe*, 37 F.4th at 934. "[T]here is no societal interest in protecting" conduct that "amount[s] to reckless or callous indifference to the rights and safety of the prisoners." *Id.* (cleaned up).

## B. Defendants are not Entitled to Qualified Immunity Under *Thorpe's* Single-Prong Analysis

As discussed above, a reasonable jury could conclude that Witherspoon and the Officer Defendants acted with deliberate indifference, violating the Eighth Amendment, when Edwards was shackled around the time of her childbirth. Under *Thorpe*, because the relevant defendants' mental states remain in issue, it was inappropriate for the district court to find that qualified immunity attaches and dismiss Edwards's shackling claims. *See id.*

As in *Thorpe*, "the pre-existing law is not in controversy: It has long been established that prison officials may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against inhumane conditions while in custody if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 935 (cleaned up).

Also as in *Thorpe*, the facts here shock the conscience. The physical and emotional harm (and risk of harm) to which Witherspoon and the Officer Defendants subjected Edwards was self-evident: Defendants chained a woman to a hospital bed for over ten hours, including while she was in active labor and experiencing extreme pain. They removed her chains only once she was told to push, then cuffed her legs together and her wrist to the bed again within an hour of delivery. She remained chained—frequently by both an arm and a leg—while recovering from childbirth and attempting to care for and bond with her newborn. This conduct was the result of Witherspoon's enforcement of inhumane policies, Witherspoon's repeated disregard of DPS's directives to update those policies, and each Officer Defendant's application of restraints and indifference to both their training and to Edwards's visible pain, suffering, and humiliation.

The district court declined to engage with the record evidence of Witherspoon's and the Officer Defendants' mental states, *cf. id.* at 926, including what a jury might conclude from their conduct under the circumstances. But the record shows ample evidence of Witherspoon's and the Officer Defendants' awareness and disregard of the risk, pain, and suffering imposed on Edwards, rendering the finding of qualified immunity inappropriate.

### C.     Edwards's Right to be Free from Shackling Was Clearly Established

Precedent also shows that Edwards's right to be free from shackling under the circumstances presented here was clearly established. The Supreme Court has ruled that officers violate the Eighth Amendment by using restraints on an incarcerated person posing no safety threat in a way that "created a risk of particular discomfort and humiliation," including "handcuffing [incarcerated people] to . . . maintain awkward positions for prolonged periods." *Hope*, 536 U.S. at 731, 742. *Hope* clearly establishes Edwards's right to be free from the risky, painful, and degrading use of restraints to which Defendants subjected her. This is true even though the factual circumstances here differ from those in *Hope*. *See id.* at 741. The district court erred when it found that, as it could locate no controlling precedent "address[ing] a pregnant [person's] Eighth Amendment protections from restraint in the situation confronting the defendants in this case," Edwards's right was not clearly established. JA3089-3090. This exceedingly narrow view of qualified immunity contravenes this Court's repeated directives. *See Scinto*, 841 F.3d at 236 ("[T]here is no requirement that the very action in question must have previously been held unlawful for a reasonable official to have notice that his conduct violated that right." (cleaned up)); *Owens*, 767 F.3d at 399.

Moreover, Edwards also demonstrated a clear consensus as to her right to be free from shackling around the time of her childbirth and immediately postpartum,

placing the serious and unnecessary dangers of such restraints well "beyond debate" in late 2019. *al-Kidd*, 563 U.S. at 741; *see* Dkt. 286 at 9–10. Edwards's authority included: three published circuit decisions,[12] two district court decisions,[13] the testimony of a medical expert, JA173–176, the consensus of leading health organizations,[14] and legislative actions across 27 states, *see* Dkt. 286 at 9–10. Meanwhile, Defendants presented *no* contrary evidence that these were acceptable practices—which they could not have, because the state's binding policy actually deemed them *unacceptable*.

The district court ignored most of Edwards's evidence, looking just at the five cases, and commenting that, while they demonstrated "an *emerging trend* in Eighth

---

[12] *Villegas*, 709 F.3d at 568 (Sixth Circuit holding fact issues precluded summary judgment where plaintiff was shackled during labor and re-shackled about six hours after giving birth); *Nelson*, 583 F.3d at 534 (Eighth Circuit holding the "obvious cruelty inherent in" shackling during labor put defendant on notice that shackling was unconstitutional); *Mendiola-Martinez*, 836 F.3d at 1252, 1254, 1257 (Ninth Circuit holding jury could find defendants deliberately indifferent when they cuffed plaintiff's wrists and ankles together during childbirth).

[13] *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1219 (W.D. Wash. 2010) (holding jury could conclude that shackling around childbirth caused plaintiff "unnecessary pain" and had "a sufficiently serious risk of harm"); *Women Prisoners of D.C. Dep't of Corr.*, 877 F. Supp. 634, 668 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995) (holding shackling prisoner in third trimester and during delivery is "redundant and unacceptable in light of the risk of injury to a woman and baby").

[14] The National Commission on Correctional Health Care, the American Medical Association, the American College of Obstetricians and Gynecologists, the Association of Women's Health, Obstetric, and Neonatal nurses all oppose shackling in pregnancy, labor, and postpartum. *See* JA174.

Amendment jurisprudence" they did not place Edwards's rights "beyond debate." JA3089-3090 (emphasis added). But the total evidence demonstrates only consensus—achieved well before 2019—and no debate. With no contrary evidence, Defendants failed to carry their burden on the "clearly established" prong. *See Stanton*, 25 F.4th at 233.

At bottom, the district court "distort[ed] qualified immunity into [an] absolute immunity"—which this Court has warned against. *Pfaller*, 55 F.4th at 453. The district court thus erred in dismissing Edwards's shackling claims on qualified immunity grounds.

## CONCLUSION

This Court should reverse the district court's summary judgment order and remand for further proceedings.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff respectfully requests oral argument. This appeal seeks review of the district court's summary judgment ruling on several complex areas of law based on a voluminous factual record. The district court's ruling involves important questions of law in areas of significant public interest including disability rights, the rights of incarcerated people, and the doctrine of qualified immunity. Plaintiff submits that oral argument would aid the Court's decisional process in this important litigation,

including by assisting the Court in working through these various issues and in navigating the voluminous factual record.

Dated: March 7, 2025        Respectfully submitted,

                                  */s/ Shana Khader*

D Dangaran                            Shana Hope Khader
RIGHTS BEHIND BARS               Jaclyn S. Tayabji
1800 M St. NW                     Hassan A. Zavareei
Front 1 # 33821                  TYCKO & ZAVAREEI LLP
Washington, D.C. 20033          2000 Pennsylvania Ave. NW
202-455-4399                    Suite 1010
d@rightsbehindbars.org        Washington, D.C. 20006
                                    202-973-0900
Sarah Grady                      skhader@tzlegal.com
David Howard Sinkman
Amelia Caramadre                 Joseph K. Longley
KAPLAN & GRADY LLC          AMERICAN CIVIL LIBERTIES UNION
2071 N. Southport Ave., Ste. 205    FOUNDATION
Chicago, IL 60614               915 15th Street NW, 7th Floor
312-852-2184                   Washington, DC 20005
sinkman@kaplangrady.com       202-675-2338
                                    jlongley1@aclu.org
Daniel K. Siegel
Amika Medha Singh
ACLU OF NORTH CAROLINA LEGAL
FOUNDATION
PO Box 28004
Raleigh, NC 27611
919-592-4630
dsiegel@acluofnc.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: March 7, 2025

*/s/ Shana Khader*
Shana Khader

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and contains, excluding the parts of the document exempted by Fed. R. App. P. 32(f), 12,823 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point font size and Times New Roman.

Date:  March 7, 2025

*/s/ Shana Khader*
Shana Khader