No. 24-7049

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

TRACEY EDWARDS,

Plaintiff–Appellant,

v.

BENITA WITHERSPOON, ET AL.,

Defendants–Appellees.

On Appeal from a Final Judgment of the United States District Court
for the Eastern District of North Carolina, Western Division
Case No. 5:21-CT-3270-D, Hon. James C. Dever III

BRIEF OF ADDICTION MEDICINE SPECIALISTS AS *AMICI CURIAE*
SUPPORTING APPELLANT AND REVERSAL

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for Amici*

March 7, 2025

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................. iii

Interests of the *Amici Curiae* ................................................................. 1

Summary of Argument ............................................................................ 2

Argument .................................................................................................. 3

I.    Opioid Use Disorder is a chronic disease, not a failure of personal will. ............ 3

II.   As a chronic disease, the proper treatment for OUD is medication. .................. 4

      A.   Medication is the standard of care for treatment of OUD. .......................... 4

      B.   Treatment with MOUD reduces the risk of overdose and death, reduces drug use overall, and has particular positive effects within the criminal justice system. .............................. 11

III.  MOUD treatment plans should reflect individual factors and the standard of care, and must not default to intentional facilitation of withdrawal. .................................................. 14

      A.   Treatment for OUD is an individualized decision between a doctor and patient. ...................................... 14

      B.   Forced withdrawal from MOUD is inappropriate. .................................... 14

IV.   The end of a pregnancy is not a medical reason to stop a prescribed MOUD treatment plan; abruptly ceasing MOUD on that basis increases the risk of maternal mortality and does not reflect the standard of care. ........................................ 16

Conclusion ................................................................................................ 20

Certificates ............................................................................................... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Other Authorities**

Alan I. Leshner, *Addiction is a Brain Disease, and it Matters*, 278 Science 45 (1997) ........................................................................................................................... 13

American College of Obstetricians and Gynecologists, *Opioid Use and Opioid Use Disorders During Pregnancy*, Committee Opinion, No. 711 (Aug. 2017), *reaffirmed 2021* .................................................................................... 16, 17, 18, 19

American Society of Addiction Medicine, Definition of Addiction (Sept. 15, 2019) .... 3

American Society of Addiction Medicine, *National Practice Guidelines for the Treatment of Opioid Use Disorder*, 2020 Focused Updated ............................passim

American Society of Addition Medicine, Public Policy Statement on Treatment of Opioid Use Disorder in Correctional Settings .......................................................... 8

C. Brendan Clark, et al., *Methadone maintenance treatment may improve completion rates and delay opioid relapse for opioid dependent individuals under community corrections supervision*, 39 Addict. Behav. 1736 (2014) ..................... 13

Centers for Disease Control and Prevention, *Guideline Recommendations and Guiding Principles* (March 16, 2023) ................................................................. 8, 16

Elizabeth A. Evans et al., *Criminal Justice Outcomes Over 5 Years After Randomization to Buprenorphine-Naloxone or Methadone Treatment for Opioid Use Disorder*, 114 Addiction 1396 (2019) ................................................................ 12

Elizabeth L.C. Merrall et al., *Meta-Analysis of Drug-Related Deaths Soon After Release from Prison*, 105 Addiction 1545 (2010) .................................................. 12

Emelie Bruzelius and Silvia S. Martins, *US Trends in Drug Overdose Mortality Among Pregnant and Postpartum Persons, 2017-2020*, 328 JAMA 2159-61 (Dec. 6 2022) ...................................................................................................................... 17

George E. Woody et al., *HIV Risk Reduction with Buprenorphine-Naloxone or Methadone: Findings from a Randomized Trial*, 66 J. Acquired Immune Deficiency Syndromes 288 (2014) ......................................................................... 11

Georgie J. MacArthur et al., *Opiate Substitution Treatment and HIV Transmission in People Who Inject Drugs: Systematic Review and Meta-Analysis*, 345 BMJ 1 (2012) ...................................................................................................................... 11

Hari Cheryl Sachs, *The transfer of drugs and therapeutics into human breast milk: an update on selected topics*, 132 Pediatrics 796–809 (2013) ............................... 19

Harvard Medical School, *Comparing medications to treat opioid use disorder* (Jan. 3, 2018) ....................................................................................................................... 7

Hendree Jones et al., *Methadone maintenance vs. methadone taper during pregnancy: maternal and neonatal outcomes*, 17 Am. J. Addiction 372–86 (2008) ................................................................................................................................... 17

Ingrid A. Binswanger, et al, *Release from Prison — A High Risk of Death for Former Inmates*, 356 New England Journal of Medicine 157 (2007) ................................ 12

## TABLE OF AUTHORITIES—continued

**Page(s)**

Laura Amato, et al., *Psychosocial combined with agonist maintenance treatments versus agonist maintenance treatments alone for treatment of opioid dependence*, 10 Cochrane Database Syst Rev. 13 (2011) ............................................................ 5

Louisa Degenhardt, et al., *The Impact of Opioid Substitution Therapy on Mortality Post-Release from Prison: Retrospective Data Linkage Study*, 109 Addiction 1306 (2014) ..................................................................................................................... 12

Luis Sordo, et al, *Mortality risk during and after opioid substitution treatment: systematic review and meta-analysis of cohort studies*, 357 BMJ 1 (2017) ....... 5, 11

Marc R. Larochelle et al., *Medication for Opioid Use Disorder After Nonfatal Opioid Overdose and Association with Mortality*, 169 Annals of Internal Med. 137 (2018) ..................................................................................................................... 11

National Academies of Science, Engineering, and Medicine, Medications for Opioid Use Disorder Save Lives (Alan I. Leshner and Michelle Mancher eds., 2019) ................................................................................................................passim

National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction (July 2018) ........................................................................................ 3, 4

National Institute on Drug Abuse, *Medications to Treat Opioid Use Disorder Research Report* (Dec. 2021) ................................................................................. 7

Nora D. Volkow et al., Neurobiologic Advances from the Brain Disease Model of Addiction, 374 New England Journal of Medicine 363 (2016)............................. 13

Press Release, U.S. Food and Drug Administration, FDA Approves New Buprenorphine Treatment Option for Opioid Use Disorder (May 23, 2023) .......... 5

*Recommendation and Benefits*, Ctrs. for Disease Control and Prevention (Mar. 17, 2023)...................................................................................................................... 19

Robert Heimer, et al, *Receipt of opioid use disorder treatments prior to fatal overdoses and comparison to no treatment in Connecticut, 2016-17*, 254 Drug and Alcohol Dependence 111040 (2024) ..................................................................... 4

Ryan Crowley, et al, *Health and Public Policy to Facilitate Effective Prevention and Treatment of Substance Use Disorders Involving Illicit and Prescription Drugs: An American College of Physicians Position Paper*, Annals of Internal Medicine (March 28, 2017)...................................................................................................... 9

Sarah E. Wakeman, et al, *Comparative Effectiveness of Different Treatment Pathways for Opioid Use Disorder*, JAMA Network Open (Feb. 5, 2020)............... 7

Sarah Gopman, *Prenatal and postpartum care of women with substance use disorders*, 41 Obstet Gynecol Clin North Am. 213–28 (2014) ................................. 18

Shane Darke et al., *Yes, People Can Die from Opiate Withdrawal*, 112 Addiction 199 (2017) ..................................................................................................................... 15

Shanna Farrell-Macdonald et al., *Impact of Methadone Maintenance Treatment on Women Offenders' Post-Release Recidivism*, 20 Eur. Addiction Res. 192 (2014) .. 13

## TABLE OF AUTHORITIES—continued

Page(s)

Shannon Gwin Mitchell et al., *Changes in Quality of Life following Buprenorphine Treatment: Relationship with Treatment Retention and Illicit Opioid Use*, 42 J. Psychoactive Drugs 149 (2015)...............................................................11

Substance Abuse and Mental Health Services Administration, *A collaborative approach to the treatment of pregnant women with opioid use disorders*, HHS Publication No. (SMA) 16-4978 (2016)...................................................17

Substance Abuse and Mental Health Services Administration, *Medications for Opioid Use Disorder For Healthcare and Addiction Professionals, Policymakers, Patients, and Families: Treatment Improvement Protocol (TIP) 63*, (2021)........ 8, 9

Substance Abuse and Mental Health Services Administration, U.S. Dep't of Health and Human Services, *Clinical Guidance for Treating Pregnant and Parenting Women With Opioid Use Disorder and Their Infants*, No. 18-5054 (2018)..... 18, 19

The National Sheriff's Association and National Commission on Correctional Healthcare, *Jail-Based Medication-Assisted Treatment Promising Practices, Guidelines, and Resources for the Field* (Oct. 2018)....................................9, 10, 16

Thomas R. Kosten & Tony P. George, *The Neurobiology of Opioid Dependence: Implications for Treatment*, 1 Science & Practice Perspective 13 (2002)...............6

Timothy Nielsen et al. *Maternal and Infant Characteristics Associated with Maternal Opioid Overdose in the Year Following Delivery*, 115 Addiction 291–301 (2020) ...................................................................................................18

Traci C. Green et al., *Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System*, 75 JAMA Psychiatry 405 (2018) ...............................................................12

Verner S. Westerberg et al., *Community-Based Methadone Maintenance in a Large Detention Center is Associated With Decreases in Inmate Recidivism*, 70 J. Substance Abuse Treatment 1 (2016) ...................................................13

World Health Organization, *Guidelines for the Psychosocially Assisted Pharmacological Treatment of Opioid Dependence* (2009)................................8, 10

## INTERESTS OF THE *AMICI CURIAE*

*Amici* are individual physicians with extensive knowledge of the research on addiction treatment and significant experience in the treatment of individuals with Opioid Use Disorder, including pregnant and postpartum individuals who are incarcerated. They have a particular interest in providing and encouraging high-quality treatment for people suffering from addition and Opioid Use Disorder (OUD), including Medication for Opioid Use Disorder (MOUD) as an evidenced-based best practice. The views expressed here are those of the *amici curiae* themselves, and their institutional affiliations are listed for identification purposes only. The individual doctor *amici* are:

**Dr. Michael Fingerhood, MD**, Professor of Medicine, Johns Hopkins University and Director of the Division of Addiction Medicine;

**Dr. Carolyn Sufrin, MD, PhD**, Associate Professor of Gynecology and Obstetrics, Johns Hopkins University;

**Dr. Katrina Mark, MD, FACOG, FASAM**, Associate Professor, University of Maryland School of Medicine, Department of Obstetrics, Gynecology & Reproductive Services;

**Dr. Jordan Nahas-Vigon, MD**, Assistant Professor, Division of Addiction Medicine at Johns Hopkins University;

**Dr. Sophia Purekal, MD**, Assistant Professor of Medicine, Division of Addiction Medicine at Johns Hopkins University;

**Dr. Jess Ratner, MD**, Assistant Professor, Division of Addiction Medicine at Johns Hopkins University;

**Dr. Mishka Terplan, MD, MPH**, Medical Director, Friends Research Institute.

No counsel for a Party authored this brief in whole or in part. No person or entity, other than *Amici*, their members, or their counsel made a monetary contribution for the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The ongoing opioid crisis has affected many aspects of American society, but few as acutely as our jails and prisons. North Carolina Correctional Institute for Women, like too many jails and prisons across the country, fails to treat OUD—a chronic disease, not a failure of will—according to the prevailing standard of care. That standard calls for OUD to be treated with medication, based upon an individualized evaluation of the patient. But despite even correctional experts recognizing this uncontroversial proposition, prisons often deny proper medical treatment to people with OUD, including, as here, Appellees forcing Appellant into withdrawal by abruptly ending her prescribed MOUD for no medical reason, only because she had given birth.

*Amici* write to offer the Court their expertise regarding opioid use disorder and the medication used to treat it. As with other chronic diseases, medication is essential to treating opioid use disorder. Treatment with medication for opioid use disorder (MOUD) is lifesaving, and particularly important in a carceral context. Decisions regarding treatment with MOUD must be made between a doctor and patient based on medical considerations. Prison policies that deny or withdraw adequate treatment are not only medically inappropriate because they fall below the standard of care, but likely violate the Eighth Amendment and Americans with Disabilities Act. And the

conclusion of Appellant's pregnancy provides no medical justification to abruptly cease MOUD and trigger dangerous withdrawal. This Court should reverse.

## ARGUMENT

## I.      Opioid Use Disorder is a chronic disease, not a failure of personal will.

Opioid use disorder ("OUD") is a chronic disease of the brain.[1] The American Society of Addiction Medicine ("ASAM"), the leading professional organization for addiction medicine, defines addiction as "a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences."[2] Repeated use of opioids results in fundamental changes to brain structure and function, particularly the parts of the brain responsible for judgment, decision-making, learning, memory, and behavior control.[3] Like other chronic diseases, opioid use disorder often involves cycles of recurrence

---

[1] *See* National Academies of Science, Engineering, and Medicine, Medications for Opioid Use Disorder Save Lives 3 (Alan I. Leshner and Michelle Mancher eds., 2019), *available at*: http://nap.nationalacademies.org/25310 (last accessed Jan. 11, 2024) ("National Academies").

[2] American Society of Addiction Medicine, *Definition of Addiction* 2 (Sept. 15, 2019), *available at*: https://www.asam.org/docs/default-source/quality-science/asam's-2019-definition-of-addiction-(1).pdf?sfvrsn=b8b64fc2_2 (last accessed Jan. 11. 2024); *see also* National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction (July 2018), *available at*: https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/drug-misuse-addiction (last accessed Jan. 11, 2024) (addiction is "a chronic, relapsing disorder characterized by compulsive drug seeking and use despite harmful consequences, and long-lasting changes in the brain.") ("NIDA, *Drugs, Brains, and Behavior*").

[3] *See* NIDA, *Drugs, Brains, and Behavior*, *supra* note 2.

and remission.[4] Without treatment or other recovery, patients with opioid use disorder are at high risk for physical harm or premature death, including due to accidental overdose. Continued drug use is not a moral failing, but a symptom of OUD itself.[5]

## II.    As a chronic disease, the proper treatment for OUD is medication.

### A.    Medication is the standard of care for treatment of OUD.

Treatment with medication for opioid use disorder ("MOUD") is also often referred to as medication-assisted treatment. The prevailing terminology among addiction medicine professionals is "medication for opioid use disorder" or "medication-based treatment for OUD," which emphasizes the centrality and importance of medication as treatment for OUD as compared to other behavioral health treatments.[6] Attempts at addiction-treatment regimens that do not include medication that have been popular in other contexts, such as alcohol use disorder, are not effective and can put people at higher risk of death than no treatment at all.[7] Studies have shown that maintaining medication treatments of opioid use disorder reduces deaths due to

---

[4] *See* NIDA, *Drugs, Brains, and Behavior*, *supra* note 2.

[5] *See* NIDA, *Drugs, Brains, and Behavior*, *supra* note 2.

[6] *See* National Academies, *supra* note 1, at 18.

[7] *See* Robert Heimer, et al, *Receipt of opioid use disorder treatments prior to fatal overdoses and comparison to no treatment in Connecticut, 2016-17*, 254 Drug and Alcohol Dependence 111040 (2024).

overdose and other causes,[8] and has a more robust effect on treatment efficacy than behavioral components of MOUD.[9]

There are three FDA-approved medications for opioid use disorder: methadone, buprenorphine, and naltrexone. Methadone is a full opioid-agonist medication, meaning it fully activates the same receptors in the brain as other opioids, but without causing a "high."[10] Buprenorphine is a partial opioid-agonist medication which partially activates opioid receptors, also without causing a "high."[11] Buprenorphine comes in many forms,[12] but the most commonly prescribed formulation is Suboxone—buprenorphine generally and Suboxone specifically are exactly the form of MOUD at issue in this case.

The fact that both buprenorphine and methadone are opioids leads to the common misconception that MOUD substitutes one addiction for another. This is incorrect. While heroin, oxycodone, and other commonly misused opioids are short-acting drugs

---

[8] *See* Luis Sordo, et al, *Mortality risk during and after opioid substitution treatment: systematic review and meta-analysis of cohort studies*, 357 BMJ 1, 4 (2017).

[9] *See* Laura Amato, et al., *Psychosocial combined with agonist maintenance treatments versus agonist maintenance treatments alone for treatment of opioid dependence*, 10 Cochrane Database Syst Rev. 13 (2011).

[10] *See* National Academies, *supra* note 1 at 19.

[11] *See id.*

[12] Buprenorphine also comes in an injectable form, usually Sublocade. The FDA recently approved a new injectable of buprenorphine called Brixadi. *See* Press Release, U.S. Food and Drug Administration, FDA Approves New Buprenorphine Treatment Option for Opioid Use Disorder (May 23, 2023), *available at:* https://www.fda.gov/news-events/press-announcements/fda-approves-new-buprenorphine-treatment-option-opioid-use-disorder.

that produce euphoria, or a "high," buprenorphine and methadone are long-acting medications designed to treat symptoms of addiction, such as cravings and withdrawal, without inducing maladaptive behaviors or euphoria.[13] Those differences help explain why the District Court's characterization of Appellee abruptly ending Ms. Edward's MOUD by substituting a nine-day so-called "oxycodone taper" for prescribed buprenorphine as a "reasonable accommodation," JA3093, was error. The use of buprenorphine and methadone medications to treat OUD is analogous to using insulin to treat diabetes, thyroid hormone to treat hypothyroidism, or a diuretic to treat hypertension. These are all safe medications for the treatment of chronic diseases, that are essential to patients' health and wellbeing.[14] The misconception that methadone and buprenorphine are substituting one addiction for another has no grounding in science and undermines access to OUD treatment.

Naltrexone is an opioid antagonist, and it works by blocking the brain's opioid receptors.[15] Unlike methadone and buprenorphine, naltrexone treatment requires stopping the use of any opioids for a period of at least 7 to 10 days and going through withdrawal prior to treatment initiation, which can be extremely challenging for

---

[13] *See* Thomas R. Kosten & Tony P. George, *The Neurobiology of Opioid Dependence: Implications for Treatment*, 1 Science & Practice Perspective 13, 18 (2002).

[14] *See* American Society of Addiction Medicine ("ASAM"), *National Practice Guidelines for the Treatment of Opioid Use Disorder, 2020 Focused Updated*, *available at*: https://www.asam.org/docs/default-source/quality-science/npg-jamsupplement.pdf?sfvrsn=a00a52c2_2 (last accessed Jan. 11, 2024).

[15] *See id.*

people with OUD—especially people in contact with the criminal justice system.[16] Naltrexone also does not activate the brain's receptors in the same way as methadone and buprenorphine, and therefore does nothing to treat withdrawal symptoms and is less effective at reducing cravings.[17] So, studies have shown that naltrexone produces poorer outcomes than either methadone or buprenorphine.[18]

*Amici*, along with professional medical associations, national and international authorities, and even organizations specializing in correctional healthcare, recognize the effectiveness of MOUD and its status as the standard of care for people with OUD. The list of organizations endorsing the effectiveness of MOUD includes the leading medical association in addiction medicine (the American Society of Addiction

---

[16] *See* National Institute on Drug Abuse, *Medications to Treat Opioid Use Disorder Research Report* (Dec. 2021), *available at*: https://nida.nih.gov/publications/research-reports/medications-to-treat-opioid-addiction/overview (last accessed Jan. 11, 2024) ("NIDA, *MOUD Report*").

[17] *See id*.

[18] *See* Sarah E. Wakeman, et al, *Comparative Effectiveness of Different Treatment Pathways for Opioid Use Disorder*, JAMA Network Open (Feb. 5, 2020), *available at*: https://pubmed.ncbi.nlm.nih.gov/32022884/; *see also* Harvard Medical School, *Comparing medications to treat opioid use disorder* (Jan. 3, 2018), *available at*: https://www.health.harvard.edu/blog/comparing-treat-opioid-use-disorder-2018010313021 (last accessed Jan. 11, 2024).

Medicine),[19] the Centers for Disease Control and Prevention,[20] the National
Institutes of Health,[21] the Substance Abuse and Mental Health Services
Administration,[22] the World Health Organization,[23] the American College of

---

[19] *See* American Society of Addition Medicine, Public Policy Statement on
Treatment of Opioid Use Disorder in Correctional Settings, *available at:*
https://www.asam.org/docs/default-source/public-policy-statements/2020-statement-
on-treatment-of-oud-in-correctional-settings.pdf (adopted by the ASAM Board of
Directors July 15, 2020) ("[A]ccess to OUD treatment within the correctional system
is a critical public health and ethical issue").

[20] *See* Centers for Disease Control and Prevention, *Guideline Recommendations
and Guiding Principles* (March 16, 2023), *available at*:
https://www.cdc.gov/opioids/healthcare-
professionals/prescribing/guideline/recommendations-principles.html (last accessed
Jan. 11, 2024).

[21] *See* NIDA, *MOUD Report*, *supra* note 16.

[22] *See* Substance Abuse and Mental Health Services Administration, *Medications
for Opioid Use Disorder For Healthcare and Addiction Professionals, Policymakers,
Patients, and Families: Treatment Improvement Protocol (TIP) 63* at 3-11, (2021),
*available at*: https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-
Disorder-Full-Document/PEP21-02-01-002 (last accessed Jan. 11, 2024)..

[23] *See* World Health Organization, *Guidelines for the Psychosocially Assisted
Pharmacological Treatment of Opioid Dependence* (2009), *available at*:
https://www.who.int/publications/i/item/9789241547543 (last accessed Jan. 11,
2024).

Physicians,[24] the National Academies of Science, Engineering, and Medicine,[25] and the National Commission on Correctional Healthcare.[26] A recent consensus report by the National Academies of Sciences, Engineering, and Medicine establishes that "[w]ithholding or failing to have available all classes of FDA-approved medication for the treatment for OUD in any care or criminal justice setting is denying appropriate medical treatment."[27] As the Substance Abuse and Mental Health Services Administration explains, "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."[28]

These organizations have also recognized the importance of MOUD in a criminal justice context specifically. ASAM has recognized that "[a]ccess to evidence-based

---

[24] *See* Ryan Crowley, et al, *Health and Public Policy to Facilitate Effective Prevention and Treatment of Substance Use Disorders Involving Illicit and Prescription Drugs: An American College of Physicians Position Paper*, Annals of Internal Medicine (March 28, 2017), *available at*: https://www.acpjournals.org/doi/10.7326/M16-2953?_ga=2.100557022.1300911244.1688056473-1161461955.1688056473 (last accessed Jan. 11, 2024).

[25] *See* National Academies, *supra* note 1.

[26] *See* The National Sheriff's Association and National Commission on Correctional Healthcare, *Jail-Based Medication-Assisted Treatment Promising Practices, Guidelines, and Resources for the Field* (Oct. 2018), *available at*: https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf ("NSA and NCCHC").

[27] *See* National Academies, *supra* note 1, at 3.

[28] SAMHSA, *supra* note 22, at ES-2.

9

OUD treatment including all FDA-approved medications, either on site or through transport, is the standard of care for all detained or incarcerated persons."[29] Similarly, the World Health Organization has noted that "[p]risoners should not be denied adequate health care because of their imprisonment. This would normally imply that the treatment options available outside prison should also be available in prison. Opioid withdrawal, agonist maintenance and naltrexone treatment should all be available in prison settings, and prisoners should not be forced to accept any particular treatment."[30] Notably, a 2018 report by the National Sheriff's Association and National Commission on Correctional Health Care highlights the benefits of MOUD and strongly cautions against "law enforcement officers, probation and parole agents, judges, and correctional officers" determining whether individuals can take MOUD.[31] Instead, "the decision to obtain medication and the specific medication chosen, should be the individual's, after consultation with medical and treatment providers, not imposed by a justice agency."[32] Even correctional experts, then, recognize that considering all FDA-approved medication options and providing the appropriate MOUD to people with OUD is the standard of care.

---

[29] ASAM, *supra* note 19.

[30] World Health Organization, *supra* note 23.

[31] NSA and NCCHC, *supra* note 26, at 8.

[32] *Id.*

**B.     Treatment with MOUD reduces the risk of overdose and death, reduces drug use overall, and has particular positive effects within the criminal justice system.**

Treatment with MOUD saves lives. Evidence shows a 50 percent or greater reduction in risk of fatal overdose and mortality as a result of treatment with methadone or buprenorphine.[33] Use of methadone or buprenorphine decreases illicit opioid use and injection drug use,[34] which—because of corresponding risks of injecting drugs with needles—also reduces the risk of HIV and hepatitis C infection.[35] Treatment with MOUD also improves quality of life.[36] ASAM concluded that treatment with MOUD led to "decreased mortality, abstinence from opioids, and retention in treatment" and "strong evidence support[s] the superiority" of MOUD over treatment without medication.[37]

Treatment of OUD with medication is particularly important in the criminal justice system. People incarcerated in state prisons have a risk of overdose 129 times

---

[33] *See* Sordo, *supra* note 8; *accord* Marc R. Larochelle et al., *Medication for Opioid Use Disorder After Nonfatal Opioid Overdose and Association with Mortality*, 169 Annals of Internal Med. 137, 140 (2018).

[34] *See* National Academies, *supra* note 1, at 39; *accord* George E. Woody et al., *HIV Risk Reduction with Buprenorphine-Naloxone or Methadone: Findings from a Randomized Trial*, 66 J. Acquired Immune Deficiency Syndromes 288, 290 (2014).

[35] *See* Georgie J. MacArthur et al., *Opiate Substitution Treatment and HIV Transmission in People Who Inject Drugs: Systematic Review and Meta-Analysis*, 345 BMJ 1, 4 (2012).

[36] *See* Shannon Gwin Mitchell et al., *Changes in Quality of Life following Buprenorphine Treatment: Relationship with Treatment Retention and Illicit Opioid Use*, 42 J. Psychoactive Drugs 149, 154 (2015).

[37] ASAM, *National Practice Guidelines*, *supra* note 14, at 27.

the risk of the general public in the two weeks immediately following their release, for example.[38] But MOUD can help combat that risk— providing MOUD during incarceration and upon release dramatically reduces the risk of overdose and death.[39] A study from Rhode Island found that offering MOUD in the correctional system and providing connections to continued treatment in the community resulted in a 60 percent decrease in overdose mortality.[40] This is because in the absence of medication treatment while incarcerated, tolerance to opioids decreases, leaving individuals at high risk of overdose if they resume illicit opioid use.[41] For those who are incarcerated for a long period of time, the strength of drugs available may have increased during their time incarcerated which can also increase the likelihood of overdose. Beyond life and death, studies also show that people who receive methadone or buprenorphine have lower rates of probation revocations, re-arrest, and re-incarceration.[42]

---

[38] *See* Ingrid A. Binswanger, et al, *Release from Prison — A High Risk of Death for Former Inmates*, 356 New England Journal of Medicine 157 (2007).

[39] *See* Louisa Degenhardt, et al., *The Impact of Opioid Substitution Therapy on Mortality Post-Release from Prison: Retrospective Data Linkage Study*, 109 Addiction 1306, 1312 (2014).

[40] *See* Traci C. Green et al., *Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System*, 75 JAMA Psychiatry 405, 406 (2018).

[41] *See* Elizabeth L.C. Merrall et al., *Meta-Analysis of Drug-Related Deaths Soon After Release from Prison*, 105 Addiction 1545, 1549 (2010).

[42] *See* Elizabeth A. Evans et al., *Criminal Justice Outcomes Over 5 Years After Randomization to Buprenorphine-Naloxone or Methadone Treatment for Opioid Use Disorder*, 114 Addiction 1396, 1400 (2019); C. Brendan Clark, et al., *Methadone maintenance treatment may improve completion rates and delay opioid relapse for opioid dependent individuals under community corrections supervision*, 39 Addict.

In a person with OUD, changes to the brain can persist even after discontinuing opioid use.[43] Methadone and buprenorphine stabilize functional changes to the brain caused by OUD and minimize symptoms like cravings. However, people who discontinue medications – by choice or by force – often have recurrent symptoms. In fact, all studies exploring tapering or discontinuing medication show high rates of recurrence.[44] People who discontinue treatment with medications often experience cravings or withdrawal – symptoms of their underlying disease – and may need to restart medication treatment. Restarting medication after a period of discontinuation is common among patients with OUD and encouraged by professional guidelines.[45]

---

Behav. 1736, 1740 (2014); *accord* Verner S. Westerberg et al., *Community-Based Methadone Maintenance in a Large Detention Center is Associated With Decreases in Inmate Recidivism*, 70 J. Substance Abuse Treatment 1, 4 (2016); Shanna Farrell-Macdonald et al., *Impact of Methadone Maintenance Treatment on Women Offenders' Post-Release Recidivism*, 20 Eur. Addiction Res. 192, 196 (2014).

[43] *See* Alan I. Leshner, *Addiction is a Brain Disease, and it Matters*, 278 Science 45, 46 (1997); Nora D. Volkow et al., Neurobiologic Advances from the Brain Disease Model of Addiction, 374 New England Journal of Medicine 363, 366 (2016).

[44] *See* National Academies, *supra* note 1, at 40.

[45] *See* ASAM, *National Practice Guidelines*, *supra* note 14, at 43.

III.  **MOUD treatment plans should reflect individual factors and the standard of care, and must not default to intentional facilitation of withdrawal.**

A.  **Treatment for OUD is an individualized decision between a doctor and patient.**

Current treatment standards for OUD recognize the important and differing roles that methadone, buprenorphine, and naltrexone play in treatment, and call for an individualized determination as to which medication is most appropriate for each patient. The form and dosage of MOUD that is most appropriate to treat a particular patient may vary based on the patient's profile—including factors such as the severity of OUD, medication side effects, co-occurring medical and mental health issues, and method and convenience of dosing—but the key commonality is that medical professionals, in partnership with their patients, should make these decisions based upon those individual factors. While one patient may do well on any of the three FDA-approved medications, another patient may find that only one of these medications provides effective treatment without significant adverse side effects. A patient with severe OUD may require a full agonist that produces a stronger opioid effect (such as methadone) to fully suppress opioid cravings. A patient with more severe OUD may also require a higher dosage of a given medication than a patient with less severe OUD.

B.  **Forced withdrawal from MOUD is inappropriate.**

Jails and prisons that require immediate discontinuation of methadone or buprenorphine cause individuals to experience, as Ms. Edwards did here, acute withdrawal. Acute withdrawal is typically very painful and causes physical

14

symptoms, including bone and joint aches, vomiting, diarrhea, insomnia, excessive sweating, hypothermia, hypertension, and tachycardia (elevated heart rate), as well as psychological symptoms like depression, anxiety, desperation, and suicidal ideation. Acute withdrawal can cause death, particularly from the dehydration and heart failure that withdrawal-associated diarrhea and vomiting often cause.[46]

Even for people who make it through acute withdrawal, however, worse symptoms may still lie ahead. A second phase of withdrawal symptoms, known as post-acute withdrawal syndrome ("PAWS"), occurs as the brain attempts to re-calibrate after opioids are removed. Symptoms of post-acute withdrawal syndrome typically involve psychological and emotional aspects of withdrawal. Post-acute withdrawal syndrome can persist for several weeks or even several months. PAWS will also render a person more likely to relapse, and because of now lower tolerance, a person will be at a higher risk of overdose and death.

Abrupt forced withdrawal—as from a short oxycodone taper—from buprenorphine or methadone is counter to the medical standard of care.[47] A report by the National Commission on Correctional Healthcare and the National Sheriffs Association explains that "medically managed withdrawal is not treatment. In fact, withdrawal

---

[46] Shane Darke et al., *Yes, People Can Die from Opiate Withdrawal*, 112 Addiction 199 (2017).

[47] There are a small number of circumstances where buprenorphine or methadone may be contraindicated such that stopping them may make medical sense. *See* ASAM, *National Practice Guidelines*, *supra* note 14, at 30 (discussing hypersensitivity to buprenorphine and methadone, certain severe liver impairments, respiratory depression and acute bronchial asthma, and paralytic ileus). These are still part of an individual medical assessment, and the rare person with these contraindications does not support abruptly stopping MOUD at jail intake as a matter of policy.

is associated with high risk for overdose and death following release, underscoring the need for [MOUD]."[48] The Centers for Disease Control and Prevention (CDC) also explains that "[c]linicians should offer or arrange treatment with evidence-based medications to treat patients with opioid use disorder . . . Detoxification on its own, without medications for opioid use disorder, is not recommended for opioid use disorder because of increased risks for resuming drug use, overdose, and overdose death."[49] Forced withdrawal from MOUD, including by a jail or prison, falls below the standard of care.

## IV. The end of a pregnancy is not a medical reason to stop a prescribed MOUD treatment plan; abruptly ceasing MOUD on that basis increases the risk of maternal mortality and does not reflect the standard of care.

MOUD is the standard of care treatment during pregnancy and "preferable to medically supervised withdrawal," which produces worse fetal, neonatal, and maternal outcomes and is not supported by research into maternal safety.[50] Indeed, opioid agonist pharmacotherapy has been in use during pregnancies since the 1970s, and methadone and buprenorphine have a long track record of success in treating

---

[48] NSA and NCCHC, *supra* note 26, at 20.

[49] CDC, *supra* note 20.

[50] American College of Obstetricians and Gynecologists, *Opioid Use and Opioid Use Disorders During Pregnancy*, Committee Opinion, No. 711 (Aug. 2017), *reaffirmed 2021.*

OUD in pregnant women.[51] Supervised withdrawal for pregnant women, by contrast, results in high rates of relapse that research suggests range from 59% to as high as 90%, with a host of negative consequences for both the mother and the child.[52] And forcing someone to shift from an MOUD to an opioid—like Appellee's rapid oxycodone taper—conflicts with guidance to take particular care prescribing opioids around delivery; the American College of Obstetricians and Gynecologists (ACOG) specifically recommends that medical providers take "a cautious approach" to ensure that opioids are appropriately indicated before prescribing them as they might during birth to people without histories of opioid addiction.[53]

If anything, continuation of prescribed MOUD matters even more postpartum. Opioid overdose is a leading cause of pregnancy-related death, and more than half of all pregnancy-related deaths occur in the postpartum period.[54] And for people who have previously dealt with OUD, the immediate postpartum period often imposes

---

[51] Substance Abuse and Mental Health Services Administration, *A collaborative approach to the treatment of pregnant women with opioid use disorders*, HHS Publication No. (SMA) 16-4978 (2016).

[52] *See, e.g.*, Hendree Jones et al., *Methadone maintenance vs. methadone taper during pregnancy: maternal and neonatal outcomes*, 17 Am. J. Addiction 372–86 (2008); *available at*: https://onlinelibrary.wiley.com/doi/10.1080/10550490802266276; Kelley A. Saia et al., *Caring for pregnant women with opioid use disorder in the USA: expanding and improving treatment*, 3 Curr. Obstet. Gynecol. Rep. 257–63 (2016); *available at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC4981621/.

[53] *Opioid Use and Opioid Use Disorders During Pregnancy*, *supra* Note 50.

[54] Emelie Bruzelius and Silvia S. Martins, *US Trends in Drug Overdose Mortality Among Pregnant and Postpartum Persons, 2017-2020*, 328 JAMA 2159-61 (Dec. 6 2022), *available at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC9856503/.

considerable stress and increases the risk of relapse[55]—which is why ACOG recommends access to adequate psychological support services and relapse prevention programs at that critical moment for people who have previously struggled with addiction.[56] As high as postpartum relapse and overdose risk is in the general population, the odds of postpartum overdose increase four-fold among people incarcerated during pregnancy.[57]  In light of all this, the United States government encourages doctors to take particular care before changing existing MOUD regimens for new mothers, advising them to "begin a conversation about the risks of changing a medication, including the potential for destabilization and return to substance use" and observing that "change should not be made without a compelling reason."[58]

Continuation of MOUD prescriptions also benefits newborns, because of the important relationship between mother and newborn and the key role that maternal stability through recovery plays for infants. Relapse or withdrawal may inhibit breastfeeding, while stable continuation of prescribed MOUD does not. The American Academy of Pediatrics recommends breastfeeding for women on MOUD, because

---

[55] Sarah Gopman, *Prenatal and postpartum care of women with substance use disorders*, 41 Obstet Gynecol Clin North Am. 213–28 (2014); *available at*: https://www.sciencedirect.com/science/article/abs/pii/S0889854514000114?via%3Dihub.

[56] *Opioid Use and Opioid Use Disorders During Pregnancy*, *supra* Note 50.

[57] Timothy Nielsen et al. *Maternal and Infant Characteristics Associated with Maternal Opioid Overdose in the Year Following Delivery*, 115 Addiction 291–301 (2020); *available at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC7066531/.

[58] Substance Abuse and Mental Health Services Administration, U.S. Dep't of Health and Human Services, *Clinical Guidance for Treating Pregnant and Parenting Women With Opioid Use Disorder and Their Infants*, No. 18-5054 (2018), at 113.

those medications have minimal transfer into breast milk, while by contrast, breastfeeding reduces the risk of neonatal opioid withdrawal syndrome for newborns exposed to opioids in utero if the mother is on MOUD.[59] And breastfeeding has a host of benefits for mother and child in general,[60] along with specific benefits for children of mothers taking methadone or buprenorphine.[61]

Under the circumstances, the standard of care involves not only maintaining access to a prescribed, stable course of MOUD for a postpartum mother, but specifically not switching to an opioid medication on the way to forcing withdrawal.

---

[59] Hari Cheryl Sachs, *The transfer of drugs and therapeutics into human breast milk: an update on selected topics*, 132 Pediatrics 796–809 (2013).

[60] *See Recommendation and Benefits*, Ctrs. for Disease Control and Prevention (Mar. 17, 2023).

[61] *Opioid Use and Opioid Use Disorders During Pregnancy*, *supra* Note 50; *Clinical Guidance*, *supra* Note 58.

## CONCLUSION

For all of these reasons, in addition to the reasons discussed in Appellant Edwards' Opening Brief, the judgment of the District Court should be reversed.

Respectfully submitted,

 /s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for *Amici Curiae*

Date: March 7, 2025

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 4,453 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.94, set in Century Schoolbook 12-point type; and

/s/ Jim Davy

Jim Davy

1

**CERTIFICATE OF SERVICE**

I certify that on March 7, 2025, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

I further certify that within the required time, I will serve 4 paper copies of this brief upon the Clerk of Court.

I further certify that those paper copies will be identical to the electronically-filed version of the brief.

<u>/s/ Jim Davy</u>

Jim Davy