No. 24-7049

# In the United States Court of Appeals for the Fourth Circuit

TRACEY EDWARDS,

*Plaintiff-Appellant*,

v.

BENITA WITHERSPOON, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of North Carolina,
No. 75:21-ct-03270-D (Hon. James C. Denver III)

**AMICUS BRIEF OF DISABILITY RIGHTS NORTH CAROLINA, LEGAL ACTION CENTER, NATIONAL WOMEN'S LAW CENTER, AND PREGNANCY JUSTICE, IN SUPPORT OF PLAINTIFF-APPELLANT**

Dorianne Mason
Alison Tanner
Ma'ayan Anafi
Emily Gabos
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 571-8725
atanner@nwlc.org

Russell H. Falconer
*Counsel of Record*
Kathryn M. Cherry
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
RFalconer@gibsondunn.com

COUNSEL FOR AMICUS NATIONAL WOMEN'S LAW CENTER

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-7049 Caption: Tracey Edwards v. Benita Witherspoon, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Disability Rights North Carolina
(name of party/amicus)

who is amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: [signature] Date: March 7, 2025

Counsel for: Disability Rights North Carolina

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-7049 Caption: Tracey Edwards v. Benita Witherspoon, Et Al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Legal Action Center
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Rebekah Joab Date: 03/07/2025

Counsel for: Legal Action Center



Print to PDF for Filing Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-7049 Caption: Edwards v. Witherspoon

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Women's Law Center
(name of party/amicus)

who is amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☒ NO

2. Does party/amicus have any parent corporations? ☐ YES ☒ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☒ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☒NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☒NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☒NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Alison Tanner Date: March 7, 2025

Counsel for: National Women's Law Center

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-7049 Caption: TRACEY EDWARDS v. BENITA WITHERSPOON, ET AL.,

Pursuant to FRAP 26.1 and Local Rule 26.1,

Pregnancy Justice
(name of party/amicus)

who is amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☐NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Dana Sussman Date: 3/7/25

Counsel for: Pregnancy Justice



Print to PDF for Filing

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

INTEREST OF AMICI CURIAE .......... 3

ARGUMENT .......... 3

I. Shackling Edwards Caused Her Obvious And Predictable Harm .......... 3

- A. In Violation Of Prison Policy, Edwards Was Shackled In Transit To The Hospital, During The 12 Hours She Was In Labor, An Hour After Giving Birth, And In Transit Postpartum. .......... 4
- B. Shackling Increases Pregnant Prisoners' Pain, Risks Their Lives And Health, And Has No Penological Justification. .......... 7

II. It Was Clearly Established By 2019 That Shackling A Pregnant Woman During Transport, Labor, and Postpartum Violates The Eighth Amendment. .......... 11

- A. A Right Can Be "Clearly Established" Even If There Is No Identical Case. .......... 13
- B. Legislation By The Federal Government And States Between 2010 And 2019 Prohibiting Shackling Reflects Society's Evolving Standards Of Decency. .......... 16
- C. The U.S. Supreme Court And This Court's Views On Shackling Make Clear That Shackling A Pregnant Person While Traveling To Seek Medical Attention, During Labor, Childbirth, And Postpartum Is Unconstitutional. .......... 18
- D. The Court Should Confirm That Shackling A Pregnant Woman Who Is Not A Threat Through Pregnancy, Labor, Childbirth, And Postpartum Is Unconstitutional. .......... 20

III. Continuation Of MOUD Is A Reasonable Modification Of Prison Policies. .......... 22

- A. Edwards Was Denied MOUD After Giving Birth To Her Daughter. .......... 23

B. But For The Prison's Discriminatory Policy, Edwards Was Qualified For NCCIW's MOUD Program. .......................... 25

C. Oxycodone Tapering Was Not A Reasonable Accommodation, And The Court Should Not Have Given Absolute Deference To Defendants' Claim That It Was. .... 29

CONCLUSION ........................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Helping Hand, L.L.C. v. Baltimore Cnty.*,
515 F.3d 356 (4th Cir. 2008) .......... 22, 26

*Alexander v. Choate*,
469 U.S. 287 (1985) .......... 33

*Atkins v. Virginia*,
536 U.S. 312 (2002) .......... 17

*Booker v. S. C. Dep't of Corr.*,
855 F.3d 533 (4th Cir. 2017) .......... 17

*Brawley v. Washington*,
712 F. Supp. 2d 1208 (W.D. Wash. 2010) .......... 12

*Constantine v. Rectors & Visitors of George Mason Univ*,
411 F.3d 474 (4th Cir. 2005) .......... 22

*Estelle v. Gamble*,
429 U.S. 97 (1976) .......... 2

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 12

*Graham v. Florida*,
560 U.S. 48 (2010) .......... 17

*Halpern v. Wake Forest Univ. Health Scis.*,
669 F.3d 454 (4th Cir. 2012) .......... 28

*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 13, 14, 15, 19

*Koon v. North Carolina*,
50 F.4th 398 (4th Cir. 2022) .......... 22, 30

*Lovelace v. Lee*,
472 F.3d 174 (4th Cir. 2006) .......... 30, 32

*M.C. v. Jefferson Cnty.*,
No. 6:22-CV-190, 2022 WL 1541462 (N.D.N.Y. May 16, 2022) ......... 27

*Mendiola-Martinez v. Arpaio*,
836 F.3d 1239 (9th Cir. 2016) ......... 12

*Neal v. E. Carolina Univ.*,
53 F.4th 130 (4th Cir. 2022) ......... 26

*Nelson v. Corr. Med. Servs.*,
583 F.3d 522 (8th Cir. 2009) ......... 12

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) ......... 22, 26

*Paulone v. City of Frederick*,
787 F. Supp. 2d 360 (D. Md. 2011) ......... 29

*Pearson v. Callahan*,
555 U.S. 223 (2009) ......... 21

*Penry v. Lynaugh*,
492 U.S. 302 (1989) ......... 17

*Pesce v. Coppinger*,
355 F. Supp. 3d 35 (D. Mass. 2018) ......... 27

*Pfaller v. Amonette*,
55 F.4th 436 (4th Cir. 2022) ......... 13, 18

*Richardson v. Clarke*,
52 F.4th 614 (4th Cir. 2022) ......... 30

*Roper v. Simmons*,
543 U.S. 551 (2005) ......... 17

*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009) ......... 16

*Scinto v. Stansberry*,
841 F.3d 219 (4th Cir. 2016) ......... 12

*Sims v. City of Madisonville*,
894 F.3d 632 (5th Cir. 2018) ......... 21

*Smith v. Aroostook Cnty.*,
376 F. Supp. 3d 146 (D. Me. 2019) .......... 27, 28

*Taylor v. Rojas*,
592 U.S. 7 (2020) .......... 15

*Trop v. Dulles*,
356 U.S. 86 (1958) .......... 14

*Villegas v. Metro Gov't of Nashville*,
709 F.3d 563 (6th Cir. 2013) .......... 11, 12

*Washington v. Harper*,
494 U.S. 210 (1990) .......... 19

*Williams v. Benjamin*,
77 F.3d 756 (4th Cir. 1996) .......... 19, 20

*Women Prisoners of D.C. Dep't of Corr.*, 877 F. Supp. 634 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995) .. 12

**Constitutional Provisions**

U.S. Const. amend. I .......... 21

U.S. Const. amend. VII .......... 2, 11, 12, 13, 14, 15, 18

**Statutes**

18 U.S.C. § 4322(a) .......... 17

Americans with Disabilities Act of 1990,
42 U.S.C. § 12101 et seq. .......... 2, 22, 23, 26, 27, 28, 32, 33

First Step Act of 2018, Pub. L. No. 115-391 .......... 16

Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504)
.......... 2, 22, 23, 26, 30, 32

**Other Authorities**

*A Call to Stop Shackling Incarcerated Patients Seeking Health Care*,
Policy Brief No. 20233, Am. Pub. Health Ass'n (Nov. 14, 2023) .......... 8

*ACOG Committee Opinion No. 830: Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals*, 138 Obstetrics & Gynecology e24 (July 2021) .......... 7

Amber H. Simpler & Jennifer Langhinrichsen-Rohling, *Substance Use in Prison: How Much Occurs and is it Associated with Psychopathology?*, 13 Addiction Rsch. & Theory (2005). .......... 25

Amnesty Int'l USA, "Use of Restraints on Pregnant Women in the USA: Policy Guidelines" (2009) .......... 11

*An "Act to Prohibit the Shackling of Pregnant Prisoners" Model State Legislation,* Am. Med. Ass'n (2015) .......... 7

*Anti-Shackling Legislation and Resource Table* (Jan. 2024), https://arrwip.org/wp-content/uploads/2024/06/ARRWIP-Anti-shackling-legislation-and-resource-table_-Jan24.pdf .......... 16

Carolyn Sufrin, et al., *Availability of Medications for the Treatment of Opioid Use Disorder Among Pregnant and Postpartum Individuals in US Jails*, JAMA 2022 .......... 24

Carolyn Sufrin, et al., *Opioid Use Disorder Incidence and Treatment Among Incarcerated Pregnant People in the U.S.: Results from a National Surveillance Study*, 115 Addiction 2057 (2020) .......... 27

Cassandra Jaramiollo & Kavitha Surana, *A Woman Died After Being Told It Would Be a "Crime" to Intervene in Her Miscarriage at a Texas Hospital*, ProPublica (Oct. 30, 2024), https://www.propublica.org/article/josseli-barnica-death-miscarriage-texas-abortion-ban .......... 28

E. Ann Carson, *Mortality in Local Jails 2000-2018 – Statistical Tables*, DOJ, NCJ 256002 (April 2021) .......... 25

Ginette G. Ferszt, et al., *Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health 17 (2018), https://www.nwhjournal.org/action/showPdf?pii=S1751-4851%2817%2930335-5 .......... 8

Ivana Hrvatin & Darja Rugelj, *Risk Factors for Accidental Falls During Pregnancy—A Systematic Literature Review*, 35 J. Maternal Fetal Neonatal Med. 7015 (2021) .......... 8

Julia Hutchinson, et al., *Stages of Labor*, STATPEARLS (Jan. 30, 2023), https://www.ncbi.nlm.nih.gov/books/NBK544290/ .............................. 10

Letter from Ralph Hale, Exec. Dir., Am. Coll. of Obstetricians & Gynecologists, to Malika Saada Saar, Exec. Dir., The Rebecca Project for Human Rights (June 12, 2007) .................................................. 9, 11

National Academies of Science, Engineering, and Medicine, *Medications for Opioid Use Disorder Save Lives* (Alan I. Leshner and Michelle Mancher eds. 2019), https://doi.org/10.17226/25310 .......................... 23

Ninad M. Desai & Alexander Tsukerman, *Vaginal Delivery*, STATPEARLS (July 24, 2023) ................................................................ 10

Penny Simkin & Ruth Ancheta, *The Labor Progress Handbook* (2nd ed. 2005) ............................................................................................ 9

*Postpartum*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/articles/postpartum ................... 6

Pregnancy Justice, *Unpacking Fetal Personhood: The Radical Tool that Undermines Reproductive Justice* (Sept. 2024), https://www.pregnancyjusticeus.org/wp-content/uploads /2024/09/Fetal-personhood.pdf; ........................................................ 28

Priscilla A. Ocen, *Punishing Pregnancy: Race, Incarceration, and the Shackling of Pregnant Prisoners*, 100 Cal. L. Rev. 1239 (2012) .......... 8

Robert J. Smith, et al., *The Way the Court Gauges Consensus (And How to do It Better)*, 35 Cardozo L. Rev. 2397 (2014) ................................ 19

Samantha Laufer, *Reproductive Healthcare for Incarcerated Women: From 'Rights' to 'Dignity,'* 56 Am. Crim. L. Rev. 1785 (2019) .............. 9

Susan Hatters Friedman, et al., *The Realities of Pregnancy and Mothering While Incarcerated*, 48 Am. Acad. of Psych & L. 1 (Nov. 3, 2020). .................................................................................................. 3

Teri Shilling, et al., *Care Practice #2: Freedom of Movement Throughout Labor*, 16 J. Perinatal Educ. 21 (2007) ................................................ 9

# INTRODUCTION

When Tracey Edwards was set to give birth, over twenty states, the federal government, and NCCIW all generally prohibited the shackling of pregnant women, especially while giving birth and postpartum. Edwards's right to give birth without restraints should have been protected. Instead, she was shackled in transit to the hospital, where she spent the next twelve hours cuffed by her wrist and ankle to the hospital bed while in labor, had a brief reprieve once she was instructed to "push," and then was shackled again postpartum, with only one hand free to carry her newborn child and constrained ability to comfort her daughter when she cried. Her treatment was unacceptable, contrary to common decency and common sense, and unconstitutional.

After that ordeal came another: after giving birth, Defendants refused to continue the same life-saving medication for Edwards's opioid use disorder (OUD) that they had given her while she was pregnant. Instead, they left her OUD insufficiently treated, causing her to suffer the brutal side effects of withdrawal while she was postpartum. By ignoring the needs of Edwards and other disabled prisoners with OUD—who need medication for OUD (MOUD) to treat their disability before,

during, and continuing after pregnancy (and indeed, regardless of whether they ever become pregnant)—the prison here too violated federal law.

The Eighth Amendment protects "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), regardless of whether a person is incarcerated. And both the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against people with disabilities and require prison officials to provide reasonable accommodations.

For Edwards, thinking of her daughter's birth evokes the hours of restraints, pain, and humiliation to which she was subjected. And the postpartum period after her return to NCCIW consisted of more weeks of pain while her body was fighting the abrupt discontinuation of her MOUD by Defendants.

Under U.S. Supreme Court and this Court's precedents, Edwards was denied basic civil rights.

## INTEREST OF AMICI CURIAE[1]

This brief is filed by *Amici* Disability Rights North Carolina, Legal Action Center, National Women's Law Center, and Pregnancy Justice, non-profit legal advocacy organizations committed to defending the rights of people with disabilities, including disabled pregnant people. Statements of interest for *amici curiae* are attached in the Appendix.

## ARGUMENT

### I. Shackling Edwards Caused Her Obvious And Predictable Harm.

The use of restraints, or "shackling," of pregnant women[2] who are incarcerated has no justification.[3] But the practice presents real risks of

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person, other than the *amici curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

[2] While this brief sometimes refers to "pregnant women," *Amici* recognize that individuals who do not identify as women, including transgender men and non-binary persons, may become pregnant and are equally entitled to be free from shackling during pregnancy, labor, and the postpartum period.

[3] Contrary to Defendants' weak prison-security justification, there are no known escape attempts by pregnant women during childbirth. *See* Susan Hatters Friedman, et al., *The Realities of Pregnancy and Mothering While Incarcerated*, 48 Am. Acad. of Psych & L. 1, 3 (Nov. 3,

permanent harm—not simply discomfort and limited mobility, but increased risks of falls (resulting in harm to the pregnant woman and fetus), delays in medical treatment, increased risk of blood clots, and interference with normal labor and delivery and parent-infant bonding.[4] Edwards was subjected to this deplorable and unconstitutional practice and suffered serious and ongoing harms as a result.

### A. In Violation Of Prison Policy, Edwards Was Shackled In Transit To The Hospital, During The 12 Hours She Was In Labor, An Hour After Giving Birth, And In Transit Postpartum.

On December 19, 2019, at 39 weeks, Edwards was transported from NCCIW to UNC-Chapel Hill Hospital for induced labor. JA0048. Defendants handcuffed Edwards's wrists and ankles for the transport to the hospital. JA0167. This occurred despite controlling prison policy by the State's Department of Public Safety (DPS) prohibiting the use of leg, waist, or ankle shackles on pregnant women and allowing only forward-facing wrist restraints on a pregnant woman for internal escort or external transport. JA0058.

---

2020). The idea that women in labor will be fleeing down hospital corridors chased by guards is pure fantasy.

[4] *Id.*

Further, despite DPS policy prohibiting the use of restraints for pregnant women in labor who do not present an immediate risk,[5] Defendants shackled one of Edwards's legs and one arm to the hospital bed even after she was induced, which began the first stage of labor. JA0122. Edwards was then forced to endure labor in chains for the next *twelve hours*. JA0167. The restraints resulted in raw and reddened skin on her ankles due to restricted circulation. JA0124. Any attempt to move or shift her position against the shackles increased her pain. *Id*. In addition to physical pain, Edwards felt dehumanized and anxious due to her inability to move freely, and she feared that in the event of a medical emergency Defendants would not be able to unshackle her in time for her to receive medical care. JA0134.

Defendants removed the shackles only when doctors instructed Edwards to begin pushing. JA0122. Defendants then re-shackled her ankles together and shackled one of her wrists to the bed less than an hour after she gave birth. JA0168, JA0729. Defendants ignored nurses' repeated requests that Edwards's restraints be removed so she could care

[5] It is uncontested that Edwards was not considered a flight risk by NCCIW nor a threat to herself or others. JA0117, JA0124.

for her baby. JA0122. Defendants had at least one of Edwards's legs shackled to the bed over the next two days, and sometimes both a leg and her wrist. JA0168. The restraints prevented Edwards from holding her child properly, making breastfeeding, diaper changes, and soothing her newborn difficult, and at times her restraints made these important tasks impossible. JA0124.

When Edwards was transported back to NCCIW, she was postpartum, meaning her belly was still distended, continuing to decrease her mobility as during pregnancy, and she was enduring continued contractions, bloody vaginal discharge, breast engorgement and pain, and hormonal swings.[6] Defendants nevertheless handcuffed her, shackled her ankles together, placed a belly chain around her midsection, and secured her hands to the chain with a "black box" device, rendering her completely unable to move her hands. JA0123. The restraints pressed painfully against the site of her epidural injection, preventing her from even leaning back in her seat for a moment of relief. JA0124. And when she arrived at NCCIW, she was forced to *jump* out of

[6] *Postpartum*, CLEVELAND CLINIC.

the transport because her ankles were shackled, resulting in severe pain. JA0123.

In sum, DPS policy prohibited *every single thing* prison officials did to Edwards. It stretches credulity to suggest Defendants are entitled to qualified immunity because they were somehow unaware of the harm their unsanctioned and prohibited actions posed.

### B. Shackling Increases Pregnant Prisoners' Pain, Risks Their Lives And Health, And Has No Penological Justification.

Long before NCCIW violated its own policies by restraining Edwards, there was an overwhelming consensus among legal and medical scholars that shackling incarcerated individuals during pregnancy, labor, and the postpartum period presents clear and serious medical risks. The use of restraints on pregnant women has been universally condemned by medical professionals, including the American College of Obstetricians and Gynecologists (ACOG), and has been the subject of extensive academic scrutiny.[7]

---

[7] *See An "Act to Prohibit the Shackling of Pregnant Prisoners" Model State Legislation,* Am. Med. Ass'n (2015) (calling "use of shackles to restrict a pregnant woman during the birthing process" a "barbaric practice"); *ACOG Committee Opinion No. 830: Reproductive Health Care for*

Medical professionals, legal scholars, and humanitarian organizations agree:

1. *Shackling increases the risk of falls, resulting in harm to the pregnant or postpartum woman and possible fetal demise.* Medical research has demonstrated that pregnancy alters an individual's center of gravity, making one more prone to falls—which can result in devastating outcomes for the pregnant woman and fetus.[8] Shackling exacerbates this risk by restricting movement and making it difficult for them to regain their balance.[9] Restraints also prevent pregnant women from adequately breaking their fall, which can lead to "abdominal trauma, potentially resulting in placental abruption, maternal hemorrhage, and even stillbirth."[10]

---

*Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals*, 138 Obstetrics & Gynecology e24, e30 (July 2021) (criticizing shackling during pregnancy, labor, and postpartum); *A Call to Stop Shackling Incarcerated Patients Seeking Health Care*, Policy Brief No. 20233, Am. Pub. Health Ass'n (Nov. 14, 2023).

[8] Ivana Hrvatin & Darja Rugelj, *Risk Factors for Accidental Falls During Pregnancy—A Systematic Literature Review*, 35 J. Maternal Fetal Neonatal Med. 7015 (2021).

[9] Priscilla A. Ocen, *Punishing Pregnancy: Race, Incarceration, and the Shackling of Pregnant Prisoners*, 100 Cal. L. Rev. 1239, 1257-58 (2012).

[10] Ginette G. Ferszt, et al., *Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health 17, 19 (2018).

2. *Shackling inhibits beneficial movement during labor and postpartum, causing increased pain during labor and life-threatening risks in postpartum.* Movement during labor reduces pain and can speed up the delivery process.[11] When the woman in labor is shackled to the hospital bed, trying to "allay the pains of labor" results in further injury.[12]

Edwards was also shackled during postpartum recovery, when individuals require mobility to reduce the potential for complications such as blood clots and impaired healing.[13]

3. *Shackling denies pregnant women timely medical treatment by interfering with and delaying medical professionals' access to them.* ACOG has warned that "[p]hysical restraints have interfered with the ability of physicians to safely practice medicine."[14] Restraints "reduc[e]

---

[11] Penny Simkin & Ruth Ancheta, *The Labor Progress Handbook* (2nd ed. 2005).

[12] Letter from Ralph Hale, Exec. Dir., ACOG, to Malika Saada Saar, Exec. Dir., The Rebecca Project for Human Rights (June 12, 2007) ("Hale Letter"); *see* Teri Shilling, et al., *Care Practice #2: Freedom of Movement Throughout Labor*, 16 J. Perinatal Educ. 21 (2007).

[13] Samantha Laufer, *Reproductive Healthcare for Incarcerated Women: From 'Rights' to 'Dignity,'* 56 Am. Crim. L. Rev. 1785, 1795-1800 (2019).

[14] Hale Letter, *supra* note 12.

[physicians'] ability to assess and evaluate the physical condition of the [woman] and the fetus."[15]

It is undisputed that Edwards was shackled during the first stage of labor, JA0122, which starts when labor begins and lasts until the cervix is fully dilated to ten centimeters.[16] During that time, any number of medical emergencies can arise, including placenta previa (a potentially fatal condition where the placenta covers the opening between the cervix and uterus); placental abruption (a potentially fatal condition where the placenta detaches from the uterine wall before delivery, depriving the fetus of oxygen and causing the laboring woman to hemorrhage); umbilical cord prolapse (a condition where the placenta is compressed between the fetus and cervix, cutting off the fetus's oxygen supply); or chorioamnionitis (a serious infection of the placenta that can be fatal to both the laboring person and fetus).[17] These conditions represent only a handful of the numerous emergencies that can arise during the first stage of labor.

---

[15] *Id.*
[16] Julia Hutchinson, et al., *Stages of Labor*, STATPEARLS (Jan. 30, 2023).
[17] Ninad M. Desai & Alexander Tsukerman, *Vaginal Delivery*, STATPEARLS (July 24, 2023).

4. *Shackling is a gratuitous assault on the dignity of pregnant women during pregnancy, labor, and postpartum.* ACOG—and others—have also taken the stance that shackling a person who is in labor "is demeaning and unnecessary," and causes the person not only "emotional distress and physical pain," but also "loss of dignity."[18]

Given the substantial body of medical research on the dangers of shackling during pregnancy, the continued use of this practice reflects a deliberate disregard for the health of pregnant women who are incarcerated. Shackling during pregnancy and postpartum is not only unnecessary but actively harmful and dangerous.

## II. It Was Clearly Established By 2019 That Shackling A Pregnant Woman During Transport, Labor, and Postpartum Violates The Eighth Amendment.

Edwards's right to be free from shackling was clearly established at the time of the events in this case.[19] The district court missed the forest

[18] Hale Letter, *supra* note 12; *see* Amnesty Int'l USA, "Use of Restraints on Pregnant Women in the USA: Policy Guidelines" (2009) ("[r]outine use of restraints on pregnant women is cruel, inhuman and degrading treatment, and given medical and other factors impeding pregnant or birthing women from attempting escape or becoming violent, the presumption must be that no restraints should be applied").

[19] Every Circuit to have addressed shackling by 2019 has seen possible constitutional violations under circumstances like Edwards's. *Villegas v.*

for the trees by requiring that a case present an identical fact pattern to Edwards's before it could find it was "clearly established" that her Eighth Amendment rights were violated. Rather, the court was required to take a broader view and rely on all the available indicia that the unconstitutionality of Defendants' actions was never in doubt.

The U.S. Supreme Court and this Court have held that certain indicators that a constitutional right is at risk can overcome a claim of qualified immunity despite the lack of an exact case. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). There are several in this case: A national consensus

---

*Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (holding fact issues precluded summary judgment where plaintiff was shackled during labor and about six hours after giving birth); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009) (holding the "obvious cruelty inherent in" shackling during labor put defendant on notice that shackling was unconstitutional); *Mendiola-Martinez v. Arpaio,* 836 F.3d 1239, 1252, 1254, 1257 (9th Cir. 2016) (holding jury could find defendants deliberately indifferent when they cuffed plaintiff's wrists and ankles together during childbirth). Multiple district courts had reached the same conclusion. *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1219 (W.D. Wash. 2010) (holding jury could conclude that shackling around childbirth caused plaintiff "unnecessary pain" and had "a sufficiently serious risk of harm"); *Women Prisoners of D.C. Dep't of Corr.*, 877 F. Supp. 634, 668 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995) (holding shackling prisoner in third trimester and during delivery is "redundant and unacceptable in light of the risk of injury to a woman and baby").

that Edwards's treatment was the equivalent of punishment and an assault on her dignity; prison policy prohibiting Defendants' actions; and the U.S. Supreme Court and this Court repeatedly criticizing shackling an individual to a bed as inhumane. With that appropriately considered context, it was obvious that Defendants violated Edwards's constitutional rights.

### A. A Right Can Be "Clearly Established" Even If There Is No Identical Case.

The right to be free from shackling during pregnancy, labor, and postpartum is clearly established, even in the absence of a specific case. "[T]here is no requirement that the very action in question must have previously been held unlawful for a reasonable official to have notice that his conduct violated that right." *Pfaller v. Amonette*, 55 F.4th 436, 445-46 (4th Cir. 2022) (cleaned up). As the Supreme Court has held, requiring an exact case concerning a plaintiff in the exact situation as Edwards's puts a "rigid gloss" on the "clearly established" inquiry not supported by the Court's cases—or reality. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Over two decades ago, the U.S. Supreme Court held that prison officers who handcuffed Larry Hope to a "hitching post" violated Hope's Eighth Amendment rights. *Id.* at 733. The officers left Hope in the hot

sun without water for hours and jeered at him—among other things. *Id.* at 736-37. Such treatment, the Court concluded, "violated the 'basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man.'" *Id.* at 738 (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

The *Hope* Court analyzed whether the officers were nevertheless entitled to qualified immunity because it was not clearly established that their conduct was unconstitutional. *Id.* at 739. But the Court rejected engaging in a painstaking search for a case with an identical fact situation. Instead, it held that a constitutional right can be established if, "in the light of pre-existing law, the unlawfulness [is] apparent." *Id*.

Calling the officers' conduct clearly cruel and antithetical to human dignity, the Court held that "[a]rguably, the violation was so obvious that our own Eighth Amendment cases gave [the officers] fair warning that their conduct violated the Constitution." *Id*. But the Court also pointed to in-circuit cases finding unconstitutional *other* conduct—corporal punishment, handcuffing inmates to fences, or forcing inmates to stand in awkward positions for prolonged periods of time—that was analogous to the prison's treatment of Hope. *Id*.

In addition, the Court relied on a "Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post." *Id.* at 741-42. The Court held that "[a]lthough there is nothing in the record indicating that the DOJ's views were communicated to [the individual defendants], this exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment prohibition against cruel and unusual punishment." *Id.* at 745. Together, all of those warnings supported the conclusion that the prison officials' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 742.

Similarly, in *Taylor v. Rojas*, 592 U.S. 7, 8 (2020) (per curiam), the U.S. Supreme Court overturned an opinion by the Fifth Circuit that held it was not a clearly established constitutional violation to leave a person who was imprisoned in a cell "teeming with human waste." The Court held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally

permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." *Id.*

The lesson these cases teach is a simple one: "The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that 'the easiest cases don't even arise.'" *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009). That is this case in a nutshell: The constitutional violation here was easy to spot, and it should never have arisen.

### B. Legislation By The Federal Government And States Between 2010 And 2019 Prohibiting Shackling Reflects Society's Evolving Standards Of Decency.

By 2019, approximately 30 states and the federal government had come to a consensus that shackling pregnant women toward the end of their pregnancy, while in transit, during labor and childbirth, and postpartum was neither necessary nor respectful of their dignity. [20] The federal government enacted the First Step Act in 2018, prohibiting the shackling of pregnant women in federal custody. Under the Act, the use

[20] *See Anti-Shackling Legislation and Resource Table* (Jan. 2024). As of January 2024, the count now stands at 41 states and D.C., alongside the federal government. *Id.* at 1.

of restraints is banned during pregnancy, labor, and postpartum recovery. 18 U.S.C. § 4322(a). Under U.S. Supreme Court jurisprudence, a position adopted by over half of states represents a national consensus about our constitutional values and civil rights. *See Penry v. Lynaugh*, 492 U.S. 302, 331 (1989) (the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures"), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 312 (2002); *Graham v. Florida*, 560 U.S. 48, 62 (2010) (finding consensus when 13 states banned life without parole for juveniles); *Roper v. Simmons*, 543 U.S. 551, 564 (2005) (explaining 30 states prohibit the execution of juvenile offenders); *Atkins*, 536 U.S. at 314-15 (noting 20 states prohibit the death penalty for individuals with intellectual disabilities).[21]

In addition, DPS's *own policy* prohibited Defendants from shackling Edwards as they did, and Defendants knew it. *See* JA0058. Those rules provided Defendants a fair warning of the existence of a right the State sought to protect. *See Booker v. S. C. Dep't of Corr.*, 855 F.3d 533, 546

[21] *See* Robert J. Smith, et al., *The Way the Court Gauges Consensus (And How to Do It Better)*, 35 Cardozo L. Rev. 2397, 2407-08 (2014).

(4th Cir. 2017) (existence of prison policy helps establish "fair warning" of right).

### C. The U.S. Supreme Court And This Court's Views On Shackling Make Clear That Shackling A Pregnant Person While Traveling To Seek Medical Attention, During Labor, Childbirth, And Postpartum Is Unconstitutional.

Alongside the national consensus and the policies applicable to Defendants are the indications in case law from this Court and the U.S. Supreme Court that shackling Edwards as NCCIW did was unconstitutional.

As this Court held in *Pfaller*, "Eighth Amendment cases exist on a spectrum of intent and harm." 55 F.4th at 446. For example, a prison doctor "doesn't need case law to tell him his patient deserves fair treatment." *Id*. And a prison guard "doesn't need case law to tell him he can't abuse an inmate." *Id.*

So too, here. It is common sense that no person should be shackled to a hospital bed by her hand and foot for *twelve hours* of labor. Nor is it unreasonable to expect prison officials to be aware that having a new mother walk up and down hospital corridors with only one hand to hold her baby, while the other hand is shackled, would risk injuring both

Edwards and her newborn unnecessarily. To be sure, some constitutional questions may be more difficult and require clear pre-existing guidance. But whether a pregnant woman should be struggling to give birth in shackles is not one of them. That is especially true in this case, where Defendants were expressly instructed *not* to do what they did to Edwards under DPS policy. *See* JA0058.

As in *Hope*, similar cases provided sufficient notice to Defendants that their treatment of Edwards was unconstitutional. Neither the U.S. Supreme Court nor this Court have been shy about criticizing shackling, even for incarcerated individuals who are resisting. The Supreme Court observed in *Washington v. Harper*, 494 U.S. 210, 226-27 (1990), that "[p]hysical restraints . . . can have serious physical side effects when used on a resisting inmate . . . ." And this Court has rejected restraining people in a similar fashion in the strongest terms. *See Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) ("In our civilized society, we would like to believe that chaining a human being to a metal bed frame in a spread-eagled position would never be necessary."). Unlike the man in *Williams*, who was restrained to his mattress for eight hours, *id.* at 760, pregnant women left cuffed to their beds during their labor pains

could be shackled for an entire *day* or more. Edwards was shackled to the hospital bed for at least 12 hours. JA0049.

Nearly three decades ago, in 1996, this Court remarked that "four-point restraints"—where a person who is incarcerated is chained by each limb to a bed—is justified only "as a *last resort,* when other forms of prison *discipline* have failed." *Williams*, 77 F.3d at 763 (emphases added). But that "*last resort*" is what Edwards experienced *while she was in labor*, even though it is undisputed she posed no danger to herself or others.[22] She was just trying to give birth to her little girl. In light of existing case law, legislation, prison policies, common sense, and context, no reasonable prison official would have been unaware Edwards's treatment was cruel and unusual punishment. The trial court erred in finding that the defendants had qualified immunity.

### D. The Court Should Confirm That Shackling A Pregnant Woman Who Is Not A Threat Through Pregnancy, Labor, Childbirth, And Postpartum Is Unconstitutional.

This case presents this Court with the opportunity to put an end to the practice of shackling in this jurisdiction. As the trial court did here,

---

[22] *See* note 5.

federal courts have discretion to dispose of a case on the ground that a right is not "clearly established" without deciding whether the alleged misconduct even violated a federal right in the first place. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But consistently doing so undermines Section 1983 as a tool of accountability—and permits unlawful practices like shackling to persist.

This "qualified-immunity escape hatch" creates a vicious cycle: Violations must be clearly established to survive qualified immunity, but qualified immunity inhibits the development of the law and prevents rights from becoming clearly established. *See, e.g.*, *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018) ("This is the fourth time in three years that an appeal has presented the question whether someone who is not a final decisionmaker can be liable for First Amendment retaliation . . . . Continuing to resolve the question at the clearly established step means the law will never get established."). At a minimum, this Court should prevent this deplorable practice from impacting another woman by affirming the existence of the right to be free from shackling during pregnancy's most vulnerable moments.

## III. Continuation Of MOUD Is A Reasonable Modification Of Prison Policies.

After enduring pregnancy and labor in shackles, Edwards returned to NCCIW and immediately faced another painful and life-threatening situation: the denial of the only medication that treats her OUD. The ADA and Section 504 impose an "affirmative obligation . . . to enable disabled persons to receive services or participate in programs or activities" through "reasonable modifications to rules, policies, or practices." *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 488 (4th Cir. 2005).[23] And it is well-established that state prisons are subject to this obligation, including in their provision of medical services. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Therefore, failure to make reasonable modifications to prison rules or policies is discrimination under the ADA and Section 504. *Koon v. North Carolina*, 50 F.4th 398, 403, 405-406 (4th Cir. 2022). The prison's failure to modify its rules so incarcerated people with OUD who had been permitted to continue MOUD through pregnancy could continue that

---

[23] *See A Helping Hand, L.L.C. v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008) ("Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations.").

care postpartum—indeed, its failure to even consider doing so—was also discriminatory. And the prison's so-called accommodation was not simply insufficient and ineffective; *it was* actively *harmful*. JA3034-35, JA0178. What is more, Defendants' blanket policy of denying all prisoners with OUD access to MOUD was also discriminatory under the ADA and Section 504. This Court should reverse summary judgment on Edwards's ADA-Section 504 claims.

### A. Edwards Was Denied MOUD After Giving Birth To Her Daughter.

When Edwards returned to NCCIW after giving birth, she was immediately faced with the immediate termination of the only medication that treats her OUD.

OUD is a chronic and treatable medical condition.[24] When improperly treated, however, OUD can be life threatening: It is "associated with a 20-fold greater risk of early death due to overdose, infectious diseases, trauma, and suicide."[25]

---

[24] *See* National Academies of Science, Engineering, and Medicine, *Medications for Opioid Use Disorder Save Lives* 23 (Alan I. Leshner and Michelle Mancher eds. 2019).

[25] *Id.*

MOUD was the only effective treatment for Edwards's OUD. Appellant's Br. 21. NCCIW, like several other state prisons, provides MOUD to prisoners who arrive to its facility pregnant and already prescribed MOUD to treat their OUD. JA0705. But it refuses to continue this medically necessary treatment after the person gives birth, and it denies access to MOUD to all prisoners who are not pregnant, including those who were receiving MOUD prior to incarceration. *Id.*[26]

Defendants admit they provide MOUD to pregnant prisoners with OUD only "*[t]o protect the fetus*." JA0705 (emphasis added); *see* JA0705 ("[o]pioid withdrawal in pregnancy can result in spontaneous abortion or premature delivery").[27] Consistent with that admission, Defendants *stopped* Edwards's MOUD once she delivered her child. JA0713.

---

[26] Significantly, NCCIW withdrew MOUD while Edwards was postpartum, the period associated with the highest opioid-related pregnancy-associated deaths. The odds are four times greater that a person will suffer postpartum overdose without MOUD during the postpartum period. Carolyn Sufrin et al., *Availability of Medications for the Treatment of Opioid Use Disorder Among Pregnant and Postpartum Individuals in US Jails*, JAMA 2022 ("[O]pioid overdose is a major cause of death for pregnant and postpartum women in the United States, and remains a huge concern for formerly incarcerated people.").

[27] This admission is particularly galling given that Defendants undermined this purported interest by shackling Edwards in particularly vulnerable points of her pregnancy, labor, and delivery.

Defendants replaced Edwards's MOUD prescription with oxycodone to "taper" her withdrawal symptoms over nine days. Appellant's Br. at 9. As a result, Edwards "experienced physical symptoms of withdrawal from buprenorphine and felt sick"—she suffered pain, diarrhea, insomnia, anxiety, and vomiting for several weeks. JA3102. Her cravings for opioids also *increased*. JA3027. She described the pain she was in at that time as "more painful than giving birth." JA0169. At times, her pain prevented her from eating or showering. *Id*. And she was constantly terrified that she might relapse. JA0170, JA0176-77.[28]

### B. But For The Prison's Discriminatory Policy, Edwards Was Qualified For NCCIW's MOUD Program.

The district court focused on whether Edwards "qualified" under the prison's MOUD policy after she gave birth. JA3093. In doing so, the

---

[28] Opioid use is not uncommon in prison. Researchers estimate that anywhere between 7% and 50% of people who are incarcerated use drugs while incarcerated. Amber H. Simpler & Jennifer Langhinrichsen-Rohling, *Substance Use in Prison: How Much Occurs and is it Associated with Psychopathology?*, 13 Addiction Rsch. & Theory (2005). In fact, the number of deaths in state jails attributable to drug or alcohol intoxication more than quadrupled between 2000 and 2018. E. Ann Carson, *Mortality in Local Jails 2000-2018 – Statistical Tables*, DOJ, NCJ 256002 (April 2021). Therefore, the risk of relapse, even while incarcerated, is real.

court accepted at face value the prison's restrictive qualifications for MOUD and did not question whether this qualification *itself* discriminatorily denied disabled individuals with OUD access to medical services. *See Neal v. E. Carolina Univ.*, 53 F.4th 130, 145 (4th Cir. 2022) (even when courts owe deference to participation qualifications established by an entity subject to the ADA, courts still "must take special care to ensure that eligibility requirements do not disguise . . . discriminatory requirements").

The district court should have first considered that all incarcerated persons were "qualified" to receive the prison's medical services generally. *See* Appellant's Br. 25-26. And denying individuals with disabilities equal access to prison medical services violates the ADA. *See Yeskey,* 524 U.S. at 210. Because it is clearly established in this Circuit that people with substance use disorders, including OUD, are disabled under the ADA and Section 504, *see A Helping Hand*, 515 F.3d at 367 ("Unquestionably, drug addiction constitutes an impairment under the ADA."), the court should have asked whether the refusal to provide individuals with OUD access to the medical service of MOUD denied equal access to the prison's medical services—and it should have agreed

with its sister courts in answering yes. *See, e.g.*, *M.C. v. Jefferson Cnty.*, No. 6:22-CV-190, 2022 WL 1541462, at *4 (N.D.N.Y. May 16, 2022) ("The refusal to provide access to methadone [a type of MOUD] deprives plaintiffs 'meaningful access' to Jefferson Correctional's healthcare services."); *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 159-61 (D. Me. 2019) (holding that refusing out-of-hand to continue a detainee's MAT (synonym for MOUD) constituted discriminatory disparate treatment because the disabled detainee's medical needs were not individually assessed like the needs of other detainees); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45-47 (D. Mass. 2018) (holding denial of methadone was denial of medical services and likely violated the ADA).

The legal issue here is not, as the district court suggested, whether pregnant women were treated better than people who are not pregnant.[29]

[29] The prison's different treatment of those with OUD—providing them necessary medical services only when pregnant, based on the prison's interest in the fetus, *see* JA0705—showed a blatant disregard for the needs of prisoners with disabilities, including pregnant prisoners with disabilities. This type of "thoughtless and indifference" or "benign neglect" of the needs of disabled people in the face of other interests is exactly what Congress intended to remedy in enacting the ADA. *Alexander v. Choate*, 469 U.S. 287, 295-97 (1985).

Further, preferencing the needs of fetuses over women is dangerous and demeaning. Carolyn Sufrin et al., *Opioid Use Disorder Incidence and*

Rather, it is that subjecting only those with OUD for whom MOUD is a necessary treatment to the *unnecessary* "qualification" that they must also be pregnant to access this medical service is textbook discriminatory. *See Smith*, 376 F. Supp. 3d at 159 (holding that denial of MAT to accommodate an incoming detainee with OUD likely violated the ADA when prison permitted pregnant detainees access to MAT). Pregnancy was irrelevant to whether Edwards's disability should be treated.

Even if the court had fairly considered and rejected Edwards's contention that the "pregnancy qualification" for MOUD was itself discriminatory, the question the court should have next asked—but didn't—was "whether there was a reasonable accommodation available by which [Edwards] would have *become* qualified." *Halpern v. Wake*

---

*Treatment Among Incarcerated Pregnant People in the U.S.: Results from a National Surveillance Study*, 115 Addiction 2057, 2064 (2020) (criticizing the discontinuation of MOUD postpartum in prison as an implicit prioritization of the well-being of the fetus over the pregnant woman, which "sends a message that the pregnant individual is only valuable for her reproductive capacity"); *see also* Pregnancy Justice, *Unpacking Fetal Personhood: The Radical Tool that Undermines Reproductive Justice* (Sept. 2024); Cassandra Jaramiollo & Kavitha Surana, *A Woman Died After Being Told It Would Be a "Crime" to Intervene in Her Miscarriage at a Texas Hospital*, ProPublica (Oct. 30, 2024) (describing Texas hospital's refusal to prevent Josseli Barnica's fatal infection because her non-viable fetus's heart tone was detectable).

*Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (emphasis added). The answer is clear—Defendants could have reasonably modified the MOUD policy and provided MOUD to Edwards regardless of her pregnancy status (just as it should have for *all* people with OUD[30]). JA0143-45. But the district court failed to consider at all whether the MOUD policy could be reasonably modified.

### C. Oxycodone Tapering Was Not A Reasonable Accommodation, And The Court Should Not Have Given Absolute Deference To Defendants' Claim That It Was.

The court accepted at face value Defendants' abrupt switch of Edwards from MOUD to tapering by oxycodone as a "reasonable accommodation" for incarcerated people with OUD who are not pregnant.[31] But Defendants were obligated to show that the accommodation they proposed was still effective in addressing Edwards's

---

[30] A growing body of case law has concluded that providing MOUD to people with OUD is a reasonable accommodation. *See supra* at 28-29.

[31] "Reasonable modifications" and "reasonable accommodations" are synonymous terms, *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 371-72 (D. Md. 2011), and to the extent the summary judgment decision can be read as considering oxycodone tapering a "reasonable modification" of the MOUD program, that conclusion was also wrong for the reasons stated herein.

disability-related needs before that accommodation was accepted by the district court. *See Koon*, 50 F.4th at 406.

State prison officials cannot be afforded absolute deference in responding to requests for reasonable modifications, as such deference would deprive disabled individuals of their rights under the ADA and Section 504. Rather, courts play an important role in determining whether state prison officials have supported their assertions that no reasonable modification is available or that another solution is a reasonable accommodation. *See Richardson v. Clarke*, 52 F.4th 614, 621 (4th Cir. 2022). While some deference to prison officials is required because of the prison setting, *id.*, "some" deference does not amount to a rubberstamp. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006) (when addressing religious accommodation claims, "a court should not rubberstamp or mechanically accept the judgments of prison administrators" but view accommodations through the "lens of due deference" (internal citations omitted)).

If the district court had assessed Defendants' evidence that the oxycodone taper was a reasonable accommodation—as they were required to present, *see Koon*, 50 F.4th at 406—it would have been found

lacking. *First*, it would have been difficult for prison administrators to establish the effectiveness of an oxycodone taper as an accommodation when methadone, buprenorphine, and naltrexone—MOUDs—are the only medications approved by the FDA to address OUD.[32]

*Second*, the facts found by the district court show that Edwards experienced the effects of MOUD denial even while on the oxycodone taper for nine days. The district court found that Defendants denied Edwards access to buprenorphine despite being "personally aware" that "[d]iscontinuing MOUD is a health risk to individuals with OUD," and denying "buprenorphine causes harm to individuals, including potential harm that may result from sudden withdrawal from buprenorphine," such as "pain and nausea." JA3077-78.

Without factual support that the prison's oxycodone tapering program was effective medical treatment for OUD or required for penological reasons, there was no basis for concluding that the taper provided Edwards a "reasonable accommodation" or otherwise met the

[32] *See National Academies of Science, Engineering, and Medicine, supra* note 24 at 3 ("[W]ithholding or failing to have available all classes of [FDA]-approved medication for the treatment of opioid use disorder in any care or criminal justice setting is denying appropriate medical treatment.").

requirements of the ADA and Section 504. *Cf. Lovelace*, 472 F.3d at 190 ("Our [due deference] approach underscores" that prison administrators "take the unremarkable step of providing an explanation for the policy's restrictions[.]"). The district court improperly afforded absolute deference to the prison officials in granting Defendants summary judgment on Edwards's disability discrimination claims.

## CONCLUSION

This Court should reverse the district court's order granting Defendants summary judgment and remand for further proceedings.

Dated: March 7, 2025

Respectfully submitted,

*/s/ Russell H. Falconer*

Russell H. Falconer
*Counsel of Record*
Kathryn M. Cherry
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900
Rfalconer@gibsondunn.com

Raena Ferrer Calubaquib
Sanjay Nevrekar
Dillon M. Westfall
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Dorianne Mason
Alison Tanner
Ma'ayan Anafi
Emily Gabos
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 571-8725
Facsimile: (202) 588-5185
atanner@nwlc.org

Robert B. Watson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for National Women's Law Center*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 24-7049 **Caption:** Tracey Edwards v. Benita Witherspoon, et al.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 6,407 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word [*identify word processing program*] in
Century Schoolbook, 14, serif [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
____________________ [*identify word processing program*] in
____________________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Russell H. Falconer

Party Name Amicus National Women's Law Ctr Date: 3/7/2025

## APPENDIX

**Disability Rights North Carolina** (Disability Rights NC) is the federally mandated Protection and Advocacy organization for people with disabilities in North Carolina. Disability Rights NC is authorized by federal law to protect and advocate for the rights of individuals with disabilities. *See* 42 U.S.C § 10801 et seq.; 42 U.S.C. § 15041 et seq.; 29 U.S.C. § 794e; 42 U.S.C. § 300d-53; 29 U.S.C § 3004; 42 U.S.C. § 1320b-20; 52 U.S.C. § 21061; 29 U.S.C. § 732; 42 U.S.C. § 405(j). Individuals with opioid use disorder are disabled individuals, and Disability Rights NC's interest in the present case is to highlight the importance of equal access to MOUD as part of the medical services provided to disabled individuals in prisons.

The **Legal Action Center** (LAC) is a non-profit law and policy organization that advocates for equity and restored opportunity for people who use(d) drugs, have conviction records, or have HIV or AIDS. Since 1973, LAC has worked to end punitive and discriminatory responses to stigmatized health conditions and create equitable access to evidence-based care. Through legal and policy efforts, LAC advocates for the rights of people who use or used drugs to receive critical treatment

and healthcare, and overcome discrimination that presents barriers to employment, housing, education, and more.

The **National Women's Law Center** (NWLC) is a non-profit legal advocacy organization, founded in 1972, that fights for gender justice in the courts, in public policy, and in our society. NWLC works across the issues that are central to the lives of women[33] and girls—especially women of color, LGBTQ people, and low-income women and families. NWLC has long advocated for women who are incarcerated, a group disproportionately consisting of women and people of color who lack income security, healthcare, educational opportunities, and access to justice.

**Pregnancy Justice**, founded in 2001 as National Advocates for Pregnant Women, is a New York based non-profit legal organization that advances and defends the rights of pregnant people, whether they give birth, experience a stillbirth or miscarriage, or have an abortion. Pregnancy Justice advances this mission by: providing direct criminal defense and engaging in nationwide appellate and strategic litigation, advocating for legal and policy change, publishing cutting-edge research,

and equipping partners in the field with analysis, training, and narrative framing. Pregnancy Justice has appeared as either counsel-of-record or *amicus curiae* in state and federal cases across the United States challenging fetal personhood principles and centering the rights, health, and dignity of pregnant people.

## CERTIFICATE OF SERVICE

I certify that on March 7, 2025, the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Russell H. Falconer*
Russell H. Falconer