No. 24-7049

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TRACEY EDWARDS,

*Plaintiff-Appellant,*

v.

BENITA WITHERSPOON, et al.,

*Defendants-Appellees,*

On Appeal from the United States District Court
for the Eastern District of North Carolina

**BRIEF OF DEFENDANTS-APPELLEES**

JEFF JACKSON
Attorney General

Laura H. McHenry
Special Deputy Attorney General

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6900

Counsel for Defendants-Appellees

## CORPORATE DISCLOSURE STATEMENT

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, that Defendants-Appellees Benita Witherspoon, Leslie Cooley Dismukes, Anthony Perry, James Alexander, Gary Junker, Elton Amos, Kavona Gill, Tamara Brown, Nikitia Dixon, Tammy Williams, Shelda Brodie, Tianna Lynch, and Lorafaith Ragano are not in any part a publicly held corporation, a publicly held entity, or a trade association, and that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

Dated: May 30, 2025

/s/ Laura H. McHenry
Laura H. McHenry
Special Deputy Attorney General

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... ii

ISSUES PRESENTED ........................................................................ 1

INTRODUCTION ............................................................................. 2

STATEMENT OF THE CASE.............................................................3

SUMMARY OF THE ARGUMENT.................................................. 20

ARGUMENT ................................................................................. 21

CONCLUSION ...............................................................................57

CERTIFICATE OF SERVICE............................................................ 59

CERTIFICATE OF COMPLIANCE ................................................... 60

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## <u>Cases</u>

*Anderson, v. Creighton,*
    483 U.S. 635, 640 (1987)...................................................................34

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ...........................................................25, 27, 29

*Bacon v. City of Richmond,*
    475 F.3d 633 (4th Cir. 2007).......................................................... 21

*Baird v. Rose,*
    192 F.3d 462 (4th Cir. 1999) ......................................................... 48

*Booker v. S.C. Dep't of Corr.,*
    855 F.3d 533 (4th Cir. 2017).....................................................25, 32

*Bouchat v. Baltimore Ravens Football Club, Inc.,*
    346 F.3d 514 (4th Cir. 2003) .....................................................21, 22

*Brawley v. Washington,*
    712 F. Supp. 2d 1208 (W.D. Wash. 2010) ................................31, 33

*Brawner v. Scott,*
    14 F.4th 585 (6th Cir. 2021) .......................................................... 44

*Brown v. Cumberland County,*
    557 F. Supp. 3d 169 (D. Me. 2021)................................................ 39

*Cartagena v. Lovell,*
    103 F.4th 171 (4th Cir. 2024)....................................................51, 52

ii

*City of Tahlequah v. Bond,*
  595 U.S. 9 (2021) ....................................................................25

*Danser v. Stansberry,*
  772 F.3d 340 (4th Cir. 2014) ...........................................24, 43

*Davis v. Scherer,*
  468 U.S. 183 (1984) ..............................................................38

*De'Lonta v. Johnson,*
  708 F.3d 520 (4th Cir. 2013) ..............................................36

*District of Columbia v. Wesby,*
  583 U.S. 48 (2018) ................................................................32

*Fain v. Rappahannock Reg'l Jail,*
  No. 3:12-cv-293-JAG, 2013 U.S. Dist. LEXIS 86384
  (E.D. Va. June 19, 2013) ...............................................26, 27

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ......................................................passim

*Fauconier v. Clarke,*
  966 F.3d 265 (4th Cir. 2020) ...............................................48

*Frost v. Stalnaker,*
  2010 U.S. Dist. LEXIS 141430 (S.D. Ohio Dec. 17, 2010) ...............39

*Hope v. Pelzer,*
  536 U.S. 730 (2002)....................................................29, 30, 31

*Horton v. Methodist Univ., Inc.,*
  788 F. App'x 209 (4th Cir. 2019) ....................................52, 53

*Hudson v. McMillian,*
　503 U.S. 1 (1992) ............................................................ 46

*Huron Valley Hosp., Inc. v. City of Pontiac,*
　887 F.2d 710 (6th Cir. 1989) ........................................ 39

*Iko v. Shreve,*
　535 F.3d 225 (4th Cir. 2008) ..............................36, 45, 47

*Irish v. Fowler,*
　979 F.3d 65 (1st Cir. 2020) ........................................... 39

*Jacobs v. N.C. Admin. Office of the Courts,*
　780 F.3d 562 (2015) ...................................................... 49

*Kapche v. City of San Antonio,*
　304 F.3d 493 (5th Cir. 2002) ........................................ 56

*Maciariello v. Sumner,*
　973 F.2d 295 (4th Cir. 1992) ........................................ 29

*McGregor v. La. State Univ. Bd. of Supervisors,*
　3 F.3d 850 (5th Cir. 1993) .............................................53

*Mendiola-Martinez v. Arpaio,*
　836 F.3d 1239 (9th Cir. 2016) ..................................31, 33

*Mitchell v. Forsyth,*
　472 U.S. 511 (1985) .......................................................23

*Nelson v. Corr. Med. Servs.,*
　583 F.3d 522 (8th Cir. 2009) .....................................31, 33

*Nguyen v. CNA Corp.,*
　44 F.3d 234 (4th Cir. 1995) .......................................... 42

iv

*O'Hara v. Nika Techs., Inc.,*
  878 F.3d 470 (4th Cir. 2017) ............................................................ 42

*Parker v. Children's Nat'l Med. Ctr. Inc.,*
  2021 U.S. Dist. LEXIS 235885 (D.Md. Dec. 9, 2021) ....................................55

*Pearson v. Callahan,*
  555 U.S. 223 (2009) .............................................................. 23, 24, 35, 43

*Perdue v. Sanofi-Aventis U.S., LLC,*
  999 F.3d 954 (4th Cir. 2021) .................................................... 53, 54

*Richardson v. Clarke,*
  52 F.4th 614 (4th Cir. 2022) ............................................................53

*Rodriguez v. Smithfield Packing Co.,*
  338 F.3d 348 (4th Cir. 2003) ............................................................ 21

*Rogers v. Dep't of Health and Envt'l Control,*
  174 F.3d 431 (4th Cir. 1999) ............................................................ 48

*Soueastern Cmty. Coll. v. Davis,*
  442 U.S. 397 (1979) .................................................................... 51

*Smith v. Aroostock County,*
  376 F. Supp. 3d 146 (D. Me.) ............................................................55

*Smith v. Aroostock County,*
  922 F.3d 41 (1st Cir. 2019) ............................................................ 56

*Spann v. Perry,*
  No. 1:18-cv-175-MOC-WCM, 2021 U.S. Dist. LEXIS 68755
  (W.D.N.C. Apr. 8, 2021) ............................................................37, 46

*Taylor v. Wexford Health Sources, Inc.,*
  737 F. Supp. 3d 357 (S.D.W. Va. 2024) ....................................................43

*Theriault v. Flynn,*
    162 F.3d 46 (1st Cir. 1998)................................................................. 56

*Thorpe v. Clarke,*
    37 F.4th 926 (4th Cir. 2022).......................................................... 28

*United States v. Al-Hamdi,*
    356 F.3d 564 (4th Cir. 2004) ......................................................... 19

*Villegas v. Metro. Gov't of Nashville,*
    709 F.3d 563 (6th Cir. 2013) ...................................................... 31, 33

*Williams v. Branker,*
    462 F. App'x 348 (4th Cir. 2012) ................................ 35, 36, 37, 38

*Willingham v. Crooke,*
    412 F.3d 553 (4th Cir. 2005) ................................................... 28, 29

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia,*
    877 F. Supp. 634 (D.D.C. 1994)................................................ 31, 33

## Statutes

29 U.S.C. § 794(a) ...................................................................... 47, 48
42 U.S.C. § 12132 ............................................................................. 47

## Rules

Fed. R. Civ. P. 56(e)....................................................................22

## ISSUES PRESENTED

I.    Did the District Court properly hold that Defendants are entitled to qualified immunity on Plaintiff's Eighth Amendment claim related to the use of restraints during pregnancy, labor, delivery and immediately postpartum?

II.   Did the District Court properly enter summary  judgment in Defendants' favor on Plaintiff's Eighth Amendment claim related to the use of restraints during pregnancy, labor, delivery, and immediately postpartum?

III.  Did the District Court properly enter summary judgment in Defendants' favor on Plaintiff's Eighth Amendment claim related to her treatment for Opioid Use Disorder?

IV.   Did the District Court properly enter summary judgment in Defendants' favor on Plaintiff's ADA and Rehabilitation Act claims?

## **INTRODUCTION**

Plaintiff was convicted of heroin trafficking in 2019 and sentenced to 70 months incarceration. In May 2019, she entered custody at the North Carolina Correctional Institute for Women. During a medical screening at intake, Plaintiff learned she was pregnant.

Plaintiff had an existing diagnosis of Opioid Use Disorder. Because opioid withdrawal can lead to a heightened risk of miscarriage, NCCIW offered medication for OUD to all pregnant offenders, including Plaintiff. The medication, typically Suboxone, provided enough opioid agonist to reduce cravings and stave off withdrawal symptoms without the risk of producing an opioid high. In December 2019, Plaintiff delivered a healthy baby girl. Plaintiff's mother took the baby home and Plaintiff returned to NCCIW to complete her sentence. Plaintiff was released from NCCIW in June 2021.

In September 2021, Plaintiff commenced this litigation. She alleges that she was shackled during pregnancy, labor, childbirth, and the postpartum period, and that she was denied certain medical care in violation of the Eighth Amendment guarantee against cruel and unusual punishment, the Americans with Disabilities Act, and § 504 of the Rehabilitation Act. The parties filed

cross motions for summary judgment.

The District Court granted summary judgment in Defendants' favor and dismissed all of Plaintiff's claims. The court found that, at the time the acts giving rise to Plaintiff's claims occurred, Plaintiff did not have a clearly established right to the particular treatment Plaintiff desired, and thus Defendants were entitled to qualified immunity, barring Plaintiff's Eighth Amendment claims. The court also concluded that Plaintiff failed to state a claim under the ADA or the Rehabilitation Act and thus no reasonable jury could return a verdict in her favor on those claims.

This Court should affirm the District Court's order awarding Defendants' motion for summary judgment on all claims.

## STATEMENT OF THE CASE

### I.    Factual Background

In May 2019, Plaintiff entered custody at NCCIW to serve a 70-month sentence for a nonviolent drug offense. [JA 45-46, 48, 166, 3270, 3408] NCCIW is a correctional facility within the North Carolina Department of Adult Correction (previously the North Carolina Department of Public Safety). [JA 721] The facts recited below are undisputed by the parties. The Department

3

issues state-wide policies that apply to all facilities within DAC. Each facility then promulgates its own policies, Standard Operating Procedures (SOPs) and Post Orders to implement the state-wide policy at that particular facility. [JA 704, 721-22, 741]

**MOUD for Pregnant Inmates and Use of Restraints during Transport**

Plaintiff was addicted to opioids when she arrived at NCCIW and had been receiving treatment for a diagnosis of Opioid Use Disorder prior to her incarceration. [JA 60, 166] Plaintiff also had existing diagnoses of bipolar disorder, depression and anxiety, and took medication to treat her mental health conditions. [JA 60, 166] During an intake screening at NCCIW, Plaintiff learned she was pregnant. [JA 48, 166]

Opioid withdrawal during pregnancy can result in spontaneous abortion or premature delivery. [JA 734-35, 738, 743, 2682-83] For that reason, NCCIW provided pregnant offenders with medication for Opioid Use Disorder (MOUD)—a daily, regulated dose of Suboxone—to prevent withdrawal. [JA 735, 738, 743-44, 2664, 2682-83] Plaintiff was transported daily to SouthLight, an outpatient opioid treatment clinic, for medication administration for the duration of her pregnancy until December 2019 when

4

NCCIW began offering MOUD on-site. [JA 167, 735, 738, 743, 2664]

For security reasons, the Department of Adult Correction and NCCIW policy require an offender to be restrained any time she is transported outside the security confines of the correctional facility. [JA 504-07, 513-17, 522-24, 725-28; 747-50, 752-55, 758-61] Non-pregnant offenders are restrained at the wrists with handcuffs behind the back and at the ankles with leg cuffs, with both attached to a belly chain, during transport to and from a correctional facility. [JA 510, 516] In contrast, pregnant offenders are only restrained by handcuffs applied at the wrists in front of the body "in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall." [JA 510, 727, 748, 753, 759] Leg, ankle and waist restraints are not used on pregnant offenders during transport. [JA 510, 515-17, 524]

During transport to SouthLight, Plaintiff was restrained at the wrists in the front of her body to prevent injury to the fetus or herself in case of a fall, consistent with policy. [JA 167, 750, 755, 1714] On December 1, 2019, NCCIW initiated an in-house MOUD program. Plaintiff continued to receive her daily, regulated dose of MOUD, but no longer required transport to the clinic for medication administration. [JA 738, 743-44]

**Plaintiff's Mental Health History and Treatment**

When Plaintiff entered NCCIW, she reported a history of health conditions including mental health diagnoses, █████████████████ ██ and substance abuse. [JA 166, 3394, 3398-3402,3408, 3410, 3417-3421, 3619, 3623-24] Plaintiff also reported a history of not taking prescribed medications or following through on treatment. For example, ██████████████ ████████████████████████████████████████████ ██████████████ [JA 3164, 3270, 3408, 3417, 3619, 3623-24]

Upon intake, ███████████████████████████████ ███████████████████████████████████████████ ███████████████████████ but did not want to take her mental health medications while she was pregnant. [JA 167, 3394, 3408, 3418] Plaintiff was referred for ████████████████████████████████ ██████████████████████ [JA 3415-3416]

At her ████████████████████████████, Plaintiff reported feeling stable and informed the provider that she had decided to stop taking all mental health medications. The provider's notes state that Plaintiff reported █████████████████████████████████████████



[JA 167, 3394, 3413] Plaintiff signed a medical ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████. [JA 3413] Plaintiff continued to receive daily MOUD at SouthLight. [JA 167]

**Use of Restraints during Hospital Admission for Labor and Delivery**

As referenced above, certain DAC and NCCIW policies govern the use of restraints on pregnant offenders during transport [JA 510; 515-17], but different provisions apply to the use of restraints once a pregnant offender is admitted to the hospital [JA 503, 510-11, 518, 523-24].

These policies and procedures are meant to be read and applied in concert. For example, DAC Policy F.1100(i)(1) provides that a pregnant offender who is not in labor may be restrained by the wrists in front of the body during internal or external transport. [JA 510] Consistent with this Department-wide policy, NCCIW SOP D. 1804(k) explains that "restraints will be utilized on all offenders, regardless of custody level, when leaving the security confines of the facility." [JA 514] The use of leg irons or waist chains

are prohibited on pregnant offenders, but "pregnant offenders will be restrained with handcuffs" during transport. [JA 514-15, 517]

NCCIW SOP D.1802(b) further instructs "that, at no time, should an offender be unrestrained while outside the security confines of the correctional facility from which they are assigned." [JA 513] Section D.1802(b)(3) provides an exception for a pregnant offender who is in active labor. [JA 513] Likewise, DAC policy provides exceptions to the general requirement that offenders are restrained when outside a secure facility for pregnant offenders once an intravenous line has been placed for induction of labor, or if the offender is in labor (defined as occurring at the onset of contractions), delivering the baby, in post-partum recuperation, or during initial bonding with a newborn. [JA 510-11]

Aside from those specific exceptions, an offender (even a pregnant offender) must be restrained during hospital admission. [JA 518] While lying in an assigned hospital bed or gurney, offenders are to be restrained with one hand secured to the bed/gurney with a handcuff and the opposite leg secured to the bed/gurney with a leg cuff. [JA 518] Policy allows for restraints to be removed at the request of medical staff and during labor, delivery, and

8

immediately postpartum. [JA 518].

After the birth of the child and the medical care associated with childbirth has been completed, the offender should be restrained as any non-pregnant offender would, except that handcuffs should be removed in order for the offender to hold her newborn. [JA 518, 524] Hand restraints are not to be applied while the offender is bonding and feeding the baby. However, the offender has to remain seated while holding the newborn, with her leg restrained to a bed or chair. [JA 518, 524]

Aside from these and other specific exceptions enumerated in these policies and SOPs, officers are not permitted to leave offenders unrestrained while lying in a hospital bed or treatment gurney. [JA 518] Any time restraints are removed, or applied, in a manner that contravenes policy, officers are required to report the deviation from policy to the Officer in Charge. [JA 518]

NCCIW correctional officers receive training on all DAC and NCCIW policies, SOPs, and Post Orders. At the beginning of each shift, the OIC notifies all officers of any updates to policies and/or procedures. Officers sign a log confirming they have reviewed the specific guidelines for their assignment or Post for that shift and complete an Outside Activity Log if they

9

are off-site with an offender (e.g., transporting an offender to a medical appointment). If an officer has a question about how to implement the policies, SOPs, or Post Orders, or believes deviation is necessary at any point during the shift, the officer must contact the OIC. These communications are documented. [JA 722, 726, 728, 747-48, 750, 752-55, 758-61]

For example, on November 22, 2019, a pregnant offender (not Plaintiff) was being treated at WakeMed. A hospital administrator contacted NCCIW because the medical staff wanted the pregnant offender's restraints to be removed so that she could be ambulatory, but because the offender was not in labor, removing the restraints at that time would violate DAC and NCCIW policy. Deputy Warden David May spoke with hospital staff and approved the removal of restraints for this offender. Deputy May communicated this deviation from policy up the chain of command to then-Warden Benita Witherspoon and DAC Central Region Director Cynthia Thornton. [JA 723-24, 537-39, 550-55]

During that time period, Warden Witherspoon had been discussing changes to the policies and procedures concerning the use of restraints on pregnant offenders with Region Director Thornton and others at DAC.

However, no DAC policies had been revised as of November 2019. [JA 722] Director Thornton sent an email on November 22, 2019, to Warden Witherspoon, copying Deputy Warden May and others at NCCIW and DAC. The subject line of the email reads, "Pregnant Female Offender Temporary Directive." In that email, Director Thornton wrote:

> Be advised that the restraints have been removed from [patient name redacted]. She should remain unrestrained while in pre and active labor. It is noted that could be for several weeks.

The email went on to explain that revisions to the policy were forthcoming, but the interim directive was that offenders in their third trimester should not be restrained, even if they are not in pre or active labor. [JA 723-24, 537-39]

That same day, Deputy Warden May shared Thornton's temporary directive with the OICs so they could notify the officers when they reported to their next shift. One of the OICs asked if this meant pregnant offenders in their third trimester should not be restrained during transport. Director Thornton clarified that DAC Policy *F*.1100 Transporting Offenders should be followed. [JA 724, 537-39] The directive to OICs and officers was that wrist restraints should still be applied at the front of the body during transport of all pregnant offenders—even pregnant offenders in their third trimester—

consistent with the version of DAC Policy *F.1100 Transporting Offenders* in effect at that time. [JA 724, 537-39]

### **Plaintiff's Labor, Delivery, and Hospital Admission**

On December 19, 2019, Plaintiff was transported to UNC Hospital in Chapel Hill for induction of labor. She was 39 weeks pregnant. [JA 48, 167, 3191, 3308, 3314, 3320] During transport, Plaintiff was restrained only at the wrists in the front of her body, consistent with DAC policy. [JA 167, 510, 515-17, 524]

Officer Tianna Lynch monitored Plaintiff from 7:00pm on December 19, 2019, to 7:00am on December 20, 2019. Pursuant to the applicable policies and SOPs, Plaintiff's wrist restraints were removed when induction began. [JA 510, 623; 721, 761, 2110-11]

Sergeant Lorafaith Ragano relieved Officer Lynch at 7:00am on December 20, 2019, and monitored Plaintiff until 7:00pm on December 20, 2019. When Sgt. Ragano arrived at the hospital at 7:00am on December 20, 2019, Plaintiff was not restrained in any way. [JA 624-25, 729][1] Sgt. Ragano did

---

[1] Plaintiff contends that officers "did not remove her wrist or leg restraints until the doctors told her to start pushing." Appellant's Br. p 16. This is the only disputed fact between the parties. For reasons explained below, this is not a material fact and has no bearing on the issues before this Court.

not apply any restraints during Plaintiff's labor or delivery. [JA 729] Plaintiff

delivered her baby at 11:04am on December 20, 2019. [JA 167, 625, 729]

About two hours after delivery, the nursing staff prepared Plaintiff and

her baby to be transferred to the maternity ward on the fifth floor. [JA 625,

729] Sgt. Ragano escorted Plaintiff in a wheelchair to her recovery room on

the fifth floor. Sgt. Ragano cuffed Plaintiff's wrist to the wheelchair during the

escort. Once they arrived in the recovery room, Sgt. Ragano followed the

normal practice of cuffing Plaintiff's opposite wrist and leg to the bed. The

wrist restraint was applied to Plaintiff's right arm because Plaintiff had an IV

in her left arm. Sgt. Ragano removed the wrist restraint when a nurse brought

Plaintiff's baby into the room. [JA 168, 625, 729-30]

Officer Nikita Dixon relieved Sgt. Ragano at 7:00pm on December 20,

2019. When Sgt. Ragano left and Officer Dixon took over, Plaintiff had one leg

restrained. No other restraints, including wrist restraints, were applied. Dixon

did not adjust Plaintiff's restraints during her shift. [JA 168, 626-28, 729-30;

1537]

Sgt. Ragano relieved Officer Dixon at 7:00am on December 21, 2019.

When a nurse informed Officer Ragano that Plaintiff should walk around, Sgt.

Ragano contacted the OIC and documented the reason Plaintiff's ankle restraint was being removed. Officer Ragano and the nurse escorted Plaintiff to the hall for a ten-minute walk. [JA 168, 629-30, 729]

Plaintiff never complained about any pain or discomfort related to the restraints. If she had complained, or if the medical staff had asked for the restraints to be removed, the restraints would have been adjusted or removed. [JA 629-30, 730]

While Plaintiff was at the hospital, she received ███████████████. [JA 3394, 3451, 3479] Upon discharge, Plaintiff was given a 14-day prescription for ████████████████████. [JA 3235-36, 3394, 3690]

When Plaintiff was transported from the hospital back to NCCIW, she was placed in restraints consistent with policies and SOPs applicable to non-pregnant offenders during transport in effect at that time. [JA 168]

**Plaintiff's Medical Care at NCCIW after Hospital Discharge**

Plaintiff was discharged from the hospital and returned to NCCIW on December 22, 2019. She stayed in NCCIW's in-patient medical unit where she could remain under the care and supervision of the facility's medical staff 24 hours a day. Plaintiff's physical, mental and emotional wellbeing were

monitored by the NCCIW medical staff during this time. [JA 66-67, 168, 744, 2691, 3394]

Because Plaintiff was no longer pregnant, she was no longer eligible for DAC's MOUD program. NCCIW medical staff began tapering Plaintiff's daily, regulated dose of opioid treatment medication. Instead of providing MOUD,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████. [JA 169, 738, 744-46; 2689-92, 3176, 3325]

Plaintiff requested continuation of Suboxone, but the request was denied. This was because NCCIW was not authorized to provide MOUD to non-pregnant inmates. [JA 735, 738, 743-44, 3325]

When Plaintiff was seen by a NCCIW health provider on January 15, 2020, Plaintiff reported that she had been taken off the facility's ████████

███████████████████████████████████████████████████████

███████████████████████████████████. [JA 167, 3394-95, 3405]

In February 2020, Plaintiff met with ████████████████████████████

15

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ Records confirm

that Plaintiff was caught with Suboxone in her bra during a search in January

and was charged with and found guilty of a prison disciplinary infraction. [JA

3395, 3404]

Plaintiff was released from NCCIW on June 4, 2021. [JA 46]

## II.    Procedural History

Plaintiff's second amended complaint, filed on April 7, 2022, is the

operative complaint in this case. [JA 43-110] After an exhaustive discovery

process, the parties filed cross motions for summary judgment. [JA 111-114, 702-

03]

On September 30, 2024, District Court Judge James C. Dever III entered

an Order granting summary judgment for Defendants, denying Plaintiff's

motion, and dismissing all seven claims asserted in Plaintiff's second amended

complaint. [JA 3070-95]

Judge Dever's Order first addresses Plaintiff's requests for injunctive and

declaratory relief, which he determined were made moot by her release from

custody. [JA 3081] Judge Dever then ruled that Eleventh Amendment immunity barred Plaintiff's Eighth Amendment claims brought against all official capacity defendants. [JA 3081-82] The court therefore granted summary judgment in Defendants' favor on counts I, II and V against the official capacity Defendants. [JA 3081-3082]

Next, the Order turns to Plaintiff's Eighth Amendment claims (counts I, II, and V) against personal capacity Defendants. To succeed on an Eighth Amendment claim, the court explained that a plaintiff must show both that she was deprived of an objectively sufficiently serious human need, and that the defendants acted with deliberate indifference to the inmate's health or safety. [JA 3082-3083] Regarding discontinuation of MOUD and allegedly inadequate mental health care provided after her baby was born, the court concluded that Plaintiff failed to meet her burden to demonstrate that "any defendant subjectively knew that she faced a substantial risk of serious harm and disregarded that risk." [JA 3084]

With respect to the use of restraints during pregnancy, labor and postpartum, the lower court found that Plaintiff did not have a clearly established right to be free of restraints during that time. [JA 3085-3090]

17

Therefore, even viewing the evidence in the light most favorable to Plaintiff, i.e., even if Plaintiff could prove she was restrained during labor and delivery, Defendants are entitled to qualified immunity concerning this claim. [JA 3091] Accordingly, the court dismissed all three of Plaintiff's Eighth Amendment claims. [JA 3084-3091]

Next the Court addressed counts III, IV, VI and VII, which assert that NCCIW violated the ADA and the Rehabilitation Act by denying Plaintiff MOUD and postpartum mental health treatment. Judge Dever concluded that, even viewing it in the light most favorable to Plaintiff, the evidence does not demonstrate an ADA or Rehabilitation Act violation. [JA 3093] The parties did not dispute that Plaintiff no longer qualified for MOUD after giving birth. "Instead of her requested MOUD, [Plaintiff] received an oxycodone taper, which is a reasonable accommodation." [JA 3093]

Similarly, the court determined Plaintiff's claim that she was denied access to mental health medication post-pregnancy failed because her prescriptions were renewed post-pregnancy, she met with NCCIW medical providers and received counseling during the period of time the Complaint alleges she was denied treatment. [JA 3093] Even if a jury could find that

Edwards was denied medical services in this period, the court continued, "no reasonable jury could find that this denial was on the basis of [Plaintiff's] disabilities." [JA 3094]

Plaintiff appeals from this Order. [JA 3097] However, the appeal is limited. Plaintiff explicitly abandons counts V, VI and VII related to postpartum mental health treatment. Appellant's Br. p 18, n.4. Plaintiff also affirmatively declines to appeal the dismissal of Plaintiff's requests for declaratory and injunctive relief[2] as moot. *Id.* Plaintiff's opening brief does not contest the dismissal of her Eighth Amendment claims brought against official capacity Defendants. *See also United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (holding that contentions not raised in the opening brief are abandoned).

Thus, the only issues before this Court on appeal are whether the district court properly granted summary judgment in favor of Defendants on (1) Plaintiff's claims related to the use of restraints during labor, delivery, and the postpartum period, and (2) Plaintiff's claims related to discontinuation of

---

[2] The only claims brought against Defendant Perry were in his "official capacity for purposes of injunctive relief." Accordingly, Plaintiff does not appeal the dismissal of any claims brought against Defendant Perry.

MOUD after her pregnancy ended—i.e., Counts I, II, III, and IV of Plaintiff's Second Amended Complaint.

## SUMMARY OF THE ARGUMENT

Defendants are entitled to summary judgment on Counts I-IV.

Count I, Plaintiff's Eighth Amendment claim related to the use of restraints during her pregnancy, is barred by qualified immunity. To date, well-reasoned decisions in this Circuit have declined to recognize an inmate's clearly established constitutional right to be free of restraints while outside the confines of a secure facility—even during pregnancy, labor, or immediately postpartum. Therefore, a reasonable person in Defendants' shoes would not have known that her conduct violated Plaintiff's constitutional rights, and the qualified immunity doctrine shields the personal capacity Defendants from liability.

Even if Defendants were not entitled to qualified immunity, Plaintiff's first claim fails to satisfy the two-prong test evincing cruel and unusual punishment under the Eighth Amendment.

Count II, Plaintiff's Eighth Amendment claim related to the discontinuation of MOUD after her pregnancy ended, fails as well. Plaintiff

did not have a clearly established right to receive Suboxone after her pregnancy ended, and Defendants' provision of an Oxycodone taper and other medical treatment of her OUD does not violate the Eighth Amendment.

Finally, Plaintiff cannot show that her discontinuation of MOUD once her pregnancy ended violated the ADA or the Rehabilitation Act (Counts III and IV). She fails to demonstrate that she was otherwise qualified to participate in the MOUD program or that she was discriminated against on the basis of her OUD diagnosis. Accordingly, these claims are not appropriate to proceed to a jury trial and summary judgment for Defendants is proper.

This Court should affirm.

## ARGUMENT

### Standard of Review

This Court reviews a district court's order granting summary judgment de novo, resolving all doubts and inferences in favor of the non-moving party. *E.g., Bacon v. City of Richmond*, 475 F.3d 633, 637 (4th Cir. 2007) (citing *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 354 (4th Cir. 2003). The party opposing summary judgment must set forth specific facts showing that there is a genuine issue for trial. *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The appellate court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Id.* at 526 (citations omitted). The existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment demonstrating that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.* at 519.

**Discussion**

## I.    The District Court Properly Entered Summary Judgment for Defendants on Plaintiff's Eighth Amendment Claim About the Use of Restraints.

On appeal, Plaintiff argues that the lower court erred when it granted summary judgment for the remaining Defendants on Plaintiff's Eighth Amendment claim concerning the use of restraints (Count I). Plaintiff assigns error to the district court's finding that the personal capacity Defendants were entitled to qualified immunity on this claim. Appellant's Br. pp 50-57. Plaintiff also protests the lower court's decision not to reach the merits of her claim after the court had determined Defendants were entitled to qualified

immunity. Appellant's Br. pp 44-45.

The district court correctly held that Defendants were entitled to qualified immunity. The district court also correctly refrained from deciding the merits of Plaintiff's constitutional claim, because doing so would have been an "academic exercise" on these facts. [JA 3091] *See Pearson v. Callahan*, 555 U.S. 223, 237 (2009).

## A. The District Court appropriately declined to reach the merits of Plaintiff's Eighth Amendment claim concerning the use of restraints.

As the United States Supreme Court has observed, "[d]istrict courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise." *Pearson*, 555 U.S. at 237. Qualified immunity is immunity from suit rather than a mere defense to liability. *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, whether immunity applies is a threshold question that must be answered before liability is determined. If a defendant is entitled to qualified immunity, a decision on Plaintiff's deliberate indifference claim has no effect on the outcome of the case. Reaching the merits "disserve[s] the purpose of qualified immunity" and "departs from the general rule of constitutional

avoidance." *Id.* at 237, 241.

Once concluding that Eleventh Amendment immunity barred Plaintiff's claim against the official capacity Defendants and qualified immunity barred the claim against the personal capacity defendants, the district court properly adhered to the principle of avoiding unnecessary questions of constitutionality. *See id.* at 241. This Court should do the same.

### B. Plaintiff did not have a clearly established right to be free from restraints. Qualified immunity thus bars her claim.

Under the doctrine of qualified immunity, claims brought against state actors in their personal capacity are barred so long as those individuals' actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See, e.g., Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014) (reversing district court's denial of qualified immunity for prison officials). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson*, 555 U.S. at 231).

In analyzing qualified immunity, "existing precedent must have placed

the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A state actor "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741. The Supreme Court has warned that "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (internal quotations and citations omitted).

When considering such precedent, this Court examines "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quotation marks omitted).

There is no support in Supreme Court precedent, Fourth Circuit precedent, or North Carolina law for Plaintiff's assertion that she had a clearly established right to be free of restraints while outside a secure facility.[3] In fact,

---

[3] Notably, there is no support in the record for Plaintiff's allegations that she was restrained during labor or delivery at all, aside from her own

the only case addressing the use of restraints on pregnant offenders within the Fourth Circuit held that the use of restraints during labor, delivery, and shortly thereafter did <u>not</u> violate a clearly established right. *Fain v. Rappahannock Reg'l Jail*, No. 3:12-cv-293-JAG, 2013 U.S. Dist. LEXIS 86384, at *14 (E.D. Va. June 19, 2013).

In *Fain*, the plaintiff asserted she was kept in shackles in some form or another throughout her labor and delivery. *Id.* at *5. The defendants asserted that they followed policy and kept the plaintiff restrained until medical personnel requested that the restraints be removed. *Id.* The district court found that, even treating the plaintiff's version of the facts as true ("farfetched as it is"), the plaintiff had failed to present any controlling precedent holding that she had a clearly established right to be free from the use of restraints during labor and delivery. *Id.* at *14-16. As a result, the district court found that the defendants were entitled to qualified immunity and plaintiff's claims were

---

uncorroborated, self-serving affidavit. [JA 711] Although the parties' version of events diverges here, this factual dispute is immaterial because even if Plaintiff's allegations are true, she did not have a clearly established constitutional right to be free from restraints during labor or delivery (or at any other time outside the secure prison facility).

barred. *Id.* at *16-17.

The same reasoning applies here. Even assuming, without conceding, that Plaintiff was restrained in any way during labor or delivery, that conduct is not a violation of Plaintiff's clearly established constitutional rights. The district court concluded that, "as of December 2019, the Eighth Amendment question as applied specifically to how the defendants in this case treated Edwards during her pregnancy, labor, and postpartum period was not "beyond debate" under the Eighth Amendment." [JA 3090] (quoting *Ashcroft,* 563 U.S. at 741). In fact, the only holding in this circuit that has addressed this question (from another district court) held that an inmate's Eighth Amendment right to be free from restraint during her pregnancy, labor, and postpartum period was <u>not</u> clearly established in April 2010. *See Fain,* 2013 U.S. Dist. LEXIS 86384, at *16-17. This, the district court observed, was "true in December 2019 and remain[s] true today." [JA 3090]

Plaintiff's arguments to the contrary lack merit. First, Plaintiff contends that this Court has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases." Appellant's Br. p 51. But even the case Plaintiff relies upon for this

proposition does not support her position. *See Thorpe v. Clarke,* 37 F.4th 926, 933 (4th Cir. 2022) (reiterating that the qualified immunity analysis looks to the "clearly established law at the time the wrong is committed.").

What's more, this Court's decision in *Thorpe* dealt with a motion to dismiss on qualified immunity grounds, not a motion for summary judgment where the factual record is well-developed. *See id.* at 932-33. The Court explained that the defendants in *Thorpe* "may well end up on the winning side of that argument after the evidence comes in," but was compelled to allow the case to move beyond the Rule 12 stage. *Id.* at 935. *See also Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.")

Here, the record is complete. Defendants are not asking for dismissal on the face of the pleadings. Defendants assert, and the district court agreed, that Plaintiff could not point to any binding authority holding that she had a clearly established right to be free of restraints during labor, delivery and in the postpartum period. Therefore, liability cannot attach—even if Plaintiff could prove her allegations about Defendants' use of restraints. [JA 3089-90]

Without any existing case law holding otherwise, a reasonable officer

could not have known that her use of restraints during labor, delivery or postpartum would violate Plaintiff's constitutional rights. Qualified immunity thus shields the officer from liability. *Willingham*, 412 F.3d at 558 ("officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Next, Plaintiff asserts that her "right to be free from shackling under the circumstances presented here was clearly established." Appellant's Br. p 55. In support, she relies on *Hope v. Pelzer*, a Supreme Court case involving an inmate's claim that prison guards subjected him to cruel and unusual punishment when they twice handcuffed him to a hitching post for up to seven hours. 536 U.S. 730, 734 (2002). But the facts in *Hope* are too dissimilar to be instructive in this case, much less provide clearly established precedent. *See Ashcroft*, 563 U.S. at 741 (holding that the constitutional right allegedly violated must be clearly defined in a concrete factual situation such that its contours are clear, unmistakable, and applicable to the precise conduct at issue.)

In *Hope*, the plaintiff was severely punished after he refused to perform road work, made vulgar remarks, and ended up in a wrestling match with a

guard. 536 U.S. at 734. Four guards intervened, subdued plaintiff, placed him in handcuffs and leg irons, transported him back to the prison and shackled him to a hitching post for seven hours. *Id.* Guards made plaintiff take off his shirt, causing his skin to be burned by the sun, only provided water once or twice, and denied plaintiff any bathroom breaks. *Id.* at 734-35. One guard taunted plaintiff about his thirst, first giving water to some dogs, then bringing the cooler close to plaintiff and kicking it over so its contents emptied on the ground. *Id.* at 735. The Court found that this punitive treatment, particularly after any safety concerns had long since abated, amounted to a gratuitous infliction of pain, discomfort and humiliation. *Id.* at 738.

The facts in *Hope* are markedly distinguishable from those in the instant case. Nothing in the record here indicates that the use of restraints was ever punitive, nor did Defendants use more restraint than was required by policy when an inmate is outside a secure facility. Far short of taunting and humiliating Plaintiff, Defendants' conduct here demonstrated compassion and respect for Plaintiff. She received specialized prenatal care, including daily transport to an outside clinic to provide preventative measures to reduce her risk of miscarriage, as well as ███████████ and mental health services.

[JA 3164-69, 3180-81, 3186-90] She does not allege that officers insulted or mocked her or were otherwise intentionally cruel. In fact, the officer present when Plaintiff delivered her baby averred that, because she did not have children of her own, she felt blessed to be there and "was as happy as [Plaintiff] was." [JA 1366, 1420]

The *Hope* decision can be read as a pronouncement that restraining an inmate to a hitching post on prison grounds for an extended period of time with no justification is unconstitutional, *id.* at 747, but it does not suggest that Plaintiff here had a clearly established right to be free of restraints while outside a secure prison facility, even during labor, delivery or postpartum.

In her final attempt to persuade the Court that she had a clearly established right, Plaintiff directs the Court's attention to case law outside of this Court's jurisdiction. Appellant's Br. pp 55-57, n. 12-13 (citing *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563 (6th Cir. 2013); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522 (8th Cir. 2009); *Brawley v. Washington*, 712 F. Supp. 2d 1208 (W.D. Wash. 2010); and *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 877 F. Supp. 634 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659

(D.D.C. 1995)). But these decisions are not binding and are beyond the scope of those that this Court regularly relies upon to determine clearly established constitutional rights. *See Booker*, 855 F.3d at 538 ("In conducting the clearly established analysis, we first examine cases of controlling authority in this jurisdiction."). (citations and internal quotation marks omitted)

Plaintiff also relied upon these decisions below. The district court considered them and concluded that, although they "may suggest an emerging trend in Eighth Amendment jurisprudence," they "fall short of establishing the 'robust consensus' in December 2019[4] that the Supreme Court requires to clearly establish a right." [JA 3087-89 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).]

In *Women Prisoners*, inmates complained of sexual harassment, sex

---

[4] In addition to this non-binding case law, Plaintiff also points to her expert report concluding that the use of restraints on pregnant inmates violates the standard of care. Appellant's Br. p 56. This argument does not hold water. First, an expert witness' opinion on the appropriate standard of care might be relevant to a medical malpractice claim but is not determinative in a constitutional analysis. Second, the expert report was drafted in 2023 and notes that the use of restraints on pregnant people is opposed by a number of health organizations. [JA 173-76] However, citations reveal reliance on publications from 2021-2023 and thus do not support Plaintiff's contention that there was a clear consensus in December 2019 regarding the use of restraints during labor, delivery and postpartum.

discrimination, inadequate obstetrical and gynecological care, exposure to fire hazards, and general conditions of confinement. 877 F. Supp. at 639. Only one inmate raised issues relevant here (i.e., labor and delivery); her labor pains were ignored, and she ended up delivering her baby in her jail cell. *Id.* at 646. She had not yet expelled the placenta when guards placed her in handcuffs and leg shackles and sent her by ambulance to the hospital. *Id.* The district court held that the defendant's conduct violated her Eighth Amendment rights. [JA 3087]

The remaining cases all involved inmates who went into labor while in the detention facility. They were placed in full restraints even though they were in active labor, some were refused epidurals and other pain management, and officers arguably refused to comply with hospital staff requests to remove restraints. The courts determined that, in those instances, officers were not entitled to qualified immunity. *See Nelson*, 583 F.3d at 525-27; *Brawley*, 712 F. Supp.2d at 1211-14; *Villegas*, 709 F.3d at 566-67; *Mendiola-Martinez*, 836 F.3d at 1243-45.

In this case, Plaintiff was transported to the hospital for induction of labor, meaning she was not in labor during transport. Even so, she was only

placed in handcuffs at the front of the body. Officers followed protocol and did not apply restraints during labor, delivery, postpartum or while Plaintiff was holding and bonding with her baby. There is no evidence that officers failed to comply with requests from hospital staff to remove restraints or that she was denied pain relief. The cases upon which Plaintiff rely simply do not clearly establish that Plaintiff had a constitutional right whose contours are "applicable to the precise conduct at issue" here. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Ultimately, Plaintiff asks this Court to go beyond its well-settled precedent, both procedurally and substantively, to grant her relief despite the absence of any binding legal authority to support her constitutional claims. This Court should affirm the district court's order, based on established doctrine, granting Defendants qualified immunity on Plaintiff's Eighth Amendment claims.

## C. Even if qualified immunity did not bar Plaintiff's claim, she has failed to demonstrate Defendants acted with deliberate indifference.

Plaintiff complains that the district court did not address the merits of her Eighth Amendment complaint regarding the use of restraints. However,

as discussed above, when a Court finds that a clearly established right was not established at the time of the challenged conduct, the Court need not undertake the academic task of determining whether the right exists and whether defendants violated that right. *Pearson*, 555 U.S. at 236. Thus, it was proper for the district court to stop short of analyzing the merits of Plaintiff's claim.

That said, even if the personal capacity Defendants were not entitled to qualified immunity, Plaintiff's Eighth Amendment claims based on the use of restraints still fail and summary judgment for Defendants was warranted.

### 1. Deliberate indifference requires that a prison official actually knows of and disregards an objectively serious condition, medical need, or risk of harm to plaintiff.

The Eighth Amendment imposes upon prison officials the duty to provide humane conditions of confinement, such as adequate food, clothing, shelter, and medical care. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Williams v. Branker*, 462 F. App'x 348, 353 (4th Cir. 2012). To establish a prima facie case claim that prison conditions violate the Eighth Amendment, a plaintiff must show "(1) that the deprivation of a basic human need was <u>objectively</u> sufficiently serious, and (2) that <u>subjectively</u> the officials acted

with a sufficiently culpable state of mind." *De'Lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (emphasis in original) (cleaned up); *see also Farmer*, 511 U.S. at 834.

The objective prong requires the plaintiff to demonstrate that there was an "extreme deprivation, that is, a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or substantial risk thereof," to satisfy the objective component of an Eighth Amendment claim. *De'Lonta*, 708 F.3d at 525; *see also Williams*, 462 F. App'x at 353 (holding that to succeed on an Eighth Amendment claim, plaintiff must first demonstrate that the "conditions of confinement objectively deprived him of minimal civilized necessities such as adequate food, clothing, shelter, medical care, or physical safety.").

The subjective prong requires a plaintiff to show that prison officials acted with deliberate indifference to the inmate's health or safety. *Id.* The deliberate indifference standard "sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); *Farmer*, 511 U.S. at 835. Mere negligence is not enough; rather, a plaintiff must show that her treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience

36

or to be intolerable to fundamental fairness." *Spann v. Perry*, No. 1:18-cv-175-MOC-WCM, 2021 U.S. Dist. LEXIS 68755, at *48-49 (W.D.N.C. Apr. 8, 2021) (internal quotations and citations omitted), *aff'd*, 2022 U.S. App. LEXIS 26351 (4th Cir. 2022).

> ### 2. There is no evidence that Defendants were deliberately indifferent to the risk of harm posed by the use of restraints during transport or Plaintiff's hospital admission.

Plaintiff argues Defendants were deliberately indifferent to her health and safety. These arguments fail on the record and the law.

First, the record evidence does not establish that the conditions of Plaintiff's confinement, including the use of restraints during transport and hospital admission, objectively inflicted harm. *See Williams*, 462 F. App'x at 353. While she objects to the use of restraints, she does not demonstrate that their use objectively led to an extreme deprivation of her basic needs or resulted in serious injury. *Id.*

Plaintiff asserts that DAC policy "prohibited most use of restraints" during transport, labor, delivery and recovery. Appellant's Br. p 45. This, she asserts, is sufficient to show that Defendants knew "shackling people while about to give birth, during childbirth, and immediately afterward could cause

serious harm." Appellant's Br. p 45. She also argues that a jury could conclude that Defendants subjected her to a substantial risk of serious harm based on (1) Plaintiff's own testimony that she experienced powerful contractions and had no choice but to lie there in pain while laboring before she received an epidural, or (2) the enumerated risks associated with the use of restraints late in pregnancy and during childbirth in her expert's report, including potential falls, inhibiting the doctor-patient relationship, and interfering with emergency medical intervention. Appellant's Br. pp 45-46. These arguments fail to demonstrate a violation of Plaintiff's constitutional right to be free from cruel and unusual punishment.

First, Plaintiff's testimony about the pain and discomfort of labor while her ankle was secured to the bed does not rise to an objectively serious injury or medical need. *See Williams*, 462 F. App'x. at 354 ("The fact that the conditions to which [plaintiff] was subjected aggravated [his pre-existing condition] is an unfortunate but inevitable result of his incarceration.").

Second, even if there had been a violation of state-wide policy, a policy violation does not equate to deliberate indifference towards an inmate's health or safety. *See Davis v. Scherer*, 468 U.S. 183, 191 (1984) (holding that a

violation of a state administrative regulation is not a *de facto* constitutional violation, and adopting such a view would "disrupt the balance that our cases strike" between protecting constitutional rights and permitting public officials' performance of their duties); *see also, e.g., Brown v. Cumberland County*, 557 F. Supp. 3d 169 (D. Me. 2021) (quoting *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) ("While a violation of state law may bolster the plaintiff's argument that a reasonable officer in the officer's circumstances would have believed that his conduct violated the Constitution it does not, in and of itself, establish a constitutional violation.") (cleaned up); *Frost v. Stalnaker*, 2010 U.S. Dist. LEXIS 141430, *15-16, (S.D. Ohio Dec. 17, 2010) (citing *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710 (6th Cir. 1989)) ("Whether negligent or deliberate, a violation of an internal prison policy, in and of itself, does not equate to a violation of a constitutional right.").

Moreover, Plaintiff's argument that Defendants violated DAC policy, which according to Plaintiff "prohibited most use of restraints" during transport, labor, delivery, and recovery, misapprehends the applicable policies and undisputed facts. Defendants' actions were in fact consistent with DAC policy, which governed the use of restraints during transport, and NCCIW

SOPs, which governed the use of restraints during hospital admission for labor and delivery. [JA 504, 513, 522] Officers adhered to all policies and SOPs. [JA 510-11, 517-18, 524, 750, 755-56, 1714-15] Plaintiff even acknowledges that officers complied with policy (e.g., she was only restrained by handcuffs at the front during transportation to SouthLight and to the hospital for induction of labor and delivery). [JA 167]

Yet Plaintiff asserts that Defendant Witherspoon promulgated NCCIW policies that contradicted DAC policy. Appellant's Br. p 47. Plaintiff's confusion appears to stem from her conflation of the DAC policy concerning transport with the NCCIW SOPs for the use of restraints while outside the secure setting of a correctional facility. Citing then-Warden Witherspoon's deposition transcript, Plaintiff contends that when "NCCIW's unlawful shackling around childbirth came to DPS's attention in April 2019," Witherspoon failed to update NCCIW policy. Appellant's Br. p 47. Yet the deposition transcript reveals that the DAC Central Region Director reached out to Witherspoon because "a group in the community had a concern regarding restraining pregnant offenders." [JA 322] Concern from a community group is not the same as notification of unlawful conduct from

state officials. In addition, the policy changes Plaintiff alludes to, which state that pregnant inmates in their third trimester should not be restrained, did not go into effect until January 2020—after Plaintiff delivered her baby. [JA 324-25]

Finally, the policies in effect at the time Plaintiff delivered her baby took into consideration the risks associated with the use of restraints during pregnancy and childbirth and sought to balance those risks with the interests of safety and security when offenders are outside the secure confines of the correctional setting (i.e., only allowing wrist restraints at the front to prevent injury in the event of a fall). [JA 510] Defendants complied with those policies, confirming that all restraints were removed during labor and delivery, and testifying that restraints would have been removed or adjusted to accommodate Plaintiff's complaints of discomfort or medical providers' requests. [JA 629-30, 723-30]

The record evidence simply does not demonstrate that the use of restraints in this situation objectively inflicted harm, nor does it show that Defendants were deliberately indifferent to Plaintiff's health or safety. The district court properly granted summary judgment for all Defendants on

Plaintiff's Eighth Amendment shackling claim. This Court should affirm.

## II. The District Court Properly Entered Summary Judgment for Defendants on Plaintiff's Eighth Amendment MOUD Claim.

This Court should also affirm the district court's entry of summary judgment on Plaintiff's Eighth Amendment MOUD claim (Count II). The analysis of this claim is the same as above, i.e., (1) whether the conditions of confinement objectively inflict harm, and (2) whether prison officials subjectively acted with deliberate indifference to plaintiff's health or safety. *Farmer*, 511 U.S. at 834. Plaintiff did not have a constitutional right to continue MOUD (daily Suboxone treatment) after she gave birth, nor did she have a constitutional right to her preferred treatment for OUD. This claim fails as a matter of law.

### A. Defendants are entitled to qualified immunity.[5]

Plaintiff has not, and cannot, show that she has a clearly established constitutional right to receive MOUD under the governing case law. Neither

---

[5] Although the district court did not reach this issue, Defendants raised it below. [DE 270, § 2.B] This Court may affirm a grant of summary judgment on an alternate ground that the record supports. *O'Hara v. Nika Techs., Inc.*, 878 F.3d 470, 475 (4th Cir. 2017); *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995).

this Court, the United States Supreme Court, nor the North Carolina Supreme Court has recognized such a right. Defendants cannot be held liable for violating a right that a reasonable person would not have known existed and thus are entitled to qualified immunity. *E.g., Danser,* 772 F.3d at 345; *Pearson,* 555 U.S. at 231.

There has only been one case decided in this circuit that addresses the issue of MOUD for incarcerated individuals. *See Taylor v. Wexford Health Sources, Inc.,* 737 F. Supp. 3d 357, 365 (S.D.W. Va. 2024). The case is neither binding on this Court nor particularly useful in providing guidance here.

In *Taylor,* policy required nonpregnant inmates to have an active MOUD prescription upon intake to qualify for MOUD while incarcerated. Without an active prescription, nonpregnant inmates with OUD were detoxed.  737 F. Supp. 3d at 367. The district court denied summary judgment for the defendants because there was a material factual dispute over whether the plaintiff in that case had an active prescription for Suboxone upon intake. *Id.* at 365. However, the court observed that pregnant inmates did receive MOUD to reduce the risk of pregnancy loss, even if they entered custody without an active prescription for MOUD. *Id.* at 367. The district court notably

made no comment on whether this approach, which mirrors the DAC policy in place at the time of Plaintiff's detox, was unconstitutional or even problematic.

Since Plaintiff cannot point to any decisions in this jurisdiction that support her position, she directs the Court's attention to a Sixth Circuit decision, *Brawner v. Scott*, in which the court of appeals reversed a district court's order granting defendants' Rule 50(a) motion at trial. 14 F.4th 585 (6th Cir. 2021). In *Brawner*, the inmate was denied three medications (including one for OUD) she asserted she had prescriptions for upon intake. She experienced roughly 30 seizures that were likely caused by the abrupt discontinuation of all three medications. Even after hospitalization for her seizures, she was never given the medications or provided with an alternative treatment plan. *Id.* at 599. Concluding that a reasonable jury could find that the defendant was deliberately indifferent to plaintiff's objective risk of harm, the appellate court determined that the lower court's entry of judgment as a matter of law at trial was error.  *Id.* at 598.

While the court in *Brawner* recognizes the seriousness of OUD and withdrawal, the case itself does not support Plaintiff's contention that she had

a clearly established right to continued MOUD after pregnancy. Defendants are aware of no case that does.

Defendants are entitled to qualified immunity on Plaintiff's Eighth Amendment MOUD claim. This Court should affirm the district court's order awarding summary judgment to Defendants on this claim.

**B. Even if qualified immunity does not apply, Plaintiff fails to demonstrate Defendants were deliberately indifferent to her health and safety.**

Under the same reasoning, Plaintiff has failed to prove that Defendants had actual knowledge of the harms presented by discontinuing her MOUD or that Defendants intentionally disregarded that risk. *See Iko*, 535 F.3d at 241.

Under the policy in effect at the time, Plaintiff was weaned from MOUD after giving birth, reducing her dosage every three days. She was monitored 24 hours a day by NCCIW medical staff in NCCIW's in-patient unit once she was discharged from the hospital. She was given Oxycodone instead of Suboxone because of limits on NCCIW's licensure and the heightened risk of diversion, assaults, and overdoses when Suboxone is introduced into the prison environment as compared to Oxycodone. [JA 742, 744-45, 877-78, 1114] Plaintiff was supervised by medical staff and treated for any withdrawal

symptoms she experienced. [JA 744-45] The evidence therefore meets neither the objective nor the subjective prongs of her Eighth Amendment claim.

First, Plaintiff was not denied care related to her OUD. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). She did not receive the treatment she desired or the treatment she argues would have been most effective. But this argument falls short of establishing that the conditions of her confinement objectively inflicted harm. *Farmer*, 511 U.S. at 834.

Second, there is no evidence that Defendants acted with a "culpable state of mind" or neglected her serious medical needs. *Id.* To the contrary, the record shows that Defendants provided a tiered taper over the course of nine days, monitored Plaintiff's withdrawal symptoms 24 hours a day, and provided treatment in response to those symptoms. [JA 744-45] Thus, Plaintiff cannot establish conduct that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" that the deliberate indifference analysis requires. *Spann*, 2021 U.S. Dist. LEXIS 68755, at *48-49. *See also Hudson*, 503 U.S. at 8-9 ("[S]ociety does not expect that prisoners will have unqualified access to health care.").

Even setting aside the doctrine of qualified immunity, Defendants were

46

properly granted summary judgment. Plaintiff cannot clear the deliberate indifference standard's high bar to recovery. *Iko*, 535 F.3d at 241; *Farmer*, 511 U.S. at 835.  This Court should affirm.

### III. The District Court Properly Granted Defendants' Motion for Summary Judgment on Plaintiff's ADA and Rehabilitation Act Claims Related to the Discontinuation of MOUD.

Plaintiff's remaining claims, CIII and IV, allege violations of the Americans with Disabilities Act and the Rehabilitation Act against the Secretary of the Department of Adult Correction in her official capacity. Specifically, Plaintiff asserts that NCCIW discriminated against individuals with OUD when, in 2019, it only allowed pregnant offenders to receive MOUD. These claims fail as a matter of law.

The ADA and the Rehabilitation Act prohibit the denial of services to a qualified individual with a disability on account of that disability. 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Where denial of services is based on some other factor, not the individual's disability, the claim fails.

To state a claim under the ADA, a plaintiff must demonstrate (1) she has a disability; (2) she is otherwise entitled to receive the benefits provided; and (3) she was denied those benefits or otherwise discriminated against on the

basis of her disability. *E.g., Fauconier v. Clarke*, 966 F.3d 265, 275 (4th Cir. 2020). The elements of a claim under the Rehabilitation Act are slightly narrower; a plaintiff must show that defendant's alleged discrimination was "solely by reason" of the plaintiff's disability. *E.g., Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999) (quoting 29 U.S.C. § 794(a)). Nonetheless, the Court has observed that, "[b]ecause the language of the two statutes is substantially the same, we apply the same analysis to both." *Id.* at 468 (citation omitted). *See also Rogers v. Dep't of Health and Envt'l Control*, 174 F.3d 431, 433 (4th Cir. 1999) (noting that Congress has called for a coordinated interpretation of the ADA and the Rehabilitation Act to "prevent[] imposition of inconsistent or conflicting standards for the same requirements under the two statutes.").

## A. Plaintiff's OUD is a disability.

Defendants do not dispute—and have never disputed—that Plaintiff's diagnosis of Opioid Use Disorder satisfies the definition of a disability under the ADA or the Rehabilitation Act.

Plaintiff correctly notes that the district court did not address whether OUD was a disability for purposes of the analysis of these claims. Appellant's Br. p 23. This is likely because those elements of her claim were not in dispute.

48

However, Plaintiff is incorrect in concluding that the district court "misconstrued the nature of Plaintiff's disability claim altogether, as it focused on whether pregnancy (or non-pregnancy) is considered a disability." Appellant's Br. pp 23-24. The lower court's order clearly contemplates OUD, not pregnancy, as the disability underlying Plaintiff's disability claims. [JA 3093] The court's brief reference to pregnancy as a disability reads as an afterthought and appears only in response to Plaintiff's attempt to "invite the court to consider that NCCIW discriminated against her because she was no longer pregnant." [JA 3093]  Plaintiff's characterization of the lower court's analysis being focused on whether pregnancy is a disability is simply incorrect.

Moreover, Plaintiff's reference to this Court's holding in *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562 (2015), is misleading and does not support her position. There, the district court "found that [the plaintiff] was not disabled as a matter of law." *Jacobs*, 780 F.3d at 568. This Court reversed, finding that the lower court improperly drew inferences in favor of the moving party and resolved factual disputes, contrary to summary judgment principles, in reaching that conclusion. *Id.* at 569-70.

Here, the lower court did not hold that Plaintiff was not disabled, nor

49

did it resolve any questions of fact related to her status as an individual with a disability. To the contrary, the court twice observed that the parties did not dispute the material facts related to this claim. [JA 3093]  The lower court's analysis focused on whether Plaintiff was qualified for the benefits she sought, and whether she was denied those benefits on the basis of her disability. [JA 3091-93] As shown below, the district court was right on both issues.

**B. Plaintiff was not qualified to receive MOUD.**

Plaintiff again mischaracterizes the lower court's ruling when she asserts that the district court "erred in holding that Edwards was not qualified for medical services." Appellant's Br. p 25. The district court did not hold that Plaintiff was not qualified for medical services, nor have Defendants ever disputed that Plaintiff was entitled to medical care while in custody at NCCIW.

Instead, the district court, relying on Plaintiff's own statement of material facts, noted that Plaintiff was not entitled to the *specific* medical care she requested – continued MOUD after her pregnancy ended. [JA 3093] The MOUD program "was reserved for pregnant inmates, and because Edwards was no longer pregnant, she no longer qualified for MOUD." [JA 3093]

50

Put differently, Plaintiff only qualified for MOUD because she was pregnant and the denial of MOUD posed a risk of miscarriage—or serious harm to the fetus. [JA 734-35, 738, 743, 2682-83] Once Plaintiff gave birth, that risk was eliminated. She was not denied MOUD because of her disability (OUD). She was denied MOUD because she was not pregnant.

In reaching this conclusion, the district court relied on two cases which Plaintiff incorrectly contends on appeal did not support the court's conclusion. Appellant's Br. p 27. First, the district court relied on this Court's recent decision in *Cartagena v. Lovell*, 103 F.4th 171 (4th Cir. 2024). [JA 3093] There, the plaintiff was incarcerated in the Virginia Department of Corrections prison system. *Id.* at 176. He asserted that his placement in the VDOC's Secure Diversionary Treatment Program (SDT) was a violation of the ADA and the Rehabilitation Act because it denied him the benefits of being housed in the general prison population. *Id.* at 184. To state a claim under the ADA, this Court explained, a plaintiff must establish she "is an individual who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities . . . ." *Id. See also Southeastern Cmty.*

*Coll. v. Davis*, 442 U.S. 397, 406 (1979) (Under the Rehabilitation Act, "an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap"). The Court held that plaintiff was not "qualified" to remain in the general prison population, and thus his ADA claim failed. *Cartagena*, 103 F.4th at 185.

Similarly, here Plaintiff did not qualify to participate in the MOUD program at NCCIW after she delivered her baby. Only pregnant offenders qualified for this service. There is no dispute that Plaintiff was not pregnant when she was discharged from the hospital and returned to NCCIW on December 22, 2019. Accordingly, she did not qualify for MOUD at that time.

The second case Plaintiff contends does not support the district court's ruling is *Horton v. Methodist Univ., Inc.*, 788 F. App'x 209 (4th Cir. 2019). Appellant's Br. p 27. In *Horton*, the plaintiff was a student in the defendant-university's Physician Assistant program. *Id.* at 210. Plaintiff argued that her admission to the program was proof that she was qualified to participate for purposes of her ADA and Rehabilitation Act claims. *Id.* However, the Court observed that she failed to show she was qualified for *continued* participation in the program, because even with her preferred accommodations, she could

not pass her classes. *Id. Cf. McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 854 (5th Cir. 1993) ("Many students, [disabled] or not, who qualify for admission into law school flunk out. They are not qualified for retention.")

Here, like in *Horton*, although Plaintiff qualified for participation in the desired program or benefit (MOUD) when she was pregnant, she cannot show that she was qualified for *continued* participation after she gave birth.

This Court has routinely held that the ADA does not entitle a disabled inmate to any specific services or benefits. *E.g., Richardson v. Clarke*, 52 F.4th 614, 620-21 (4th Cir. 2022) (finding correctional facility's provision of ASL interpreter services was a reasonable accommodation and plaintiff's desire for more accommodations did not make the given accommodations unreasonable). Rather, the ADA only requires a reasonable modification that will allow an inmate meaningful access. *Id.* This aligns, of course, with ADA interpretation in other contexts. *See, e.g., Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 961-62 (4th Cir. 2021) ("The ADA does not require employers to create new positions to accommodate their employees with disabilities.")

Here, Plaintiff is not entitled to MOUD—a benefit available to pregnant offenders with OUD—after she is no longer pregnant. *See Richardson*, 52 F.4th

at 620-21; *accord Perdue*, 999 F.3d at 961-62. The ADA does not require NCCIW to craft new policies or initiate new programs to provide a service currently unavailable to any non-pregnant offender simply because that is Plaintiff's preferred service. *Id.* It requires only that NCCIW provide a reasonable accommodation, which it did.

Instead of Plaintiff's preferred medical benefit (i.e., a daily, regulated dose of Suboxone to prevent withdrawal symptoms), she received a tapered course of Oxycodone to wean her off opioids. [JA 169, 738, 744-45, 2689-92, 3093, 3176, 3325, 3780] The Oxycodone taper, the district court correctly concluded, was a reasonable accommodation. [JA 3093]

### C. Plaintiff was not denied MOUD because of her OUD.

There is no allegation or evidence that Plaintiff's MOUD was discontinued for any reason other than the end of her pregnancy. [JA 3093]

Plaintiff advances two theories of disability discrimination: (1) NCCIW's policy of providing MOUD only to pregnant offenders "amounts to disparate treatment against people with OUD," and (2) NCCIW failed to provide a reasonable accommodation by discontinuing MOUD for Plaintiff. Appellant's Br. p 28. Neither theory holds water.

First, Plaintiff's own allegations demonstrate, at the most, disparate treatment based on pregnancy status, not based on an OUD disability. Pregnancy is not a disability and therefore disparate treatment on that basis does not violate the ADA or the Rehabilitation Act. *E.g., Parker v. Children's Nat'l Med. Ctr. Inc.*, 2021 U.S. Dist. LEXIS 235885, at *36 (D.Md. Dec. 9, 2021)(collecting cases). Attempting to support her contention that she was discriminated against based on her OUD diagnosis, Plaintiff cites three out-of-circuit opinions with irrelevant holdings and a website identified by a non-working hyperlink. Appellant's Br. pp 28-29. These authorities are neither binding nor persuasive.

First, Plaintiff cites *Smith v. Aroostock County,* 376 F. Supp. 3d 146, 149 (D. Me.) *aff'd,* 922 F.3d 41 (1st Cir. 2019), to support her position. In *Aroostook,* plaintiff sued the county and the Sheriff in his official capacity, alleging that defendants' refusal to allow plaintiff to continue taking MOUD during her impending incarceration violated the ADA and the Eighth Amendment. *Id.* However, the opinion does not resolve those claims; instead, it addresses plaintiff's motion for preliminary injunction. *Id.* In a fact-specific ruling, the district court granted the preliminary injunction because defendants

identified multiple ways they could provide MOUD to plaintiff without the risk of diversion and how they had previously provided MOUD to another inmate with no impact on security. *Id.* at 162. Reviewing for an abuse of discretion, the Court of Appeals affirmed. *Smith v. Aroostock County*, 922 F.3d 41 (1st Cir. 2019).

Next, Plaintiff cites *Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998), and *Kapche v. City of San Antonio*, 304 F.3d 493, 500 (5th Cir. 2002), for the proposition that defendants "discriminate on the basis of disability when they simply define the disability itself as a disqualifying criterion." Appellant's Br. p 29. This proposition is irrelevant to the issue before this Court, since Defendants have never treated OUD as a disqualifying criterion.

Finally, the link Plaintiff ostensibly intended to direct the Court to is https://archive.ada.gov/opioid_guidance.pdf. This contains guidance from the U.S. Department of Justice, Civil Rights Division, on combating discrimination against people in recovery from OUD. This guidance was issued on April 5, 2022, *after* the conduct Plaintiff challenges. Moreover, the guidance about MOUD in jails itself specifies that it only applies to individuals who are not engaged in the illegal use of drugs. *See*

https://archive.ada.gov/opioid_guidance.pdf, pp 2, 6 (last visited May 28, 2025). Plaintiff was caught diverting opioids during her incarceration at NCCIW. [JA 3404] Regardless, this document is insufficient to retroactively assign liability under the ADA or the Rehabilitation Act.

Plaintiff has not, and cannot, cite a single case in this jurisdiction that would support her ADA and Rehabilitation Act claims concerning MOUD. The district court properly granted summary judgment for the Secretary on this claim. This Court should affirm.

## CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims. Defendants respectfully ask this Court to affirm the lower court's order granting summary judgment to Defendants and dismissing Plaintiff's claims.

Respectfully submitted,

JEFF JACKSON
Attorney General

/s/ Laura H. McHenry
Laura H. McHenry
Special Deputy Attorney General
N.C. State Bar No. 45005

57

Email: lmchenry@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763

*Counsel for Defendants-appellees*

May 30, 2025

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

Dated:  May 30, 2025.

<u>/s/ Laura H. McHenry</u>
Laura H. McHenry
Special Deputy Attorney General

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the length requirements of Fed. R. App. P. 32(a)(7) because it contains 11,292 words/fewer than 15,300 words, excluding the items listed in Fed. R. App. P. 32(f), as measured by Microsoft Word. This brief further complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface: 14-point Constantia font.

<u>/s/ Laura H. McHenry</u>
Laura H. McHenry
Special Deputy Attorney General