No. 24-7049

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TRACEY EDWARDS

*Plaintiff-Appellant,*

*v.*

BENITA WITHERSPOON, ET AL.,

*Defendants-Appellees.*

———————————————————

On Appeal from the United States District Court
for the Eastern District of North Carolina
Case No. 5:21-ct-03270-D (Hon. James C. Dever III, U.S. District Judge)

———————————————————

## APPELLANT'S REPLY BRIEF

———————————————————

Shana H. Khader
Jaclyn S. Tayabji
Hassan A. Zavareei
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Ave. NW, Ste. 1010
Washington, DC 20006
202-973-0900
skhader@tzlegal.com

Joseph K. Longley
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW, 7th Floor
Washington, DC 20005
202-675-2338
jlongley1@aclu.org

D Dangaran
Samuel Weiss
RIGHTS BEHIND BARS
1800 M St. NW
Fnt. 1 #33821
Washington, DC 20033
202-455-4399
d@rightsbehindbars.org

Sarah Grady
David Howard Sinkman
Amelia Caramadre
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
312-852-2184
sinkman@kaplangrady.com

*Additional counsel on following page*       June 27, 2025

Daniel K. Siegel
Amika Medha Singh
ACLU OF NORTH CAROLINA LEGAL
FOUNDATION
PO Box 28004
Raleigh, NC 27611
919-532-3693
dsiegel@acluofnc.org

*Counsel for Plaintiff-Appellant Tracey Edwards*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.     Defendants Admit They Maintain a Blanket Policy Prohibiting MOUD, Regardless of Individualized Medical Need, In Violation of the ADA ...............................................................................2

      A.    Edwards Was Qualified for Adequate Prison Healthcare...........3

      B.    A Reasonable Jury Could Conclude That Edwards Was Treated Differently Than Other Prisoners Because She Has Opioid Use Disorder ...........................................................5

      C.    A Reasonable Jury Could Conclude That Edwards Was Not Provided With A Reasonable Accommodation ........................8

II.    A Reasonable Jury Could Find that Defendants Denied Edwards Adequate Medical Care ...............................................................10

      A.    A Reasonable Jury Could Conclude Defendants Were Deliberately Indifferent to Edwards's Serious Medical Needs Because They Denied Care Pursuant to a Blanket Policy....................................................................................12

      B.    The Constitutional Right to Adequate Medical Care Was Clearly Established ...................................................................15

III.   Defendants Are Not Entitled To Qualified Immunity On Edwards's Shackling Claims............................................................17

      A.    Defendants Shackled Edwards in Violation of the Eighth Amendment ...........................................................................17

           1.    Defendants caused serious physical and emotional injury and subjected Edwards to a substantial risk of serious harm................................................................17

           2.    Defendants acted with deliberate indifference ..............20

      B.    Defendants Are Not Entitled To Qualified Immunity ..............24

CONCLUSION ..................................................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                                 **Pages(s)**

*Alexander v. Choate*,
  469 U.S. 287 (1985) ................................................................4

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ...............................................................26

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ...............................................................25

*Booker v. S.C. Dep't of Corr.*,
  855 F.3d 533 (4th Cir. 2017) ....................................... 26, 28

*Brawner v. Scott County*,
  14 F.4th 585 (6th Cir. 2021) ...............................................16

*Cartagena v. Lovell*,
  103 F.4th 171 (4th Cir. 2024) ............................................4, 5

*Coleman v. Jones*,
  No. 20-7382, 2022 WL 2188402 (4th Cir. June 17, 2022) ..................................25

*Colwell v. Bannister*,
  763 F.3d 1060 (9th Cir. 2014) ............................................12

*Davis v. Keller*,
  No. 7:23-cv-00593, 2024 WL 4326544 (W.D. Va. Sept. 27, 2024) ...................15

*De'Lonta v. Angelone*,
  330 F.3d 630 (4th Cir. 2003) ("*De'Lonta I*")......................... 13, 16, 20

*De'Lonta v. Johnson*,
  708 F.3d 520 (4th Cir. 2013) ("*De'Lonta II*")........................ 13, 17, 19

*Estelle v. Gamble*,
  429 U.S. 97 (1976) ....................................................... 12, 15, 19

*Fain v. Rappahannock Reg'l Jail*,
  No. 3:12CV293-JAG, 2013 WL 3148145 (E.D. Va. June 19, 2013) .................28

iv

*Fauconier v. Clarke*,
    966 F.3d 265 (4th Cir. 2020) .............................................................3, 5

*Fields v. Smith*,
    653 F.3d 550 (7th Cir. 2011) ...............................................................13

*Gordon v. Schilling*,
    937 F.3d 348 (4th Cir. 2019) ........................................... 4, 14, 16, 23

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ........................................... 11, 17, 18, 19, 24, 27

*Horton v. Methodist Univ., Inc.*,
    788 F. App'x 209 (4th Cir. 2019) .........................................................5

*Iko v. Shreve*,
    535 F.3d 225 (4th Cir. 2008) ...............................................................15

*Jones v. Solomon*,
    90 F.4th 198 (4th Cir. 2024) ................................................................26

*Kapche v. City of San Antonio*,
    304 F.3d 493 (5th Cir. 2002) .............................................................4, 7

*King v. Riley*,
    76 F.4th 259 (4th Cir. 2023) ................................................................26

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016) ........................................................ 17, 20

*Koon v. North Carolina*,
    50 F.4th 398 (4th Cir. 2022) .................................................................9

*LaFaut v. Smith*,
    834 F.2d 389 (4th Cir. 1987) ...............................................................23

*M.C. v. Jefferson County*,
    No. 6:22-CV-190, 2022 WL 1541462 (N.D.N.Y. May 16, 2022).........6

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) .............................................................4, 9

*P.G. v. Jefferson County*,
    No. 5:21-CV-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021) .........................6

*Pesce v. Coppinger*,
    355 F. Supp. 3d 35 (D. Mass. 2018) ..........................................................6

*Pfaller v. Amonette*,
    55 F.4th 436 (4th Cir. 2022) ................................................................ 25, 26

*Pritchett v. Alford*,
    973 F.2d 307 (4th Cir. 1992) ....................................................................26

*Putney v. Likin*,
    656 F. App'x 632 (4th Cir. 2016) ........................................................ 17, 19

*Scinto v. Stansberry*,
    841 F.3d 219 (4th Cir. 2016) ............................................................... 12, 15

*Slakan v. Porter*,
    737 F.2d 368 (4th Cir. 1984) ....................................................................27

*Smith v. Aroostook County*,
    376 F. Supp. 3d 146 (D. Me. 2019), aff'd, 922 F.3d 41 (1st Cir. 2019) ...............6

*Stanton v. Elliott*,
    25 F.4th 227 (4th Cir. 2022) .....................................................................10

*Taylor v. Wexford Health Sources, Inc.*,
    737 F. Supp. 3d 357 (S.D.W. Va. 2024) ................................................ 6, 8, 16

*Theriault v. Flynn*,
    162 F.3d 46 (1st Cir. 1998) ....................................................................4, 7

*Thompson v. Virginia*,
    878 F.3d 89 (4th Cir. 2017) ......................................................................28

*Thorpe v. Clarke*,
    37 F.4th 926 (4th Cir. 2022) ............................................................... 24, 27

*Trop v. Dulles*,
    356 U.S. 86 (1958) .................................................................................17

*Wall v. Wade*,
    741 F.3d 492 (4th Cir. 2014) ......................................................... 26, 27

*Williamson v. Stirling*,
    912 F.3d 154 (4th Cir. 2018) ................................................................10

*Willingham v. Crooke*,
    412 F.3d 553 (4th Cir. 2005) ....................................................... 11, 16

*Younger v. Crowder*,
    79 F.4th 373 (4th Cir. 2023) ....................................................... 25, 26

**Other Authorities**

U.S. Department of Justice, *The Americans with Disabilities Act and the Opioid Crisis: Combatting Discrimination Against People in Treatment or Recovery*, https://archive.ada.gov/opioid_guidance.pdf [https://perma.cc/Y9ML-LPUC] ....7

**Regulations**

28 C.F.R. § 35.130 ............................................................................9

# INTRODUCTION

Defendants concede that they maintain a blanket policy denying people in their custody with Opioid Use Disorder ("OUD") access to medication for OUD ("MOUD"), regardless of their individual medical needs. By enforcing this policy, Defendants treat people with OUD differently from those who require other medical services. This blanket policy violates the ADA and the Eighth Amendment.

The only exception to this policy is for pregnant women, who may receive MOUD to prevent harm to the fetus. Defendants' rationale for this dangerous policy ignores the clearly established constitutional requirement that Edwards receive adequate healthcare for *her* medical needs. A blanket rule denying necessary care in any other context would be unimaginable, like a policy providing insulin to only *pregnant* women with diabetes. That is precisely how Defendants treated Edwards because she had OUD.

As to shackling, the district court failed to draw all inferences in Edwards's favor when she said the shackles caused her extreme pain. It ignored disputes of fact regarding which Defendants knew of their policy violations and the risk of harm and actual harm they caused Edwards. And binding precedent and persuasive authority demonstrate that Edwards's right to be free from shackling was clearly established.

Because Defendants violated federal disability law and clearly established law under the Eighth Amendment, this Court should reverse.

1

**ARGUMENT**

## I. Defendants Admit They Maintain a Blanket Policy Prohibiting MOUD, Regardless of Individualized Medical Need, In Violation of the ADA

Defendants treat people with OUD differently than they treat people with any other disability—banning the only effective treatment for OUD while not prohibiting treatment for other health conditions. Defendants spend much of their brief explaining that pregnant women are the exception to this ban. Appellees' Response Brief ("ARB") 15, 45, 50–51. But by subjecting Edwards to a blanket policy that bans the only effective care for her specific disability (OUD), JA169-170, divorced from any evaluation of her individual medical needs, Defendants violated the ADA.[1]

Accepting Defendants' logic means it would be perfectly legal for correctional facilities to enforce a policy permitting patients with diabetes to receive insulin only when they are pregnant since denying such care would cause a risk of "serious harm to the fetus." ARB 51. Once an incarcerated person with diabetes gave birth, prisons—like the North Carolina Correctional Institution for Women ("NCCIW"), which employs the Defendants in this suit—would be allowed to provide 9 days' worth of a totally different medication (not FDA-approved to treat diabetes) and then no treatment at all, aside from "monitor[ing]" and Tylenol—even

---

[1] This conduct also violates the Rehabilitation Act. The standards are construed similarly. Appellants' Opening Brief ("AOB") 22–23; ARB 48. Plaintiff refers only to the ADA, but maintains her Rehabilitation Act claim.

though NCCIW provides treatment for other ongoing medical conditions. ARB 15, 45. This conduct would clearly be illegal, but that is precisely what Defendants forced Edwards to endure for her untreated OUD. The district court erroneously ruled this was proper.

To survive summary judgment, a plaintiff must provide evidence that would allow a reasonable factfinder to conclude that "(1) [s]he has a disability or has been regarded as having a disability; (2) [s]he is otherwise qualified to receive the benefits provided by a public entity; and (3) [s]he was denied those benefits or was otherwise discriminated against on the basis of [her] disability." *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020). Defendants concede that Edwards had a disability—OUD. ARB 48. They dispute only that she was qualified for the relevant program and that she was denied MOUD because of her disability.

## A.    Edwards Was Qualified for Adequate Prison Healthcare

Defendants do not contest that Edwards was qualified for adequate prison healthcare. ARB 50. Rather, they attempt to move the goalposts, arguing that she does not qualify for the MOUD program, which is reserved for pregnant incarcerated individuals. But they ignore Edwards's assertion that she did not have equal access to prison healthcare *because* of the categorical ban on effective healthcare for her OUD (except while pregnant). AOB 25. "The Supreme Court has cautioned against defining the scope of a public benefit so as to avoid questions of discriminatory

effects." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Accepting Defendants' circular logic would empty discrimination laws "of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." *Id.* (citation omitted); *Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998) (holding that rejecting an applicant automatically because of a disease can amount to disability discrimination); *Kapche v. City of San Antonio*, 304 F.3d 493, 500 (5th Cir. 2002) (noting that the ADA mandates individualized assessments and bars categorical exclusions).

Defendants assert that Edwards was provided MOUD only to mitigate the "risk of miscarriage—or serious harm to the fetus," and once she gave birth, that risk was eliminated and she was thus no longer qualified for healthcare. ARB 51. This argument ignores the fact that the Constitution requires that Edwards receive adequate healthcare for *her* medical needs. *See Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).

Defendants discuss two cases cited by the district court but ignore Edwards's analysis distinguishing both. ARB 51–52. Defendants note that in *Cartagena v. Lovell*, the court found that the plaintiff, who had mental health disabilities, was not "qualified" to live in general population. 103 F.4th 171, 184–85 (4th Cir. 2024). Defendants assert that this means they can permissibly limit the MOUD program to

4

pregnant incarcerated individuals. But Cartagena was unqualified for general population because he was found to be "assaultive, disruptive, and/or unmanageable," and thus posed a "significant risk to the health or safety of others," which is a valid defense under the ADA. *Id.* at 184–85 (citation omitted). Next, Defendants cite *Horton v. Methodist University, Inc.*, where a student, even with reasonable accommodations, could not pass classes and thus no longer qualified for participation in an academic program. 788 F. App'x 209, 210 (4th Cir. 2019). Horton's disqualification was thus due to an individualized analysis: her failing grades. These individualized assessments are exactly what was missing here. Defendants admit they implemented a blanket ban on MOUD for all non-pregnant incarcerated people at NCCIW, regardless of these patients' individual medical needs, and fail to cite any individualized security risk as the reason they discontinued Edwards's medication. ARB 15, 45, 50–51.

### B.    A Reasonable Jury Could Conclude That Edwards Was Treated Differently Than Other Prisoners Because She Has Opioid Use Disorder

It is undisputed that Edwards was denied MOUD pursuant to a blanket policy, rather than an analysis of her individualized medical needs. *Id.* This differs from the individualized care Defendants provide to individuals with other health conditions. A reasonable jury could conclude this amounts to disparate treatment. *Cf. Fauconier*, 966 F.3d at 277 (holding that plaintiff adequately pleaded an ADA claim where a

correctional facility determined he was ineligible for *all* jobs because of his medical classification).

Defendants fail to distinguish cases directly supporting Edwards's ADA claims. In *Smith v. Aroostook County*, the court held that a jail's "out-of-hand, unjustified denial of the Plaintiff's request for her prescribed [MOUD]—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability." 376 F. Supp. 3d 146, 159–60 (D. Me. 2019), *aff'd,* 922 F.3d 41 (1st Cir. 2019). Defendants dismiss this ruling as "fact-specific" and argue that those officials identified "multiple ways they could provide MOUD" safely and had previously provided MOUD to another incarcerated person with no adverse impact on security. ARB 55–56. But here, NCCIW provided MOUD *to Edwards herself* for six months before she gave birth; they point to no resulting adverse effects on security. Additionally, Defendants ignore four other cases cited in the opening brief, each of which found that a correctional facility's denial of MOUD pursuant to a blanket policy can violate the ADA.[2]

---

[2] *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47 (D. Mass. 2018); *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 376 (S.D.W. Va. 2024); *P.G. v. Jefferson County*, No. 5:21-CV-388, 2021 WL 4059409, at *4–5 (N.D.N.Y. Sept. 7, 2021); *M.C. v. Jefferson County*, No. 6:22-CV-190, 2022 WL 1541462, at *4 (N.D.N.Y. May 16, 2022).

Next, Defendants inexplicably assert that they "have never treated OUD as a disqualifying criterion." ARB 56. Yet they repeatedly admit that they have a categorical ban on MOUD for anyone who is not pregnant. ARB 15, 45, 50–51. Just as it would be disability discrimination on the basis of diabetes to categorically ban insulin for anyone who is not pregnant, the same is true for OUD. Therefore, the rule adopted by the First and Fifth Circuits, that a public entity discriminates on the basis of disability when it simply defines the disability itself as a disqualifying criterion, applies to Defendants' conduct here. *See Theriault*, 162 F.3d at 50; *Kapche*, 304 F.3d at 500.

Defendants also dismiss the relevance of guidance from the United States Department of Justice because it post-dates the conduct at issue in this case. ARB 56–57. But Defendants do not contest the accuracy of the guidance, which states that a "jail's blanket policy prohibiting the use of MOUD would violate the ADA."[3] Here, Edwards was subjected to a blanket policy prohibiting the use of MOUD after having an active MOUD prescription.

Moreover, the ADA's limitations for people who currently use drugs illegally is inapplicable here. Defendants claim that, because Edwards was allegedly caught

---

[3] U.S. Department of Justice, *The Americans with Disabilities Act and the Opioid Crisis: Combatting Discrimination Against People in Treatment or Recovery*, https://archive.ada.gov/opioid_guidance.pdf [https://perma.cc/Y9ML-LPUC] (hereinafter "DOJ Guidance").

diverting MOUD during her incarceration, she is not protected by the ADA. ARB 56–57. But that alleged conduct happened *after* she was kicked off her MOUD and therefore could not have been the basis of her removal from the MOUD program. *Compare* JA3404 *with* JA459 (Defendants admitting that Edwards no longer received MOUD after December 23, 2019, before the January 2020 alleged diversion incident). Indeed, Defendants acknowledge that she was removed because of their blanket policy, not because of misconduct. ARB 15, 45, 50–51. Additionally, Defendants fail to acknowledge DOJ's guidance that "an individual cannot be denied health services, or services provided in connection with drug rehabilitation, on the basis of that individual's current illegal use of drugs, if the individual is otherwise entitled to such services."[4] Because MOUD is undoubtedly a health service or a service provided in connection with drug rehabilitation, Edwards is protected by the ADA. *Taylor*, 737 F. Supp. 3d at 375.

### C.    A Reasonable Jury Could Conclude That Edwards Was Not Provided With A Reasonable Accommodation

Edwards was forced off her prescribed medication, provided nine days of a completely different medication that does *not* treat OUD, and thereafter received no treatment at all for her OUD. A reasonable jury could conclude that she did not

---

[4] DOJ Guidance at 4 (citations omitted).

receive meaningful access to the prison's health services and thus was denied a reasonable accommodation.

Edwards's burden of establishing her need for a reasonable accommodation is "not a heavy one"; it "is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Lamone*, 813 F.3d at 507–08 (citation omitted). "Congress has told us that disability 'discrimination' includes not just 'outright intentional exclusion' but also lesser injustices like 'failure to make modifications to existing facilities and practices' and 'relegation to lesser services . . . .'" *Koon v. North Carolina*, 50 F.4th 398, 405 (4th Cir. 2022) (citation omitted).

Defendants argue that Edwards received a reasonable accommodation when she received "a tapered course of Oxycodone to wean her off opioids." ARB 54. But a jury could reasonably conclude that providing oxycodone was "not as effective in affording equal opportunity to . . . gain the same benefit," *Lamone*, 813 F.3d at 506 (quoting 28 C.F.R. § 35.130(b)(1)(iii)), because there is ample evidence in the record that oxycodone does not treat MOUD at all. In fact, oxycodone is not FDA-approved for OUD or MOUD withdrawal, heightens the risk of relapse and overdose, caused Edwards's addiction in the first place, and is not a substitute for the MOUD Edwards was receiving. JA178; JA3018-3019. After nine days on oxycodone, Edwards received *no* medication purporting to treat her OUD at all, aside from

Tylenol/ibuprofen. As a result of Defendants' conduct, she suffered intense nausea, insomnia, diarrhea, vomiting, anxiety, and physical pain for weeks—symptoms she described as "more painful than giving birth." JA169; JA3324; JA178; JA3035. The record shows, and Defendants do not dispute, that incarcerated individuals who are denied MOUD face a five-fold higher risk of fatal overdose after release. JA146 (¶ 202, undisputed); *see* JA3064. Far from merely preferring one accommodation among equally good options, Edwards required MOUD to have an "equal opportunity" to benefit from NCCIW's health services.

Defendants additionally argue that the ADA does not require them to "craft new policies or initiate new programs." ARB 54. To the extent that Defendants are attempting a "fundamental alteration" defense, they waived it by not raising it below. See AOB 31 n.6. Regardless, Edwards did not request a new program, but rather an accommodation to continue in the existing MOUD program, which allowed her to manage her OUD.

## II. A Reasonable Jury Could Find that Defendants Denied Edwards Adequate Medical Care

Defendants have raised a qualified immunity defense to Edwards's Eighth Amendment claim based on the denial of MOUD. ARB 42–45. To determine whether officials are entitled to qualified immunity, a court must determine (1) whether the official has violated a constitutional right, and (2) whether the constitutional right was clearly established. *Williamson v. Stirling*, 912 F.3d 154,

186 (4th Cir. 2018). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). The contours of the right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement, however, that the "very action in question" must have been held unlawful; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. A ruling on qualified immunity is inappropriate at the summary judgment stage when factual disputes remain. *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).

The district court did not reach qualified immunity for this claim, granting summary judgment on the merits of deliberate indifference alone—specifically, the subjective deliberate indifference element. JA3084. But Edwards succeeds on both prongs of the qualified immunity analysis. First, Defendants' denial of MOUD based on a blanket policy violated the Eighth Amendment. The dispute over whether Edwards received any adequate treatment for OUD precludes summary judgment on this issue. Second, Supreme Court precedent clearly established Edwards's right to adequate healthcare.

### A.      A Reasonable Jury Could Conclude Defendants Were Deliberately Indifferent to Edwards's Serious Medical Needs Because They Denied Care Pursuant to a Blanket Policy

Defendants abruptly terminated Edwards's MOUD treatment without tapering, pursuant to a blanket policy. Defendants then provided a completely different medication that exacerbated, rather than treated, Edwards's symptoms of OUD. Edwards received no treatment for her OUD pursuant to a blanket policy rather than an individualized medical assessment. A reasonable jury could conclude that Defendants were deliberately indifferent to Edwards's OUD in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

To establish an Eighth Amendment violation, a plaintiff must show that (1) she has an objectively serious medical need, and (2) officials were deliberately indifferent by knowing of that need, but disregarding it. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

Defendants do not contest that Edwards's OUD is a serious medical need. ARB 44–46. Nor could they: Edwards was put at dramatically increased risk of relapse, overdose, and death when she was forced off of her MOUD, JA177, and suffered painful withdrawal symptoms that she said were worse than the pain of giving birth. JA169. Defendants even cite a case from the Sixth Circuit recognizing the "seriousness" of OUD. ARB 44 (citing *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021)).

12

Defendants also do not contest that Edwards was denied MOUD pursuant to a blanket policy. But "[t]he blanket, categorical denial of medically indicated [care] solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014); *see also De'Lonta v. Angelone*, 330 F.3d 630, 635–36 (4th Cir. 2003) ("*De'Lonta I*"). Defendants repeatedly highlight that this decision was pursuant to a blanket policy. ARB 15, 45, 50–51. Defendants' policy could not be clearer: no matter how severe your OUD is, if you are not pregnant, you are not getting MOUD. *Cf. Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) (holding ban on hormone therapy unconstitutional, comparing it to a hypothetical "law that DOC inmates with cancer must be treated only with therapy and pain killers").

Defendants primarily argue that they provided Edwards with some care—oxycodone—just not the care that she wanted. ARB 46. But this is not a case regarding the provision of one adequate form of care rather than another. *See De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("*De'Lonta II*") ("[J]ust because Appellees have provided [plaintiff] with *some* treatment . . . it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." (emphasis in original)). Here, Edwards was denied the *only* effective treatment available for OUD, not just treatment that was "her choice." *Id.* Indeed, Edwards proffered expert testimony that oxycodone does not meet the standard of

13

care for MOUD withdrawal. JA178; JA3018. And Edwards was not provided *any* treatment at all for her OUD after receiving nine days of oxycodone, aside from vague "monitoring" and Tylenol/ibuprofen. After Edwards was taken off of MOUD, she still had OUD, for which MOUD is the standard of care and the only effective treatment available. JA169-170; JA174; JA176-177; JA3035. A reasonable jury could conclude that Defendants' course of conduct was contrary to the standard of care; predictably resulted in painful symptoms for weeks; and substantially increased Edwards's risk of relapse, overdose, and death—all of which amounts to deliberate indifference. JA169; JA3324; JA178; JA3035.

Defendants make two conclusory arguments. First, they assert that Edwards was denied MOUD, in part, because of "limits on NCCIW's licensure." ARB 45. Whatever limits Defendants refer to were obviously overcome when they provided Edwards MOUD for months during her pregnancy. And Defendants' record citations establish that they *were* legally authorized to continue this care. JA742-743 (noting that in 2019 the X-waiver "authorize[d] the outpatient use of buprenorphine for the treatment of OUD," and that at least three staff members obtained the X-waiver). In any event, administrative barriers are not a legal justification for inadequate healthcare. *See Gordon*, 937 F.3d at 361 (holding that the denial of Hepatitis C treatment "predicated on administrative convenience rather than medical judgment

. . . evinced a disregard for the substantial risk of harm presented to inmates by their [Hepatitis C]").

Second, although Defendants invoke the specter of a "heightened risk of diversion, assaults, and overdoses when [MOUD] is introduced into the prison environment as compared to Oxycodone," they cite to six pages in the record that do not discuss safety concerns at all. ARB 46 (citing JA742, JA744-745, JA877-878, JA1114). In the face of unchallenged data showing that MOUD reduces the risk of fatal overdose in the weeks following release by 80%, JA177, the bare assertion of counsel that provision of MOUD somehow increases risk of overdose should be ignored. And a reasonable jury could conclude that providing evidence-based treatment for addiction *decreases* the risk of diversion, assaults, and overdose because there is less demand for illicit drugs when incarcerated people's OUD is treated according to the standard of care. JA3037 (¶ 20).

## B.    The Constitutional Right to Adequate Medical Care Was Clearly Established

The constitutional right to receive adequate medical care in penal settings has been established since at least 1976. *Estelle*, 429 U.S. at 104. In prison healthcare cases, this Court has rejected attempts to define the right in question more narrowly than this. *See Scinto*, 841 F.3d at 236 (rejecting attempt to define the right more narrowly and defining "the right in question as the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their

15

known medical needs"); *Iko v. Shreve*, 535 F.3d 225, 243 n.12 (4th Cir. 2008) (defining the right at issue as "the right to adequate medical care"); *cf. Davis v. Keller*, No. 7:23-cv-00593, 2024 WL 4326544, at *7 (W.D. Va. Sept. 27, 2024) (rejecting qualified immunity defense in MOUD case).

Additionally, this Court has held twice, before the events in this case, that discontinuing or limiting necessary medical care for no legitimate medical reason can violate this Eighth Amendment right. *See Gordon*, 937 F.3d at 361 (holding a one-year suspension of Hepatitis C treatment based on administrative convenience—rather than medical need—can amount to an Eighth Amendment violation); *De'Lonta I*, 330 F.3d at 634 (finding deliberate indifference when hormone therapy was discontinued for nonmedical reasons and no treatment was provided to prevent harm).

Therefore, when Defendants cut Edwards off from her lifesaving medication pursuant to a blanket policy in 2019, it was clearly established that such behavior amounted to unconstitutional deliberate indifference to known serious medical needs. Defendants' argument otherwise relies on two cases that actually support Edwards's position on the merits.[5] ARB 43–45.

---

[5] *See Taylor*, 737 F. Supp. 3d at 374 (denying summary judgment where jury could conclude that defendant maintained a policy that denied plaintiff MOUD); *Brawner*, 14 F.4th at 597–98 (holding jury could find a nurse deliberately indifferent for abruptly discontinuing suboxone per county policy).

## III.   Defendants Are Not Entitled To Qualified Immunity On Edwards's Shackling Claims

The district court erred when it granted summary judgment on Edwards's shackling claims based on qualified immunity because "a dispute of material fact preclude[d] a conclusive ruling on qualified immunity at the summary judgment stage." *Willingham*, 412 F.3d at 560. Defendants concede there is a factual dispute over one crucial issue: whether Defendants shackled Edwards *while she was laboring* until she was fully dilated. They contend this factual dispute is immaterial because Edwards's right to be free from shackling was *not* clearly established. ARB 25 n.3. But this factual dispute and others, and ample legal authority, preclude summary judgment here.

### A.   Defendants Shackled Edwards in Violation of the Eighth Amendment

#### 1.   Defendants caused serious physical and emotional injury and subjected Edwards to a substantial risk of serious harm

Edwards easily satisfies the objective prong of the Eighth Amendment analysis, requiring a showing of "'serious or significant physical or emotional injury resulting from the challenged conditions,' or substantial risk thereof," *De'Lonta II,* 708 F.3d at 525 (citation omitted), or "a serious deprivation of a basic human need," *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). Substantial *risk* of serious harm is sufficient. *Putney v. Likin*, 656 F. App'x 632, 637 (4th Cir. 2016). "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."

*Hope*, 536 U.S. at 738 (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)) (cleaned up). The record demonstrates that Defendants subjected Edwards to treatment that was inconsistent with human dignity, physically and emotionally injurious, and laden with risk.

Defendants restrained Edwards while she was giving birth, with no penological justification. Edwards testified that she was shackled with one arm and one leg to the hospital bed when she was induced, up until she was instructed to begin pushing. JA167. This treatment was inconsistent with Edwards's human dignity, particularly because it is undisputed that Edwards posed no flight or security risk. *See* JA117 (¶ 15, undisputed); JA3057; *Hope*, 536 U.S. at 745 (holding that applying "degrading and dangerous" restraints without penological justification violates the Eighth Amendment). While Defendants contend, based *solely* on the declaration of Defendant Ragano, that Edwards was not restrained after the IV was placed, they acknowledge that this is a disputed factual issue. ARB 12 & n.1.

Furthermore, the *undisputed* facts about the other moments of Edwards's shackling support Edwards's showing of a substantial risk of harm. Edwards was handcuffed while being transported to the hospital for delivery, shackled just after giving birth,[6] shackled to the bed while recovering and bonding with and caring for

---

[6] Edwards testified that she was shackled "[l]ess than an hour" after giving birth (JA168 ¶ 16), while Defendants contend it was "[a]bout two hours" after she delivered, ARB 13.

her newborn, and placed in full restraints (including a belly chain and handcuffs with a "black box") while being transported back to NCCIW. ARB 12–14. Again, the record reflects no penological justification for this cruel and degrading treatment.

Defendants do not contest Edwards's medical evidence that such shackling "is psychologically devastating, dehumanizing, and painful, and it increases the risks to mother and baby." AOB 10–11, 45–46 (quoting JA173). Instead, they vaguely contend—citing the very North Carolina Department of Public Safety ("DPS") policy prohibiting restraints that they violated—that "the policies in effect" took any risks "into consideration." ARB 41 (citing JA510). Thus, the record contains *only* evidence that Defendants subjected Plaintiff to a substantial risk of serious harm when they shackled her. This substantial risk of serious harm satisfies the objective prong. *See Putney*, 656 F. App'x at 637.

Nor do Defendants contend with Edwards's testimony that Defendants' treatment caused her *actual* harm: extreme pain, embarrassment, and trauma. *See* JA167; ARB 12 n.1. Instead, Defendants argue that Edwards's suffering must be regarded as the "unfortunate but inevitable result of [her] incarceration." ARB 38 (citation omitted); *see also* ARB 37. But there was nothing "inevitable" about the harm caused by Defendants shackling Edwards while she was in labor and postpartum, particularly because DPS expressly prohibited this conduct and Defendants agree that Edwards did not pose a flight or safety risk. JA117 (¶ 15,

19

undisputed). Edwards's physical pain and emotional trauma constitute exactly the sort of "serious or significant physical or emotional injury" that the Eighth Amendment prohibits. *De'Lonta II*, 708 F.3d at 525 (citation omitted); *see also Estelle*, 429 U.S. at 102–03 (stating Eighth Amendment is violated by "unnecessary and wanton infliction of pain"); *Hope*, 536 U.S. at 731 (stating "discomfort and humiliation" caused by prolonged restraint, plus "the clear lack of emergency," makes Eighth Amendment violation "obvious"); *King*, 825 F.3d at 218–19 (holding plaintiff's description of physical pain and emotional anguish satisfies objective prong, particularly in light of lack of penological justification).

In sum, there is a genuine dispute of material fact over when Edwards was shackled. And the record evidence demonstrating that Defendants seriously harmed Edwards and placed her at substantial risk of serious harm by shackling her is undisputed. Thus Edwards easily satisfied the objective prong of the Eighth Amendment analysis.

### 2.    Defendants acted with deliberate indifference

Edwards's evidence also satisfies the subjective deliberate indifference prong, which requires that "a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta I*, 330 F.3d at 634 (citations omitted). The record presents ample evidence of Defendants' deliberate indifference, both through the dangerous policies that Defendant Witherspoon put

into place, and through the deliberate indifference of the line officers who shackled Edwards, including while she gave birth. At the very least, there is a factual dispute regarding Defendants' mental states, precluding summary judgment.

As to Defendant Witherspoon, the record demonstrates that she ignored binding DPS policy and admonishment directly from DPS when she promulgated the policies Defendants now use to justify their inhumane treatment of Edwards. Defendants agree that NCCIW had to promulgate policies in compliance with DPS policy, ARB 3–4, and do not contest that Witherspoon was personally responsible for this. JA119 (¶¶ 27–28, undisputed); *see* JA3057. But Witherspoon abandoned this duty when it came to pregnant people under her watch, implementing NCCIW policies that *required* shackling when DPS *prohibited* it, even though NCCIW's non-compliance had been brought to her attention by DPS. *See* AOB 12–13.

There are three policy documents at issue: (1) DPS Policy F.1100 on "Transporting Offenders" (JA504-511) ("DPS Policy"), which took effect September 2018 and contains specific carve-outs for pregnant people (JA510-511); (2) NCCIW Policy D.1800 "Offender Restraints" (JA513-520), which took effect February 2019; and (3) NCCIW Policy H.0300 on "Use of Force and Restraints" (JA522-527), which also took effect February 2019 (together, the "Witherspoon Policies"). Witherspoon became warden of NCCIW in November 2018, shortly after

the DPS Policy took effect, and a few months before issuing the Witherspoon Policies. JA119-129 (¶¶ 26–33, 84–86, 94, undisputed); *see* JA3057; JA3059.

In short, the DPS Policy *expressly prohibited* restraints while being transported for labor and delivery, during induction, during labor and delivery, during initial bonding, and during postpartum recuperation. JA510-511. In contrast, the Witherspoon Policies *required* leg irons and/or handcuffs at all these times, except while in "active labor." *See* JA513 (exception for "active labor"); JA524 (same); JA513-520; JA522-527.

Defendants attempt to read out this conflict, arguing that the DPS Policy applied only in transit, while the Witherspoon Policies applied only at the destination (the hospital). ARB 39–40. This argument—forfeited because it is made for the first time on appeal—lacks *any* support in the record, and is contradicted by the plain language of the policies.

The DPS Policy, on its face, is not limited to transit. *See*, *e.g.*, JA510, F.1104(i) (prohibiting use of restraints on persons "*housed* in an outside medical facility for treating labor and delivery" (emphasis added)); JA507, F.1104(a)(3) (covering officers in the medical clinic waiting areas). Similarly, the Witherspoon Policies purport to govern transit. *See, e.g.*, JA514, D.1804(k), (governing transportation). What's more, the Witherspoon Policy on "Offender Restraints" incorrectly states that under *DPS policy*, "at no time" may an incarcerated person

22

outside the facility be "unrestrained," unless in "active labor." JA513, D.1802(b). The Witherspoon Policies thus misrepresent and directly contravene the DPS Policy.

A jury could find that Witherspoon acted with deliberate indifference to the risk of serious harm posed by shackling Edwards. She exhibited deliberate indifference by promulgating policies in *direct contravention* of binding DPS policy protecting a vulnerable population, and failing to remedy the contrary policies during the ten months leading up to Edwards's childbirth. *See Gordon*, 937 F.3d at 361 (reversing summary judgment in favor of prison official where official enacted policy suspending Hepatitis C treatment for a year); *LaFaut v. Smith*, 834 F.2d 389, 392, 394 (4th Cir. 1987) (holding prison warden who was aware of poor prison conditions, but waited more than two months to attempt to modify them, demonstrated deliberate indifference).

Moreover, DPS specifically discussed NCCIW's noncompliance with Witherspoon on multiple occasions. JA321-323 (describing communications with DPS about shackling pregnant person in April 2019); JA539, JA551-555 (correspondence with DPS in November 2019). Defendants suggest that Edwards is "confus[ed]" when she advances this argument. ARB 40–41. She is not. Witherspoon acknowledged that, in April 2019, after a community group raised "concern" about shackling pregnant people, she "had discussions with the region[al] director" about "the DPS policies in place at the time"—*i.e.,* the DPS Policy—and

that she purportedly updated one NCCIW policy but not the others. JA322-323. A jury could conclude that Witherspoon had awareness of the DPS Policy and the risk of harm her policies posed, but failed to ensure NCCIW complied with the safer practices that DPS mandated.

The Officer Defendants, for their part, do not contest Edwards's evidence or argument that the cruelty, harm, and risk they occasioned by shackling Edwards— including shackling her while she labored—was obvious. *See* AOB at 49–50; *Hope*, 536 U.S. at 738. They do not dispute the evidence showing that the Officer Defendants were *explicitly trained* on the DPS Policy, which prohibited restraints in the precise circumstances when they restrained her, further evidencing their deliberate indifference. *See* AOB 49; *Hope*, 536 U.S. at 745 (stating DOJ report indicating practice at issue was improper supports view that "reasonable officials . . . should have realized" the practice was unconstitutional). Thus, there is substantial evidence on which a jury could find that the Officer Defendants acted with subjective deliberate indifference.

## B. Defendants Are Not Entitled To Qualified Immunity

It was error for the district court to grant Defendants qualified immunity, both because Defendants' mental states remain in issue and because Edwards's constitutional right was clearly established.

*First*, a plaintiff's showing of an *intentional* violation of the Eighth Amendment is "sufficient to overcome any claim to qualified immunity." *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022). "So long as the officers' mental state remains genuinely in issue," a court should not dismiss based on qualified immunity. *Id.* Here, the cruelty and harm inherent in shackling Edwards during childbirth was so obvious that Defendants *must* have known they were harming her, precluding any award of qualified immunity. *See id.* at 936.

In response, Defendants make two unavailing arguments. They first assert that Edwards is *incorrect* that this Court has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases." ARB 27. But those words come directly from this Court's decision in *Younger v. Crowder*, which Defendants do not address at all. *See* 79 F.4th 373, 385 n.17 (4th Cir. 2023) ("We have effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases. In such cases, we look only to see whether there was a constitutional violation." (citations omitted)). Next, Defendants distinguish *Thorpe* because it was decided on a motion to dismiss. ARB 28. This Court has rejected that argument where, as here, the record reflects genuine issues of material fact as to Defendants' mental states. *See Pfaller v. Amonette*, 55 F.4th 436, 446 n.2 (4th Cir. 2022) (rejecting argument that *Thorpe* only applies at the motion to dismiss because "*Thorpe*'s reasoning doesn't hinge on

its procedural posture."); *Coleman v. Jones*, No. 20-7382, 2022 WL 2188402, at *6 (4th Cir. June 17, 2022) (relying on *Thorpe* in vacating summary judgment). This Court should follow its reasoning in *Thorpe* and reverse the district court's grant of qualified immunity.

*Second*, Defendants incorrectly contend that *Hope v. Pelzer* does not clearly establish Edwards's right to be free from risky, painful, and degrading use of restraints. They argue, based on *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), and *Anderson v. Creighton*, 483 U.S. 635 (1987), that the facts in *Hope* are not analogous. ARB 29–31, 34. But *al-Kidd* and *Anderson* were Fourth Amendment decisions. This Court has repeatedly indicated that it "require[s] less specificity in [the] Eighth Amendment context" than under the Fourth Amendment when framing the constitutional right at issue. *Younger*, 79 F.4th at 385–86; *Jones v. Solomon*, 90 F.4th 198, 208 (4th Cir. 2024); *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023); *Pfaller*, 55 F.4th at 445.

"[C]learly established 'includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.'" *Wall v. Wade*, 741 F.3d 492, 502–03 (4th Cir. 2014) (quoting *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir. 1992)). Thus, in light of the Supreme Court's "unequivocal statement" in *Hope* that incarcerated people have a right to be free from risky, painful, and degrading use of restraints when they

26

don't pose a safety threat, a court need not identify the exact same fact pattern "to demand that prison officials act reasonably in administering that right." *Id.*

*Third*, even if *Hope* did not control, other persuasive authorities that this Court may consider establish a consensus. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017) (stating that in the absence of controlling authority, this Court "may look to a consensus of cases of persuasive authority from *other jurisdictions*" (emphasis in original (cleaned up)). The decisions of the Sixth, Eighth, and Ninth Circuits demonstrate consensus that shackling during and adjacent to childbirth constitutes cruel and unusual punishment. AOB 56 n.12 (collecting cases). Defendants attempt to distinguish these cases factually, ARB 32–33, but, as discussed above, this Court does not require that the right at issue be defined in the exact same factual circumstances, and Edwards's right to be free from shackling is "manifestly included" within the Eighth Amendment jurisprudence of each Circuit Court to have spoken on this issue. *Wall*, 741 F.3d at 502–03. Further, the DPS Policy itself, prohibiting the shackling Edwards experienced, is persuasive authority that her right was clearly established. *See Hope*, 536 U.S. at 741–42, 745–46 (considering a DOJ report related to the practice at issue when determining that a right was clearly established).

*Fourth*, Defendants also ask this Court to set aside *all* the authorities cited in Edwards's expert report because it includes *some* authorities from after 2019. ARB

27

32 n.4. The report demonstrates a consensus amongst expert organizations—*before* Edwards gave birth—opposing shackling pregnant women, especially during and adjacent to labor.[7] Other sources predating December 2019 also detail the harm that shackling poses to pregnant, laboring, or postpartum persons, including increased risk of falling, fetal distress, preterm birth, and tearing of the placenta. JA175-176; JA180-181. This evidence supports a determination that Defendants knew their actions were unconstitutional. *See Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'" (quoting *Hope*, 536 U.S. at 741)).

*Finally*, in the face of *all* this authority, Defendants' sole support is *Fain v. Rappahannock Reg'l Jail*, No. 3:12CV293-JAG, 2013 WL 3148145, at *5 (E.D. Va. June 19, 2013). This unpublished district court opinion "cannot be considered in deciding whether particular conduct violated clearly established law." *Booker*, 855 F.3d at 542–43 (cleaned up).

For all these reasons, the district court erred by granting Defendants qualified immunity.

---

[7] Defendants argue that the report should not be considered because this is not a medical malpractice case. ARB 32 n.4. This Court has long relied on expert testimony in the Eighth Amendment context. *See, e.g.*, *Slakan v. Porter*, 737 F.2d 368, 378 (4th Cir. 1984); *Thorpe*, 37 F.4th at 936.

# CONCLUSION

This Court should reverse the summary judgment order and remand for further

proceedings.

Respectfully submitted,

*/s/ Shana H. Khader*
Shana H. Khader
Jaclyn S. Tayabji
Hassan A. Zavareei
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Ave. NW
Suite 1010
Washington, DC 20006
202-973-0900
skhader@tzlegal.com

Joseph K. Longley
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW, 7th Floor
Washington, DC 20005
202-675-2338
jlongley1@aclu.org

D Dangaran
Samuel Weiss
RIGHTS BEHIND BARS
1800 M St. NW
Front 1 # 33821
Washington, DC 20033
202-455-4399
d@rightsbehindbars.org

Sarah Grady
David Howard Sinkman
Amelia Caramadre
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
312-852-2184
sinkman@kaplangrady.com

Daniel K. Siegel
Amika Medha Singh
ACLU OF NORTH CAROLINA LEGAL
FOUNDATION
PO Box 28004
Raleigh, NC 27611
919-532-3693
dsiegel@acluofnc.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: June 27, 2025

/s/ Shana H. Khader
Shana H. Khader

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and contains, excluding the parts of the document exempted by Fed. R. App. P. 32(f), 6,495 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point font size and Times New Roman.

Date: June 27, 2025

*/s/ Shana H. Khader*
Shana H. Khader